1
2
3
4
5
6
7
8
9
10

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD GALVAN MONTIEL, | Case No.  1:96-cv-05412-LJO-SAB |
| Petitioner, | DEATH PENALTY CASE |
| v. | MEMORANDUM AND ORDER (1) DENYING PETITION FOR WRIT OF HABEAS CORPUS, and (2) ISSUING CERTIFICATE OF APPEALABILITY FOR CLAIMS 24 AND 25 [DOC.NO. 83] |
| KEVIN CHAPPELL, as Warden of San Quentin State Prison, | |
| Respondent. | ORDER DENYING MOTION FOR EVIDENTIARY HEARING [DOC. NO. 180] |
| | ORDER TERMINATING  RESPONDENT'S MOTION FOR SUMMARY JUDGMENT [DOC. NO. 165] |
| | CLERK TO ENTER JUDGMENT |

Petitioner Richard Galvan Montiel ("Petitioner" or "Montiel") is a state prisoner proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  He is represented by Gary M. Sirbu, Esq., of the Law Office of Gary M. Sirbu, Joseph Schlesinger, Esq., and George Allen Couture, Esq., of the Office of the Federal Defender, and Terence John Cassidy, Esq., of Porter Scott, APC.  Respondent Kevin Chappell is the Warden of San Quentin

1

State Prison ("Respondent" or "Warden"). He is represented by Julie Anne Hokaus, Esq., and Ward Allen Campbell, Esq., of the Office of the California Attorney General.

## I.

## BACKGROUND

### A.    Procedural Background

In May 1979, Montiel was convicted of the robbery and burglary of Eva Mankin and the robbery and murder of Gregorio Ante. Both crimes occurred on January 13, 1979. Two special circumstances of "in the course of a robbery" and "for financial gain" were found true, and the special circumstance of "heinous, atrocious and cruel" was found untrue. The jury could not unanimously decide on the appropriate penalty.

In September 1979, a second jury was impaneled to consider the penalty, and Montiel was sentenced to death on November 20, 1979. On direct appeal the California Supreme Court affirmed the guilty verdict and the robbery special circumstance finding, but set aside the financial gain special circumstance and reversed the penalty. People v. Montiel, 39 Cal. 3d 910 (1985) ("Montiel I"). No petition for habeas corpus was filed with the state court at the time of the first direct appeal.

Montiel's penalty was reversed because a Briggs instruction about the governor's commutation power was given without qualification, and a sympathy instruction was given without curative instructions to allow the consideration of mitigating factors. Montiel I, 39 Cal. 3d at 928 (citing People v. Ramos, 37 Cal. 3d 136, 159 (1984) and People v. Easley, 34 Cal. 3d 858, 875 (1983)). Also, the testimony of Dr. Ronald Siegel predicting future violence was viewed as unreliable, but was not a basis for reversal since Montiel failed to object and reversal was required on other grounds. Montiel I, 39 Cal. 3d at 929 (citing People v. Murtishaw, 29 Cal. 3d 733, 767, 775 (1981)).

On November 10, 1986, after retrial, Montiel was again sentenced to death. The sentence was affirmed by the California Supreme Court. People v. Montiel, 5 Cal. 4th 877 (1993) ("Montiel II"). On June 30, 1994, Montiel's petition for certiorari was denied by the United

States Supreme Court.  On February 21, 1996, Montiel's state habeas petition, filed June 1, 1993, was found to be timely and was summarily denied on the merits.

On April 23, 1997, Montiel filed his initial federal petition for writ of habeas corpus.  On October 2, 1997, Montiel filed an amended petition.  On October 27, 2000, Montiel filed a motion for an evidentiary hearing seeking to present evidence on all but one of the claims in his federal petition.  The Warden filed a motion for summary judgment concurrently with the opposing points and authorities.  In his opposition to Montiel's request for evidentiary hearing filed on December 15, 2000, the Warden admits that the motion for summary judgment was not accompanied by a stipulated statement of facts as required, and requests the motion for summary judgment be dismissed without prejudice. Doc. 182, at n.1.

## B.  Factual Background

### 1.  Robbery and Burglary of Eva Mankin

On January 13, 1979, Montiel was living at his parents' home in Bakersfield.  79A RT Vol. I:22.[1]  A neighbor, Eva Mankin, returned home that morning and saw Montiel (whom she did not know at the time) sitting on the steps of the house across the street.  Id. at 5-6.  She had transferred her grocery bags and purse to her porch when she saw Montiel approach, accompanied by two small children.  Id. at 7.  Montiel said they would help her carry in her groceries.  Id. at 9.  She declined, but he insisted, so she unlocked the door, allowing Montiel and each of the children to carry a bag into the house.  Id. at 9-10.  She was afraid, and thought something was wrong because his eyes were "staring" and "glassy."  Id. at 10.  The children emerged, but Montiel stayed inside.  Id. at 11.  Feigning calm, Mrs. Mankin thanked Montiel and

---

[1] The lodged State Record contains the following transcripts: (1) Clerk's transcripts from the guilt and first penalty trial in April and May, 1979, numbered Vol. I through Vol. III; (2) Reporter's transcripts from the guilt and first penalty trial, numbered Vol. I through Vol. III, as well as two volumes that are not numbered; (3) Reporter's transcripts from the second penalty trial in September, October and November of 1979, numbered Vol. I through Vol. IV, as well as one volume that is not numbered; (4) Clerk's transcripts from the third penalty trial in 1986, numbered Vol. I, as well as five volumes that are not numbered; and (5) Reporter's transcripts from the third penalty trial, numbered Vol. I through Vol. VIII.

Since there are duplicate volumes with the same number (for example, there are three Reporter's Transcript numbered Volume I), the following numbering will be used to differentiate between similarly numbered volumes: The records from guilt and first penalty trial in the spring of 1979 will be designated "79A RT Vol. I," the records from the second penalty trial in the fall of 1979 will be "79B RT Vol. I," and the records from the third penalty trial from 1986 will be "A86 RT Vol. I."  The volumes which are not numbered will be designated by the date of the proceeding.

1  quietly told him he had to leave.  Id.  She led him out of the house and locked the door behind

2  him.  Id. at 12.

3       Montiel began breaking the glass window in the door.  79A RT Vol. I:12.  Mrs. Mankin

4  called the operator and told her to summon the police.  Id. at 13.  By then, Montiel had reached

5  in, unlocked the door and was entering the house.  Id.  Montiel demanded her purse, and Mrs.

6  Mankin responded that she had called the police.  Id. at 14.  Montiel grabbed her purse and fled,

7  leaving behind her wallet, which had fallen on the floor.  Id.  Mrs. Mankin recovered her purse

8  from the seat of her car, but her checkbook, several bank books, her husband's pocketknife, and

9  some cash were missing.  Id. at 15.  Mrs. Mankin identified Montiel from some photographs the

10 police showed her, and in a later lineup.  Id. at 17-19.

11      2.    Robbery and Murder of Gregorio Ante

12      Victor Cordova, a PCP user and dealer, 86 RT Vol. VI:395, testified that Montiel arrived

13 at his home the morning of January 13, 1979.  79A RT Vol. I:135.  Also present at Victor's

14 house when Montiel arrived were Victor's wife (Maruy), their children, Maruy's mother and

15 sister (Kathy and Lisa Davis), Lisa's boyfriend (Tom Sinnett), and Tom's brothers (Dennis and

16 Michael).  Id. at 44, 97, 122, 212 and 217.  Montiel's hands and arms were scratched and cut,

17 and his shirt was bloody when he arrived at Victor's house.  Id. at 47-49, 98-100, 135-36.  Victor

18 cut off a piece of dangling flesh from a deep wound on Montiel's left arm, but Montiel registered

19 no pain.  Id. at 49; 86 RT Vol. VI:403.  Montiel said he was injured when he jumped through a

20 window and "did a purse snatch."  79A RT Vol. I:91, 136.  After his wound was dressed, Victor

21 gave Montiel a clean shirt.  Id. at 100, 140-41.  Victor, Maruy, Lisa and Tom all testified about

22 Montiel's unusual appearance, behavior and speech, with Victor, Maruy and Tom concluding he

23 was "loaded" or high on PCP.  Id. at 49-50, 67-69, 119-20, 134-35.  Montiel continued his

24 bizarre behavior and speech, making advances to Kathy Davis, trying to wipe a mole off Lisa

25 Davis's face, challenging Victor by saying "deck me out," grabbing Lisa's purse, and arguing

26 with some guys across the street.  86 RT Vol. VI:406-08; 79A RT Vol. I:220-21, 135, 102.

27      Unwilling to deal with Montiel's intoxicated state, Victor decided to take Montiel to his

28 brother's house on Victor's motorcycle.  79A RT Vol. I:141-42.  Before they left, Victor shared

1   a PCP cigarette with Montiel.  86 RT, Vol. VI:401-02.  <u>See also</u> <u>Montiel I</u>, at 919 (Montiel
2   testified on his own behalf at trial, stating he smoked a PCP joint around 9 am the morning of the
3   murder, and shared another one with Victor before leaving Victor's house.)  On the way the
4   motorcycle's chain came off the sprocket.  79A RT Vol. I:55, 143-44; 86 RT Vol. VI:451.
5   Victor pushed the motorcycle to a nearby gas station and called his wife, while Montiel walked
6   toward a nearby house.  79A RT Vol. I:144-46.  A few minutes later, Montiel returned and
7   announced he had just killed a man "like you do a goat."  <u>Id.</u> at 146, 159.  The victim, 78-year-
8   old Gregorio Ante, was killed in his home by a deep slash wound to the throat, which severed the
9   carotid artery and blocked his breathing passage.  79A RT Vol. I:232-33, 272-74.  Montiel told
10  Victor he left two beer cans in the victim's house and wanted Victor to go get them.  <u>Id.</u> at 148.
11  When Victor refused, Montiel walked to the house and returned holding a can of beer and
12  carrying a sack.  <u>Id.</u> at 148-49.

13      Earlier on the day of the murder, Ante had received $200 in cash from his granddaughter
14  and her husband for the sale of a piano.  <u>Id.</u> at 248, 268.  He placed this money in the pocket of
15  his T-shirt, under another shirt.  <u>Id.</u> at 248.  He gave his son Henry $20 from that money for
16  parts to repair his faucet, since he did not think $12, which he had in his pants pockets, was
17  enough.  <u>Id.</u> at 249.  As Henry left to purchase the parts, he saw two men with a motorcycle in
18  front of the house.  <u>Id.</u> at 250.

19      Soon after, Ante's grandson David Ante, who was to help with repairing the faucet,
20  telephoned Ante and received no response.  79A RT Vol. I:233.  David drove the 5-10 minutes to
21  the house and found Ante's body.  <u>Id.</u> at 233-34.  He ran down the street to summon help from
22  the fire station.  <u>Id.</u> at 234.  The firemen who responded to David's call found Ante lying on the
23  floor in a large pool of blood, with his left pants pocket pulled out.  79A RT Vol. II:260-61.
24  They attempted CPR on Ante and secured the crime scene.  <u>Id.</u> at 261, 263.  Sara Galacia, Ante's
25  daughter, testified that when she was allowed in the house after the murder, she noticed the
26  master bedroom had been disturbed as the mattress was down and coins, which Ante was in the
27  habit of saving, were missing.  <u>Id.</u> at 256-59.

28  //

3.     <u>Post-Crime Events</u>

Tom Sinnett drove Maruy and a friend, Marlene Gallegos, in Tom's brother's pickup to get Victor and Montiel.  79A RT Vol. I:54, 57, 104-05.  When they arrived, Montiel said he "cut some man's head off."  <u>Id.</u> at 56, 105.  On the ride back to Victor's house, Montiel repeated the statement, and said he was the devil.  <u>Id.</u> at 57, 106.  After they arrived, Victor asked Montiel what had happened, and in response, Montiel removed a sack from his pants, which contained coins, some cash, and a knife.  86 RT Vol. VI:434-38.  After viewing the sack, Victor told Montiel to leave and Montiel agreed to do so, but instead went and squatted in a corner of the living room, telling Maruy not to mention the name "Jesus Christ" to him as he was the devil. <u>Id.</u> at 439-40, 467.

Although the testimonies of the witnesses at the 1979 and the 1986 trials vary to some degree, it is uncontradicted that after the murder a sack or bag containing pennies, currency, and a knife was at Victor's house.  79A RT Vol. I:59-60, 114-15, 86 RT Vol. VI:436-37.  Tom and Maruy said the bag also contained checkbooks, and Lisa said she saw the bag on Maruy's bed with the checkbooks, pennies, and knife.  79A RT Vol. I:59, 115, 222-23.  Although estimates of the length of the knife vary, each of the witnesses described it as appearing bloody.  79A RT Vol. I:59 (rusted-up), 115 (covered in blood), 86 RT Vol. VI:437-38 (red-stained).  Both Tom and Victor claim to have disposed of the knife by throwing it in a canal.  79A RT Vol. I:60, 115-16 (Maruy said she and Tom threw it away), 86 RT Vol. VI:438.  The other items in the sack were put in a dresser drawer and Tom stated they were later given to the police.  79A RT Vol. I:60, 116-17.

Both Victor and Maruy testified that Montiel had quite a bit of cash after the murder, but made no mention of what happened to the money.  79A RT Vol. I:106 (quite a few twenties, over $300), 151 (guesses 18-19 $20 bills), 86 RT Vol. VI:437 (a few bills, ones, fives and twenties).

Victor, Maruy and their kids drove Montiel and Marlene to a motel, picking up Montiel's sister Irene on the way.  79A RT, Vol. 1:110, 154, 86 RT Vol. VI:442 (Victor only recalls driving Montiel and Marlene to the motel).  Victor registered for a room under his name, then

1  left Montiel, Marlene, and Irene at the motel. 79A RT Vol. I:111-12, 153-54, 86 RT Vol.

2  VI:442-43. Victor and his family went on to a family birthday party. Id. at 113, 154, 86 RT Vol.

3  VI:443 (Victor says he dropped his family off and went back home).

4      Victor said that Montiel asked about the knife when he saw him later, and Victor told him

5  not to worry about it, but that the cops were looking for him. 79A RT Vol. I:156-57. Victor

6  stated he saw Montiel at the home of a mutual acquaintance and asked if Montiel knew what he

7  did, to which Montiel nodded. 79ART Vol. I:158. Victor advised Montiel to flee to Mexico. 86

8  RT Vol. VI:444-45. Victor also said Montiel told him a couple of times he was worried about

9  having left fingerprints on the phone. 79A RT Vol. I:158.

10 ///

11     Montiel testified about his history of drug abuse, and his alcohol and drug use

12 immediately before the crimes. 79A RT Vol. II:384-85, 395-96, 407-09.  He also testified that

13 his statement to Victor and the others was that he observed a man with his throat cut when he

14 looked through a window while trying to phone for help. Id. at 397.  He further stated that when

15 Victor asked if he knew what he had done, he thought Victor was referring to the wound on his

16 arm. Id. at 428.

17                                      **II.**

18                               **JURISDICTION**

19     Relief by way of a petition for writ of habeas corpus extends to a person in custody

20 pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

21 or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v.

22 Taylor, 529 U.S. 362, 375 (2000).  Petitioner asserts that he suffered violations of his rights as

23 guaranteed by the U.S. Constitution.  The challenged conviction arises out of Kern County

24 Superior Court, which is located within the jurisdiction of this Court. 28 U.S.C. § 2254(a); 28

25 U.S.C. § 2241(d).

26     As an initial matter, the Court must determine whether the provisions of the Antiterrorism

27 and Effective Death Penalty Act of 1996 ("AEDPA") apply to this case.  Generally, AEDPA

28 does not apply to cases pending in federal court on April 24, 1996--AEDPA's effective date.

1  Woodford v. Garceau, 538 U.S. 202, 204 (2003).

2      In this case, Montiel filed a request for appointment of counsel and a request for a stay of

3  execution on April 22, 1996.  (ECF No. 1.)  However, Montiel's federal petition which presented

4  his claims for relief was filed after AEDPA's effective date.

5      "[A]n application filed after AEDPA's effective date should be reviewed under AEDPA,

6  even if other filings by that same applicant-such as, for example, a request for the appointment of

7  counsel or a motion for a stay of execution-were presented to a federal court prior to AEDPA's

8  effective date."  Woodford v. Garceau, 538 U.S. at 207.  Since Montiel's petition seeking

9  adjudication on the merits of his claims was filed after AEDPA's effective date, AEDPA applies

10  to this case pursuant to Garceau, despite the fact that Montiel filed a request for appointment of

11  counsel and a request for stay of execution two days prior to AEDPA's effective date.

12  **III.**

13  **LEGAL STANDARDS**

14      Two issues are raised with respect to Montiel's claims.  First, the Court must determine

15  whether Montiel is entitled to an evidentiary hearing with respect to the claim.  Second, if no

16  evidentiary hearing is warranted, the Court must adjudicate the merits of the claim.

17      **A.**    **Legal Standards for Evidentiary Hearings**

18      "A habeas petitioner is entitled to an evidentiary hearing if: (1) the *allegations* in his

19  petition would, if proved, entitle him to relief, and (2) the state court trier of fact has not, after a

20  full and fair hearing, reliably found the relevant facts."  Phillips v. Woodford, 267 F.3d 966, 973

21  (9th Cir. 2001)(emphasis in original).  "The standard governing such requests establishes a

22  reasonably low threshold for habeas petitioners to meet."  Id.

23      Entitlement to an evidentiary hearing is limited further under 28 U.S.C. § 2254(e)(2),

24  which states:

25          (2)    If the applicant has failed to develop the factual basis of a
        claim in State court proceedings, the court shall not hold an

26          evidentiary hearing on the claim unless the applicant shows that--

27              (A)    the claim relies on--
                (i)    a new rule of constitutional law, made

28                      retroactive to cases on collateral review by the
                    Supreme Court, that was previously unavailable; or

> > (ii)     a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B)     the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

With respect to diligence, "[u]nder the opening clause of § 2254(e)(2), a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." Williams v. Taylor, 529 U.S. 420, 432 (2000). "Diligence for purposes of the opening clause depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court." Id. at 435.

An evidentiary hearing is not required where there is no dispute regarding the facts, where the state court has reliably found the relevant facts, or where the claim presents a purely legal question.   Hendricks v. Vasquez, 974 F.2d 1099, 1103 (9th Cir. 1992).  An evidentiary hearing also is not required for claims based on conclusory allegations, or for claims refuted by or can be resolved by reference to the state record.   Pinholster, 131 S. Ct. at 1399; Landrigan, 550 U.S. at 474; Campbell v. Wood, 18 F.3d 662, 679 (9th Cir. 1994).

## B.     Legal Standards for Federal Habeas Review of State Court Convictions

Federal habeas review of state court convictions is governed by 28 U.S.C. § 2254, which states, in pertinent part:

> (a)     The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in violation of the Constitution or laws or treaties of the United States.
>
> ***
>
> (d)     An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> > (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the

1  evidence presented in the State court proceeding.

2  "[A] state court decision is 'contrary to [the United States Supreme Court's] clearly

3  established precedent if the state court applies a rule that contradicts the governing law set forth

4  in [Supreme Court] cases' or 'if the state court confronts a set of facts that are materially

5  indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result

6  different from [Supreme Court] precedent.'"  Lockyer v. Andrade, 538 U.S. 63, 74 (2003).  A

7  state court decision is an unreasonable application of Supreme Court precedent "'if the state

8  court identifies the correct governing legal principle ... but unreasonably applies that principle to

9  the facts of the prisoner's case.'"  Id. at 75.  A state court decision is based on an unreasonable

10  determination of the facts if "the state court was not merely wrong, but actually unreasonable,"

11  as demonstrated by clear and convincing evidence.  Taylor v. Maddox, 366 F.3d 992, 999 (9th

12  Cir. 2004).

13  The petitioner carries the burden of proof of demonstrating that Section 2254(d)(1) or

14  (d)(2) applies.  Cullen v. Pinholster, 131 S. Ct. 1388, 1398 (2011).  Review under Section

15  2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on

16  the merits.  Id.  Moreover, Section 2254 sets a standard that is "difficult to meet," "highly

17  deferential," and "demands that state-court decisions be given the benefit of the doubt."  Id.

18  (internal quotations and citations omitted)  "[A] habeas court must determine what arguments or

19  theories supported or, ... could have supported, the state court's decision; and then it must ask

20  whether it is possible fairminded jurists could disagree that those arguments or theories are

21  inconsistent with the holding in a prior decision of [the Supreme Court]."  Harrington v. Richter,

22  131 S. Ct. 770, 786 (2011).  "[E]ven a strong case for relief does not mean the state court's

23  contrary conclusion was unreasonable."  Id.  "[A] state prisoner must show that the state court's

24  ruling on the claim being presented in federal court was so lacking in justification that there was

25  an error well understood and comprehended in existing law beyond any possibility for

26  fairminded disagreement."  Id. at 786-87.

27  //

28  //

10

# IV.

# DISCUSSION

### A.    Ineffective Assistance of Counsel Claims

Montiel contends that habeas relief is warranted due to ineffective assistance of counsel. Claims 9-12, 14-16, 17(b), 18-20, 22-30, 32 are premised upon the issue of ineffective assistance of counsel.

"'[T]he right to counsel is the right to the effective assistance of counsel.'" Strickland v. Washington, 466 U.S. 668, 686 (1984) (quoting McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970)). "Counsel ... can ... deprive a defendant of the right to effective assistance, simply by failing to render 'adequate legal assistance.'" Id. (quoting Cuyler v. Sullivan, 446 U.S. 335, 344 (1980)). In Strickland, the Supreme Court articulated the legal standard governing claims based upon ineffective assistance of counsel:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components.  First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id. at 687.

"To establish deficient performance, a person challenging a conviction must show that counsel's representation fell below an objective standard of reasonableness." Premo v. Moore, 131 S. Ct. 733, 739 (2011) (internal quotations and citations omitted).  "A court considering a claim of ineffective assistance must apply a strong presumption that counsel's representation was within the wide range of reasonable professional assistance." Id. (internal quotations and citations omitted).  "With respect to prejudice, a challenger must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. (internal quotations and citations omitted).

"Surmounting Strickland's high bar is never an easy task." Premo, 131 S. Ct. at 739

1   (internal quotations and citations omitted).  "Even under *de novo* review, the standard for judging

2   counsel's representation is a most deferential one."  Id. (internal quotations omitted).  "The

3   question is whether an attorney's representation amounted to incompetence under prevailing

4   professional norms, not whether it deviated from best practices or most common custom."  Id.

5   (internal quotations and citations omitted).  "Establishing that a state court's application of

6   *Strickland* was unreasonable under § 2254(d) is all the more difficult....  When § 2254(d) applies,

7   the question is not whether counsel's actions were reasonable.  The question is whether there is

8   any reasonable argument that counsel satisfied *Strickland's* deferential standard."  Id. (internal

9   quotations and citations omitted).

10          1.      Claims 9 and 10

11          In Claims 9 and 10, Montiel contends that counsel did not provide reasonably competent

12   psychiatric assistance and did not present competent expert testimony regarding diminished

13   capacity.

14          Montiel alleges his mental state was a critical issue during his guilt and penalty trials, as

15   he was under the influence of PCP at the time of the homicide.  While at Victor's house prior to

16   the homicide, Montiel's behavior was so bizarre and erratic that Victor wanted to take Montiel to

17   his brother's house.  Montiel observes that before he left Victor's house, he ingested more PCP.

18   The People's expert, Dr. Siegel, opined that despite this fact, Montiel was still able to

19   premeditate and to maturely and meaningfully reflect on the consequences of his acts.  Dr. Siegel

20   further testified Montiel formed the intent to kill and appreciated the criminality of his conduct

21   because he fled the scene and later worried about the knife.  Dr. Siegel dismissed the evidence

22   that Montiel was "flipping out" and saying he was the devil, asserting such action was not

23   delusionary but an unconscious value judgment triggered by the killing.

24          Dr. Cutting was appointed to advise trial counsel Eugene Lorenz ("Lorenz") about mental

25   state issues.  Montiel alleges Dr. Cutting's focus was to determine whether he was legally insane,

26   and so he only obtained a list of the code charges and did not speak with Lorenz prior to his

27   interview with Montiel.  Montiel asserts Dr. Cutting did not know that his PCP use was a critical

28   factor or that he was charged with a capital offense.  Montiel contends Lorenz did not provide

1    Dr. Cutting with any reports or documents, even though Lorenz knew it was not the practice of

2    appointed physicians to review police reports or documents, nor did Lorenz advise Dr. Cutting

3    about the nature of the case or about Montiel's PCP use.   Dr. Cutting told Lorenz that in

4    rendering his opinion, he did not consider whether Montiel was under the influence of any drug,

5    nor considered the use of PCP and its affects.

6         Lorenz attempted to enter a change of plea to not guilty by reason of insanity (NGI) on

7    the third day of trial, after testimony by Maruy and Victor Cordova indicated Montiel was under

8    the influence of PCP at the time of the homicide.   The court, after hearing testimony from Dr.

9    Cutting, denied the motion as untimely, noting there was no evidence of insanity and that

10   evidence of intoxication was presented at the preliminary hearing.   79A RT Vol. I:209-10.

11   Lorenz suggested he had not sufficiently prepared for this case, but the trial judge strongly

12   disagreed with Lorenz's statement.   Id. at 185.

13        After the court refused to allow Montiel to enter an NGI plea, Lorenz was permitted to

14   retain an expert on diminished capacity.[2]   Lorenz sought the assistance of Dr. Lerner, a

15   psychologist with PCP expertise, but Dr. Lerner was unavailable and referred Lorenz to his

16   associate, Dr. Linder.   Dr. Linder was not a mental health professional, but held a doctorate in

17   education.   Lorenz instructed Dr. Linder to explore whether Montiel was under the influence of,

18   or intoxicated by, PCP at the time of the homicide.   Montiel alleges Lorenz did not supply Dr.

19   Linder with any legal definitions of the pending charges, explain any standards for application of

20   legal definitions, nor disclose the questions he planned to ask.

21        Montiel asserts because Dr. Linder was unfamiliar with the relevant legal principles, he

22   testified Montiel had an intent to steal when he took Ms. Mankin's purse, even though Dr. Linder

23   believed that Montiel's intoxication prevented the cognitive process needed to form such intent.

24   Declaration of Dr. Linder, Ex. 10:2-3.   Similarly, Dr. Linder testified he could not say whether

25   Montiel could have formed the intent to steal from Mr. Ante, when he did not understand the

26   distinction between the legal concepts of intent to take and intent to steal.   Id., at 3-4.   The

27

28   _____
     [2] Montiel's trial occurred before the 1982 abolishment of the diminished capacity defense.

1  prosecutor prejudicially capitalized on Dr. Linder's testimony, and argued Dr. Linder's opinion

2  did not carry as much weight as Dr. Siegel's testimony.  The trial judge, in denying the motion

3  for a new trial, stated that he questioned Dr. Linder's qualifications and that his testimony was

4  unpersuasive.

5        Montiel contends competent psychiatric assistance would have revealed he was suffering

6  from cerebral dysfunction caused by PCP use and was dissociated from normal cognitive

7  functioning.  Montiel asserts he was incapable of exercising moral judgment, or premeditating or

8  deliberating, and rather was acting spontaneously, reflexively and without appreciation for the

9  consequences of his actions.  Montiel argues his diminished mental state was manifested by his

10 physical symptoms: incoherent and nonsensical speech, communication through hand gestures,

11 no reaction or awareness of pain, and no cognitive functioning at the time of the homicide.

12 Declaration of Dr. Ferris Pitts, Ex. 18:7-9.  Montiel contends testimony similar to the declaration

13 of Dr. Pitts would have refuted the incriminating significance Dr. Siegel placed on Montiel's

14 reported concern about the fingerprints on the beer can and the whereabouts of the knife, and

15 would have led the jury to conclude that Montiel did not and could not reason.

16       Montiel asserts reasonable investigation would have revealed evidence from family

17 members and others of Montiel's intoxication and erratic behavior in the weeks prior to, and the

18 morning before, the homicide.  This information, combined with the facts showing Montiel was

19 raised in a family preoccupied by beliefs in evil spirits and hexes, would have lent credibility that

20 Montiel's statement immediately after the homicide, that he was the devil, was a delusion, not an

21 "afterthought" as described by Dr. Siegel.  Montiel argues it was standard practice in 1979 for

22 Kern County practitioners to use psychosocial histories in cases with potential drug or alcohol

23 use, and Lorenz failed to prepare a psychosocial history for Montiel.  See Declaration of

24 Timothy Lemucchi, Esq., Exhibit 29 to Amended Petition, and Supplemental Declaration of

25 Timothy Lemucchi, filed in support of Montiel's 2004 Supplemental Brief.

26       Montiel argues that diminished capacity was the central issue of his guilt trial and of his

27 mitigation defense at the penalty retrial, and observes his crime and his guilt trial occurred before

28 the 1983 Carlos decision which required a finding of intent to kill as an element of the felony-

1   murder special circumstance.  See Carlos v. Superior Court, 35 Cal. 3d 131, 153-54 (1983),

2   overruled by People v. Anderson, 43 Cal. 3d 1104, 1147 (1987) (holding intent to kill is only

3   required to be shown for an aider or abettor, not an actual killer).[3]  Montiel asserts Lorenz's

4   failure to investigate and present a mental state defense based on Montiel's organic brain

5   damage, neuropsychological defects, and brain dysfunction, which were exacerbated by his PCP

6   use, was unreasonable and deficient performance which prejudiced Montiel's chance of

7   obtaining a more favorable verdict and sentence.

8          Montiel asserts Lorenz's failure to provide background information is not excused by the

9   fact that Dr. Linder did not request it, distinguishing Hendricks v. Calderon, 70 F.3d 1032 (9th

10  Cir. 1995) (holding trial counsel has no duty to present social history information to consulting

11  mental health professionals unless requested).  Dr. Linder was not a mental health professional,

12  he was retained when the trial was already underway, and he was only instructed to explore

13  whether Montiel was under the influence of PCP, or suffering from PCP intoxication, at the time

14  of the murder.  Montiel argues that, more importantly, Lorenz's failure to provide Dr. Linder

15  with the applicable definitions of murder and robbery caused him to admit Montiel had intent to

16  steal from Mrs. Mankin and to have no opinion about whether Montiel could have formed an

17  intent to steal from Mr. Ante, which paved the way for a first-degree felony murder conviction

18  and a true finding on the robbery-murder special circumstance.  Dr. Linder declares that had he

19  known the definitions of the mental state elements, he would not have given these answers, and

20  also would not have conceded that Montiel could premeditate and deliberate at the time of the

21  murder.  See Exhibit 10.

22         Montiel argues these investigative failures were highly prejudicial, that the psychosocial

23  history evidence would have undercut Dr. Siegel's interpretation of Montiel's statements,

24  provided factual support for Dr. Linder's theme that PCP causes a dissociative state, supported

25  the conclusion that Montiel believed he was the devil, and made it reasonably probable for the

26  jury to find Montiel was incapable of premeditation and deliberation.  Montiel asserts Lorenz's

27

28  [3] Montiel's penalty retrial occurred in 1986, during the 1983 through 1987 "Carlos window."

1  failure to investigate was compounded by the mistake in retaining Dr. Linder, which lead to his

2  testimony and created systemic error as Dr. Linder's concessions left Montiel's defense in a state

3  of collapse.   Montiel contends the implicit conclusion by the California Supreme Court that

4  Lorenz's actions were not prejudicial is an unreasonable application of the holding of Strickland

5  v. Washington, 466 U.S. 668 (1984), that the right to counsel means an effective assistance of

6  counsel.   Montiel urges this claim satisfies section 2254(d)(1) and entitles him to an evidentiary

7  hearing.

8        Montiel points to the following evidence in support of this claim that was presented to the

9  state court: testimony from Maruy and Victor Cordova and Tom Stinnett about the actual extent

10  of Montiel's diminished capacity[4]; testimony from Montiel's parents, Hortensia and Richard Sr.,

11  regarding Montiel's erratic drug-induced behavior[5]; the testimony of Montiel's habeas experts,

12  Ferris Pitts, M.D. (psychiatrist)[6], Gretchen White, Ph.D. (psycho-social historian)[7], and Dale G.

13  Watson, Ph.D. (neuro-psychologist)[8],that evidence supporting a finding of diminished capacity

14  and organic brain damage was available in 1979.

15        Montiel proposes to present the following evidence in support of this claim at an

16  evidentiary hearing which was not presented to the state court: testimony by trial counsel Lorenz

17  stating he had no strategic reason for using Dr. Linder, or for failing to investigate lay witnesses,

18  and that he knew an expert with an M.D. or Ph.D. should be employed[9]; Montiel's own

19  _____

20  [4] This evidence was available to Lorenz through transcripts of police interviews with these witnesses, and was
presented in their testimony at trial, both of which revealed their observations of Montiel's mental state at the time
of the crime.

21  [5] Both of these witnesses testified to this at the 1986 penalty retrial.

22
23  [6] Dr. Pitts concluded, based on the review of records, transcripts, and reports, that PCP intoxication rendered
Montiel incapable of forming the intent to rob either Mankin or Ante, and unable to premeditate and deliberate or
form the intent to kill/malice aforethought. See Ex. 18 in support of petition.

24  [7] See discussion of Dr. White's psycho-social history (Ex. 8 in support of petition) in Claim 29, supra.

25  [8] Dr. Watson concluded, based on tests and review of records and reports, that Montiel suffers from cognitive and
neuropsychological deficits and probable brain dysfunction consistent with solvent abuse.  These impairments
compromise Montiel's ability to hold and process information, understand cause and effect, and engage in tasks that

26  require logical, systematic thinking.  The severity and effects of these impairments would be exacerbated by drug or
alcohol intoxication.  Dr. Watson states that the tests he employed in rendering his opinion were in widespread use

27  prior to 1979.  See Ex. 11 in support of federal petition.

28  [9] Lorenz has not submitted any declaration in Montiel's post-conviction proceedings.

testimony that he refused to speak to Dr. Cutting because he had no identification and he was

leery of him, and that he was not in Mexican Mafia[10]; testimony from Dr. Cutting that he did not

know of the capital charges against Montiel or that PCP intoxication was a critical issue, and that

no information was provided to him regarding the elements of the crime[11]; testimony from Dr.

Linder that he was unfamiliar with legal definitions and that he lacked the qualifications to

render an expert opinion on the effects of PCP[12]; and testimony from a Strickland expert stating

that investigation of lay witnesses and presentation of competent experts was standard practice in

1979.[13]

The Warden argues it is unlikely a psychological history would have been admissible at

Montiel's guilt trial, even if offered in support of a diminished capacity defense.  The Warden

observes Montiel is not claiming Lorenz failed to raise a diminished capacity defense, as there is

no dispute such a defense was presented, only that Lorenz should have done a better job at

investigating and presenting this defense.  The Warden asserts Montiel should not be allowed to

blame Lorenz or his retained experts about the development of a diminished capacity defense

since Montiel refused to assist the doctors in their examinations.

The Warden contends Lorenz could have made a tactical decision to obtain evidence of

---

[10] Although Montiel testified at each stage of his trial, his testimony did not include the subjects proposed to be presented for this or for any other claim.

[11] Dr. Cutting's November 10, 1980 declaration (Ex. 2 in support of Points and Authorities), which was presented on state habeas, supports the last assertion, stating he has no record of, and does not recall, receiving any reports or documents from Lorenz prior to his April, 1979 examination of Montiel, and does not believe that he had any information about the case or charges against Montiel or about his history, other than statements Montiel made during the exam.

[12] Dr. Linder submitted a declaration (Ex. 10 in support of the petition), which was presented on state habeas, supports the first assertion, stating he was unfamiliar with and was not provided applicable legal definitions, especially regarding intent and premeditation and deliberation, that Lorenz did not inform him about the questions he planned to ask at trial, and that if he had been provided this information, it would have changed some of his testimony.  Dr. Linder does not admit he lacked the qualifications to render an expert opinion on the effects of PCP.

[13] Two declarations were submitted by Timothy J. Lemucchi, Esq., as a potential Strickland expert, dated September 24, 1997 and July 27, 2004, neither of which were presented on state habeas.  The declarations state that at the time of Montiel's trials, it was common practice in Kern County capital cases, especially those involving drug or alcohol use, to use psychosocial histories and to retain mental health experts.  Mr. Lemucchi states a social history like the one prepared by Dr. White (Ex. 8 in support of petition), documenting a history of alcohol or substance abuse, would be relevant to a defense of diminished capacity.

1  PCP use from Dr. Linder and by cross-examining Dr. Siegel, the prosecution's witness, thus

2  increasing Montiel's chances of the jury believing his diminished capacity defense.  The Warden

3  argues such a tactic also avoided mentioning Montiel's background, which included ties to a

4  violent prison gang.

5      The Warden disputes the opinion of Dr. Pitts offered in support of Montiel's petition.[14]

6  The Warden contends the record contradicts Dr. Pitt's opinion that Montiel was acting on

7  impulse when he broke into Eva Mankin's home and stole her purse, and that the effect of PCP

8  did not permit Montiel to evaluate his behavior or make any moral judgments.  The Warden

9  notes Montiel did not simply take the purse, but demanded Mrs. Mankin give it to him, and that

10 he took only certain valuable items from the purse before leaving it in Mrs. Mankin's front yard.

11 The Warden also disagrees with Dr. Pitts' opinion that Montiel was incapable of forming the

12 intent to rob, to premeditate and deliberate, or to kill despite certain actions by Montiel,

13 including obtaining a knife from Mr. Ante's kitchen and realizing a beer can left at the scene

14 would incriminate him.  The Warden observes Dr. Cutting testified that the fact Montiel was

15 under the influence of PCP at the time of the murder would not have affected his opinion that

16 Montiel did not suffer from a mental disease or defect.

17     The Warden states there is no disagreement Montiel was under the influence of PCP at

18 the time of the murder, but asserts the issue is whether he was capable of sufficient rational

19 thought to form the requisite mental state for each offense.  The Warden argues even if the jury

20 had heard the theories advanced by Dr. Pitts, that Montiel was acting due to "sheer impulse" or

21 "primitive reflex action," there was little chance of overcoming the significant evidence showing

22 Montiel knew and understood the nature and consequences of his actions.

23     The Warden asserts Montiel is not entitled to challenge the competency of psychiatric

24 assistance he received, as there is no constitutional right to competent assistance of mental health

25

_____

26 [14] The Warden observes Dr. Pitts' license in California was suspended in 1997, and argues the accusations that he
   engaged in unprofessional conduct by excessively prescribing or administering drugs or treatment to more than one
   patient casts doubt upon the weight due his professional opinion.  See Montiel's Ex. 6 to Reply.  Dr. Pitts
27 surrendered his medical license on March 20, 1997, contesting the charges but agreeing to retire and not fight the
   charges.  Dr. Pitts' declaration is from 1993 and was presented to the California State Supreme Court in support of
28 Montiel's state habeas petition.

1   professionals.  Even assuming a right to competent psychiatric assistance, the Warden argues

2   Montiel cannot demonstrate incompetent assistance in his case as he was examined by two

3   medical experts, one of whom testified for the defense.

4          Montiel replies the Warden has not produced any evidence to substantiate the argument

5   that using Dr. Linder was the result of strategic considerations, and that the evidence instead

6   shows the choice was made out of desperation, not strategy.  Montiel asserts evidence of his

7   purported membership in the Mexican Mafia would not have been admitted during the guilt trial,

8   so avoidance of that evidence does not support counsel's decision to use Dr. Linder or to rely on

9   the prosecution's expert, Dr. Siegel.  Further, Montiel contends no evidence supports the

10  Warden's assertion that counsel's decision to rely on the cross-examination of Dr. Siegel was

11  legitimate case strategy, and further argues it was not reasonable as Dr. Siegel had strong

12  opinions adverse to Montiel.

13         Montiel disputes that he bears some responsibility for Lorenz's failure to develop a

14  diminished capacity defense due to his reluctance to discuss the facts of the case with Dr.

15  Cutting, as Dr. Cutting failed to show any identification when he came to see him.  Montiel also

16  asserts that Lorenz failed to inform Dr. Cutting about the pending capital charge or about the

17  testimony of numerous witnesses that Montiel was under the influence of PCP at the time of the

18  crime.  Montiel argues Dr. Cutting's testimony in effect rendered him a prosecution witness, and

19  since he was a general psychiatrist and not a neuropsychologist, he was not competent to form an

20  opinion on organic impairment, particularly in the absence of testing.

21         Montiel disagrees with the Warden's assertion that Lorenz vigorously presented a

22  diminished capacity defense and offered expert testimony to support it.  Montiel contends Lorenz

23  only presented two lay witnesses, himself and Dr. Linder, both of whose testimony was

24  undermined, when additional testimony was necessary to cast doubt on the conclusions of the

25  prosecution's witness, Dr. Siegel, and was readily available had Lorenz properly investigated.

26  Montiel asserts this failure, combined with the concessions by Dr. Linder's testimony, left the

27  jury free to make findings on both first degree murder and a felony murder special circumstance

28  and left the expert testimony without the supporting evidence necessary to counter the

1  prosecution's witness.  Montiel argues Dr. Linder was not a mental health professional and was

2  not competent to offer an opinion.

3        Montiel replies to the Warden's attack on the declaration of Dr. Pitts, asserting that

4  although it is true Dr. Pitts' medical license has been revoked, this occurred after the declaration

5  was made in support of this case and it had nothing to do with the issue of PCP.  Montiel asserts

6  Dr. Pitts' knowledge and experience regarding PCP remains valid despite the revocation of his

7  license, as the allegations which led to his voluntarily surrendering his medical license have no

8  relation to PCP.  Montiel requests that should Dr. Pitts' qualifications be negatively impacted by

9  the status of his medical license, he be provided the opportunity to consult with another expert

10  and provide supplemental declarations and briefing.  Montiel disputes the Warden's assertion

11  that failure to present evidence from a qualified PCP expert at trial was not prejudicial, asserting

12  instead that such evidence was absolutely critical to whether his capacity to harbor the requisite

13  mental state was diminished by the effects of PCP.

14        The Warden observes much of the evidence Montiel presents in support of this claim was

15  not presented to the state court, but urges if the evidence is properly before this Court, it does not

16  fundamentally alter the nature of Montiel's claim, so the state court's adjudication of the claim is

17  entitled to deference under § 2254(d)(1).  The Warden contends the state court's determination

18  does not involve an unreasonable application of <u>Strickland</u>.  The Warden argues the evidence

19  shows Montiel formed the intent to steal from both Ms. Mankin and Mr. Ante, and also formed

20  the intent to kill Mr. Ante, and that his use of PCP, or evidence of a purported organic brain

21  disorder did not preclude his forming the intent to steal and kill.

22        This claim was presented to the state court in Montiel's state habeas petition (Claim

23  VIII), was found timely and summarily denied on the merits February 21, 1996.[15]  On direct

24  appeal, the California Supreme Court denied Montiel's claim that the trial court improperly

25  refused to allow his change of plea to not guilty by reason of insanity, finding the trial court did

26  not abuse its discretion in ruling the attempted plea change was untimely as it was made after the

27
28
[15] The entire text of the summary denial states: "The motion for judicial notice of the records in the underlying appeals is granted.  The petition for writ of habeas corpus is denied.  The delay in presentation of claims has been adequately explained.  All claims are denied on the merits.  (See <u>Harris v. Reed</u> (1989) 489 U.S. 255, 264, Fn. 10.)"

1   trial had started.  The California Supreme Court also found that none of the evidence upon which

2   the plea change was based was new since similar testimony had been presented at the

3   preliminary hearing and that no showing of legal insanity had been made.  The state court found

4   there was no ineffective assistance of counsel for failing to advance the NGI plea at an earlier

5   stage, as nothing in the record before them on direct appeal indicated Montiel was legally insane

6   at the time of the offense.  Montiel I, 39 Cal. 3d at p. 923.

7        Due process requires a state to provide access to competent psychiatric assistance when a

8   defendant demonstrates that his sanity at the time of the offense will be a significant factor at

9   trial.  Ake v. Oklahoma, 470 U.S. 68, 83 (1985).  The trial court's factual finding that there was

10  no evidence Montiel was insane is entitled to a presumption of correctness.  Montiel bears the

11  burden to rebut that presumption by clear and convincing evidence.

12       In Ake, the Supreme Court determined that "when a defendant demonstrates to the trial

13  judge that his sanity at the time of the offense is to be a significant factor at trial, the State must,

14  at a minimum, assure the defendant access to a competent psychiatrist who will conduct an

15  appropriate examination and assist in the evaluation, preparation, and presentation of the

16  defense."  Id., 470 U.S. at 83.  Contrary to Ake, the trial court rejected Montiel's assertion of

17  insanity.  Despite this factual finding, the trial court granted Lorenz's request to appoint a

18  psychiatrist to examine Montiel prior to the trial, and further granted an expert on the effects of

19  PCP when the NGI plea was denied.

20       There is no evidence Montiel's access to psychiatric assistance was limited by the state or

21  that the funding provided was insufficient.  Montiel's claim that Dr. Cutting was incompetent for

22  not knowing of the capital charges or that PCP intoxication was a critical issue, and the claim

23  that Dr. Linder was incompetent for failing to obtain legal definitions and that he lacked the

24  qualifications to render an expert opinion on the effects of PCP, are both foreclosed by Harris v.

25  Vasquez, 949 F.2d 1497, 1517-18 (9th Cir. 1990).  Harris addressed the same claim raised here,

26  and refused to expand Ake to encompass a "battle of experts."  Id. (citing Silagy v. Peters, 905

27  F.2d 986, 1013 (7th Cir. 1990)).  "Allowing such battles of psychiatric opinions during

28  successive collateral challenges to a death sentence would place federal courts in a psycho-legal

1  quagmire resulting in the total abuse of the habeas process." Harris, 949 F.2d at 1518.

2       In accordance with Harris, this court refuses to engage in a battle of psychiatric experts

3  and "place federal courts in a psycho-legal quagmire resulting in the total abuse of the habeas

4  process." Id. at 1518.  Despite Montiel's failure to justify the entry of a plea of not guilty by

5  reason of insanity, the trial court appointed two mental health experts to assist the defense.  No

6  Ake due process violation occurred.

7       When a state court's decision is unaccompanied by an explanation, a petitioner still has

8  the burden to show there was no reasonable basis for the state court's denial of relief.  Richter,

9  131 S. Ct. at 784.  A state court decision must be granted deference and latitude beyond that

10 involved in evaluating a Strickland claim.  Id. at 785.  When § 2254(d) applies, the question is

11 not whether counsel's actions were reasonable, but whether there is any reasonable argument that

12 counsel satisfied Strickland's deferential standard.  Richter, 131 S. Ct. at 788.

13      This claim asserts Lorenz failed to investigate and present a mental state defense based

14 on Montiel's organic brain damage, neuropsychological defects and brain dysfunction, which

15 were exacerbated by his PCP use, and that the failure to adequately prepare for a diminished

16 capacity defense resulted in two main errors: (1) the failure to sufficiently prepare Dr. Cutting

17 with reports or documents, or advice about the nature of the case or evidence of Montiel's PCP

18 use, and the failure to obtain an opinion on diminished capacity and intoxication, and (2) the

19 failure to hire a qualified expert (instead of Dr. Linder) to give an opinion on PCP intoxication,

20 or alternatively, the failure to adequately prepare Dr. Linder to testify.  Montiel asserts these

21 errors prejudiced him because sufficient preparation by Lorenz would have revealed evidence of

22 his diminished capacity and organic brain damage.

23      Montiel has failed to show the asserted failures of Lorenz to investigate and present a

24 mental state defense based on Montiel's organic brain damage, neuropsychological defects and

25 brain dysfunction, which were exacerbated by his PCP use, and to adequately prepare a

26 diminished capacity defense, raise a reasonable probability the result of the proceeding would

27 have been different.  Even had Lorenz presented testimony that Montiel was incapable of

28 forming the intent to steal or kill, or to premeditate and deliberate, that evidence would have

1   been largely duplicative of evidence already before the jury and would have been unlikely to

2   have overcome the significant evidence, such as Montiel's demand for Mrs. Mankin's purse and

3   only taking valuable items from it before leaving it in her front yard, and obtaining a knife from

4   Mr. Ante's kitchen and realizing a beer can he left at the scene would incriminate him, which

5   show Montiel knew and understood the nature and consequences of his actions.

6       Montiel has failed to rebut the state's finding that there was no evidence he was insane,

7   and the Court finds no due process violation under Ake.   Further, Montiel has not shown

8   prejudice from Lorenz's alleged failures to investigate and present a more complete mental

9   defense.  Claims 9 and 10 are denied an evidentiary hearing and denied on the merits.

10          2.   Claim 11

11      In Claim 11, Montiel contends that counsel did not present evidence of Dr. Siegel's

12   alleged previous perjury.

13      During the guilt phase of the 1979 trial, Dr. Siegel, responding to defense cross-

14   examination, denied providing the prosecutor with a tentative conclusion regarding

15   premeditation and diminished capacity prior to May 2, 1979, adding, "and I told you so on the

16   phone."  Lorenz responded, "Oh, I see, just before you hung up, right?  I indicated to you that I

17   had some information that you had been somewhat less than truthful in some other cases."  The

18   prosecutor objected, the judge sustained the objection and admonished the jury to disregard the

19   question. 79A RT Vol. II:497.

20      During the second penalty trial in 1979, the prosecution sought to establish that despite a

21   court order Montiel refused to speak with Dr. Siegel.  Lorenz objected to revealing Montiel's

22   refusal to speak with Dr. Siegel to the jury as Lorenz had advised Montiel not to talk to Dr.

23   Siegel.  Lorenz stated he gave Montiel that advice because after Dr. Siegel was hired, the

24   prosecutor gave Lorenz information on Dr. Siegel's tentative opinion, and when Dr. Siegel

25   contacted Lorenz about interviewing Montiel, they "did not have a particularly friendly

26   conversation at that time due to some investigation that I had found out about Dr. Siegel in other

27   cases." 79B RT Vol. III:89-90.  Lorenz told Dr. Siegel that since he already had given his

28   opinion, he would not allow him to speak to Montiel.  Id.  The prosecutor asked for a new court

order allowing Dr. Siegel to interview Montiel.  Id. at 90.  When the judge overruled his objection, Lorenz stated he would allow Montiel to talk with Dr. Siegel.  Id. at 94-95.

Montiel alleges these two statements by Lorenz imply he possessed evidence of prior perjury by Dr. Siegel which would have cast doubt on Dr. Siegel's truthfulness in general and in particular regarding his assessment of Montiel's ability to form intent, which was central to his felony-murder conviction.  Montiel asserts Lorenz was ineffective for failing to investigate and present this evidence.  Alternatively, if Lorenz did not have evidence of perjury by Dr. Siegel, his raising the issue and not following through damaged his credibility with the jury, resulting in prejudice to Montiel.

Montiel argues the California Supreme Court's implicit conclusion that he received effective assistance of counsel was an unreasonable application of established United States Supreme Court precedent.  Montiel asserts Lorenz was obligated to act as a zealous advocate in his defense, and credible evidence that Dr. Siegel had lied under oath would have diminished, if not destroyed, Dr. Siegel's credibility and would have reasonably caused the jury to conclude, contrary to Dr. Siegel's testimony, that Montiel was unable to form intent.  Lorenz's failure to present this evidence to the jury fell below the level of reasonable representation and was without any reasonable or tactical basis.

Montiel proposes to present the following evidence in support of this claim at an evidentiary hearing which was not presented to the state court: testimony by trial counsel Lorenz detailing the information he possessed of Dr. Siegel's previous dishonesty and that he had no tactical reason not to present this evidence; or alternatively, if such evidence did not exist, an admission that he engaged in a fabricated attack on Dr. Siegel; testimony by a Strickland expert that counsel has an obligation to present any impeachment evidence and an opinion of the cumulative impact of Lorenz's deficient representation; and testimony by a jury dynamics expert regarding the prejudicial impact on Lorenz's veracity of his failure to impeach Dr. Siegel, which resulted in a negative perception of Montiel and prejudiced the jury's decision.[16]

---

[16] None of the exhibits submitted in support of the petition presents the admissions, opinions or conclusions Montiel proposes to offer as evidence in this claim.

1    The Warden asserts that Montiel has had twenty years to produce evidence of this claim,

2    or even to present a declaration by Lorenz that Dr. Siegel had previously testified untruthfully.

3    The Warden contends that until it is shown that such an incident occurred, Lorenz's decision not

4    to pursue this information cannot be ineffective.

5    Montiel argues in rebuttal the issue is appropriately raised by the allegations alone, which

6    are presumed true, so the question is whether they are sufficient as a matter of law to state a

7    claim.   Montiel asserts the allegations and the trial record are enough to prove ineffective

8    assistance of counsel.  Montiel contends Lorenz's inflammatory remark about Dr. Siegel's lack

9    of honesty was properly stricken by the trial court as it was based on hearsay, but since Lorenz

10   did not introduce any evidence on this issue, the only conclusion the jury could draw was that

11   Lorenz lacked integrity, which tainted his advocacy from that point on.  Montiel argues it was

12   incumbent upon Lorenz to introduce such evidence once he leveled his attack.  Conversely, if

13   Lorenz did not have such evidence, Montiel contends his attack was completely irresponsible,

14   and even if not sufficient for prejudice on its own, would contribute to the cumulative error

15   claim.

16   The Warden responds Lorenz did attempt to impeach Dr. Siegel, but the cross-

17   examination was limited by the trial court after the prosecutor objected.  The Warden argues the

18   claim that Lorenz was ineffective is without merit, and the California Supreme Court's rejection

19   was a reasonable application of Strickland.

20   This claim was presented to the state court in Montiel's state habeas petition at claim VIII

21   therein, and was summarily denied on the merits.

22   Montiel must show both deficient performance and actual prejudice resulting from the

23   deficiency to prevail on a claim of ineffective assistance of counsel.  Montiel has presented no

24   evidence to support the implication that Dr. Siegel previously testified untruthfully.   Even

25   assuming Lorenz rendered deficient performance in questioning Dr. Siegel's veracity in front of

26   the jury (who made only one statement at the guilt trial; his other statement was at the 1979

27   penalty trial which was reversed), the statements were brief and lack a sufficient connection to

28   the ultimate outcome, so there is no prejudice sufficient to undermine the jury's verdict.

1   Montiel has failed to show that Lorenz's remarks to Dr. Siegel prejudiced the trial.

2   Claim 11 is denied an evidentiary hearing and is denied on the merits.

3       3.   Claim 12

4   In Claim 12, Montiel contends that counsel did not present evidence regarding the

5   invalidity of Dr. Siegel's test.

6   Montiel asserts Lorenz was ineffective for failing to impeach Dr. Siegel's credibility by

7   presenting evidence that a test (the Experiential World Inventory or EWI) Dr. Siegel wished to

8   administer was invalid and not accepted in the field of psychology.  Dr. Siegel stated the EWI

9   was designed to assess the effects of drugs on personality function and included several "lying

10  fixed scales."   Montiel contends that readily available evidence indicates the EWI is not a

11  generally accepted clinical or research tool for the evaluation of drugs on personality

12  functioning, and that it was developed by persons associated with the "orthomolecular

13  psychiatry" school, a group not considered credible by psychiatrists or psychologists in the

14  United States.

15  Montiel argues Lorenz's complete failure to challenge the introduction, validity, and

16  reliability of the EWI deprived him of his constitutional rights.  Montiel contends an adequate

17  investigation would have revealed evidence of either the test's unreliability, or its creation by a

18  non-credible school of practitioners, which would have cast doubt on Dr. Siegel's credibility as

19  an expert witness and rendered his findings as to Montiel suspect.  Montiel further asserts Lorenz

20  should have objected to Dr. Siegel's reference about Montiel refusing to submit to the EWI,

21  which falsely and prejudicially suggested Montiel was afraid of testing because he had

22  something to hide.

23  Montiel proposes to present the following evidence in support of this claim at an

24  evidentiary hearing: testimony by Lorenz that he did not consult an independent expert regarding

25  the validity of the EWI and had no tactical reason for failing to challenge its validity; testimony

26  by a Strickland expert that counsel needs to investigate and challenge the validity of tests relied

27  on by prosecution experts; testimony of a psychiatric test designer and/or evaluator stating the

28

1   EWI is not generally accepted as credible or reliable[17]; and testimony by a jury dynamics expert

2   regarding the likely impact of Dr. Siegel's testimony regarding Montiel's refusal to take a

3   psychiatric test which would have shown his propensity to lie.  Other than the declaration by Dr.

4   Pitts, no evidence in support of this claim at an evidentiary hearing was presented to the state

5   court.

6         The Warden contends Lorenz brought out the questions about the EWI's validity and

7   acceptance in the psychological community at trial through the testimony of Dr. Linder.  The

8   Warden observes the testimony from Dr. Siegel was at the second penalty trial in 1979, which

9   was reversed, so trial counsel's failure to challenge this test is irrelevant.

10        Montiel disputes that Lorenz's failure is irrelevant since this claim concerns the guilt

11  proceeding, not the penalty trial that was reversed.  Montiel argues that even if this claim is not

12  prejudicial standing alone, it is a factor in accumulation of the deprivation of effective legal

13  representation he suffered at trial.

14        The Warden argues the state court's rejection of this claim does not involve an

15  unreasonable application of Strickland, since it is not reasonably probable the outcome of the

16  guilt trial would have been different even if Lorenz had presented evidence about the alleged

17  invalidity of the EWI.  The Warden contends it is not reasonably probable the jury would have

18  concluded, contrary to Dr. Siegel's opinion, that Montiel's intoxication was sufficient to

19  diminish his capacity for the intent to kill and premeditate.  Further, the Warden observes Dr.

20  Siegel did not base his opinion on the EWI, so it is not reasonably probable the jury would have

21  rejected his opinion solely on the basis of a dispute about the validity of a test that was not given

22  to Montiel.

23        This claim was presented to the state court in Montiel's habeas petition at claim VIII

24  therein, which the California Supreme Court summarily denied on the merits.  Montiel argues the

25

---

26  [17] An October 1, 1990 declaration from Stephen Pittel, Ph.D., an expert on the effects of drug use that was in
    support of a state habeas petition by David Murtishaw states the EWI is not generally credible or reliable.  In

27  December 1990, Dr. Pittel was arrested for cocaine use during a lunch break during a trial where he was testifying
    as an expert. See People v. Tillis, 18 Cal. 4th 284, 288 (1998).  Other than Dr. Pittel's declaration, no exhibits

28  submitted in support of Montiel's petition present the admissions, opinions or conclusions Montiel proposes to offer
    as evidence in this claim.

1   California Supreme Court's implicit conclusion that he received effective assistance of counsel

2   was an unreasonable determination of the facts and a misapplication of established United States

3   Supreme Court precedent.

4       Montiel must show both deficient performance and actual prejudice resulting from the

5   deficiency to prevail on a claim of ineffective assistance of counsel.  Dr. Siegel testified at the

6   guilt phase trial, both as part of the prosecution's case and in rebuttal after the presentation of the

7   defense case, which included Montiel's testimony about his mental state.

8       Dr. Siegel testified that Montiel said his attorney had advised him not to talk with Dr.

9   Siegel and shortly after that their discussion ended.  79A RT II:491.  Immediately after this

10  testimony, the prosecutor asked, "Now, are there certain tests which you can give which would

11  indicate whether or not a person in this situation is truthfully relating the events of the day in

12  question on which the crime is charged?"  Dr. Siegel answered, "There are no absolute tests but

13  there are many tests which give us an indication of malingering, the degree to which a patient

14  will lie or fake results."  Dr. Siegel then discussed the tests, including the MMPI and EWI.  79A

15  RT II:491-92.  Dr. Siegel did not specifically tie Montiel's refusal to talk to him to evasion of

16  such a test in order to cast doubt on Montiel's story.  In fact, Dr. Siegel testified that Montiel's

17  stated lack of recall was not necessarily volitional.  Id., at 495.  The prosecutor made no mention

18  of the EWI in closing argument to the jury.  79A RT III:507-26, 539-44.

19      It is not reasonably probable that had Lorenz challenged the EWI, a test Montiel did not

20  even take, the jury would have been prompted to conclude that Montiel's intoxication diminished

21  his capacity to harbor intent to kill and to premeditate.  Even assuming Lorenz's failure to

22  investigate the background of the EWI and to challenge the testimony about it was deficient

23  performance, the questioning about the test was brief and Dr. Siegel did not opine that Montiel

24  was malingering.  Montiel has not shown prejudice sufficient to undermine confidence in the

25  outcome.  Claim 12 is denied an evidentiary hearing and is denied on the merits.

26      4.   Claim 14

27      In Claim 14, Montiel contends that counsel unreasonably presented a prejudicial alibi

28  defense.

1    Montiel asserts Lorenz was ineffective for unreasonably and prejudicially presenting an

2  alibi defense at guilt.  Montiel took the stand and testified that after Victor's motorcycle broke

3  down, he walked to a house and knocked twice.  After receiving no answer, Montiel looked

4  through the front door and saw someone lying on the floor with blood.  He immediately returned

5  to the gas station.  In rebuttal, a photo was admitted into evidence showing Mr. Ante's front door

6  was solid wood, and two of Mr. Ante's sons testified there was a window to the left of the door

7  through which they could see him lying on the floor but were not able to see that his throat had

8  been slit.  Montiel contends reasonably competent counsel would have viewed the scene, or at

9  least the prosecution's crime scene photographs, and concluded Montiel's account was

10  inconsistent with the physical conditions.  Montiel asserts Lorenz's failure prevented him from

11  making a knowing and intelligent waiver of his right against self-incrimination.  Montiel argues

12  that although it was his decision to testify, the advice of counsel about the strategic implications

13  of his testimony was crucial to an effective waiver of a constitutional right.  Johnson v. Baldwin,

14  114 F.3d 835, 838-40 (9th Cir. 1997) (holding counsel ineffective for failing to investigate

15  validity of defendant's proposed alibi testimony).

16    Montiel contends his testimony supports a finding of prejudice under Strickland because

17  he denied entering Mr. Ante's home, while admitting he told Victor and Maruy he had seen

18  someone with their throat cut.  Similarly, Montiel denied grabbing Mrs. Mankin's purse, but also

19  admitted taking her checkbook and bankbooks.  Montiel asserts this implausible alibi testimony

20  both angered the jury and undermined his diminished capacity defense.  Montiel could not

21  provide an explanation of why he did not go home to treat his bleeding arm after leaving Mrs.

22  Mankin's house, which allowed the jury to conclude that even though he was under the influence

23  of PCP, he was still rational enough to distance himself from Mrs. Mankin's house, which was

24  across the street from his home, in order to avoid detection.

25    Montiel proposes to present the following evidence in support of this claim at an

26  evidentiary hearing: testimony by trial counsel Lorenz that he was unprepared to represent

27  Montiel, never viewed the scene or photos despite Montiel asking about the door window and

28  did not advise Montiel regarding diminished capacity versus alibi, or the injurious effects of

asserting an alibi defense; his own testimony that Lorenz did not advise him regarding

diminished capacity and alibi, or the injurious effects of presenting an alibi defense, and that he

asked Lorenz to check the crime scene to verify there was a window in the door;[18] testimony by a

Strickland expert that counsel should not have put Montiel on the stand when presenting either a

diminished capacity or alibi defense, and that counsel had an obligation to educate Montiel

regarding his testimony and the incongruence between diminished capacity and alibi;[19] and

testimony by a jury dynamics expert regarding the adverse effect of an alibi defense on the jury's

ability to evaluate diminished capacity.   Other than Birchfield's declaration opining that

Lorenz's failure to view the crime scene was ineffective, no evidence was presented in support of

this claim at an evidentiary hearing in state court.

The Warden disagrees with Montiel that Lorenz presented an alibi defense, rather

asserting Lorenz presented a diminished capacity defense, but allowed Montiel to testify about

his recollections of the events surrounding the murder.   The Warden argues the decision to call a

defendant to testify "is a classic example of a strategic trial judgment."   United States v. Chavez-

Marquez, 66 F.3d 259, 263 (10th Cir. 1995).   The Warden observes Montiel, in his testimony,

did not claim to be absolutely certain that the window he looked through was in the door, which

actually served to support his claim of PCP intoxication.

The Warden asserts Montiel's declaration, which supports this claim, was not presented

to the state court and should not now be relied upon, as Montiel has not demonstrated he was not

at fault in failing to develop that evidence in state court or that § 2254(e)(2)'s conditions are

satisfied.   If, however, Montiel's declaration is found to be properly before the Court, the

Warden argues that deference is due the state court decision.   The Warden contends the state

court's rejection of this claim did not involve an unreasonable application of Strickland, as

Montiel's inability to recall the exact location of the window supported the claim that his mental

state was compromised due to PCP intoxication, which was consistent with the defense theory,

---

[18] Montiel's declaration, dated August 16, 2000, only asserts the last of these allegations.

[19] Birchfield's declaration, dated May 28, 1993, asserts Lorenz's presentation of both an alibi and diminished
capacity, and failure to view the crime scene to verify the alibi defense, was ineffective assistance of counsel.   See
Ex. 17, ¶¶ 14-16.

1  supported by Dr. Linder's testimony, that Montiel was "disassociated" by PCP at the time he

2  killed Mr. Ante.  The Warden alleges even if Lorenz did perform inadequately, it is not

3  reasonably probable the jury would have accepted Montiel's diminished capacity defense merely

4  because Montiel admitted to unintentionally killing Mr. Ante, since the evidence was

5  considerable that Montiel formed the intent to steal from both Mrs. Mankin and Mr. Ante, as was

6  the evidence that he formed the intent to kill Mr. Ante and premeditated and meaningfully

7  reflected on the consequences of his actions.

8         Montiel replies counsel had a duty to educate him about the evidence and available

9  defenses, that Lorenz should have advised him the alibi and diminished capacity defenses were

10 inconsistent, that there was overwhelming evidence supporting the fact he had killed Mr. Ante,

11 and that if he insisted on his alibi, he was best advised not to testify.  Montiel claims his

12 impeachment on such a basic point – the impossibility of his seeing what he claimed – indicates

13 no such discussion occurred, and counsel admitted at trial he had not had sufficient time to

14 prepare.  Montiel argues that had an alibi defense not been presented, and had trial counsel

15 retained a competent psychiatrist or psychologist with expertise regarding PCP to challenge Dr.

16 Siegel, it is reasonably probable the jury would have accepted the diminished capacity defense.

17        This claim was presented to the state court in Montiel's state habeas petition at claim

18 VIII.  The California Supreme Court summarily denied it on the merits.

19        Montiel must show both deficient performance and actual prejudice resulting from the

20 deficiency to prevail on a claim of ineffective assistance of counsel.  Despite Lorenz's alleged

21 failure to investigate the alibi defense, Montiel was not forced to commit perjury.  "[T]here is no

22 right whatever-constitutional or otherwise-for a defendant to use false evidence."  Nix v.

23 Whiteside, 475 U.S. 157, 173 (1986).  Montiel could have chosen either not to testify or to testify

24 truthfully.  United States v. Day, 285 F.3d 1167, 1171-72 (9th Cir. 2002).  The trial was not

25 rendered unfair or unreliable by the jury considering Montiel's perjury, so he cannot show

26 prejudice sufficient to undermine confidence in the outcome.  Claim 14 is denied an evidentiary

27 hearing and is denied on the merits.

28 //

5.    Claim 15

In Claim 15, Montiel contends that counsel allowed a prejudicial admission of an invalid prior conviction.

Prior to the beginning of voir dire, Lorenz told the court he had advised Montiel to admit a prior conviction of robbery of a Foster's Freeze in 1972.  The court minutes from the prior conviction in June 28, 1972, do not indicate whether Montiel was advised that by pleading guilty he was waiving his rights to a jury trial, to confrontation and against self-incrimination, and no reporter's transcript of the proceeding exists.  Montiel asserts he has no recollection of being advised that he was waiving his constitutional rights.  Montiel was addicted to narcotics at the time, and had been promised that if he changed his plea, the criminal proceedings would be suspended and he would receive treatment.  Montiel states he was unaware he had waived his right to a jury trial.  The prior conviction was used to enhance his sentence in 1979 and was admitted in aggravation at his penalty retrial in 1986.

Montiel argues that Lorenz's failure to object to the admission of the prior conviction resulted in prejudice and was ineffective, and that the finding of the California Supreme Court to the contrary was an unreasonable application of Strickland.  Montiel asserts Lorenz failed to properly investigate the prior conviction to determine whether Montiel's waiver of rights was knowing and intelligent.  Montiel argues that when he entered the guilty plea in 1972, he believed it was only a conditional waiver of his right to trial, and that if he was not accepted in the California Rehabilitation Center (CRC) for treatment, or if he was accepted but later excluded from the program, he would be entitled to a trial upon return to court.  However, Montiel makes no further allegation about this claim: he does not state whether he was not accepted for treatment or if he was accepted but later excluded from the program.[20]

Montiel proposes to present the following evidence in support of this claim at an evidentiary hearing which was not presented to the state court: testimony by trial counsel Lorenz stating he failed to interview Montiel regarding his 1972 conviction, that if he had he would have

---

[20] Montiel's declaration does state that he was incarcerated at the CRC in 1972.  Ex. 1 to the Reply to the Warden's Opposing Points and Authorities.

filed a motion to strike based on an invalid waiver of the right to a jury, and that he had no

tactical reason for failing to do so; testimony by a <u>Strickland</u> expert that it is standard practice to

interview a client regarding the validity of a waiver of jury on a prior conviction and to file a

motion to strike; and testimony by a jury dynamics expert regarding the prejudicial impact of the

1972 prior conviction by depicting Montiel as a recidivist.

The Warden asserts there is no evidence Lorenz failed to review the transcript from

Montiel's 1972 conviction, that prior convictions carry a strong presumption they comply with

the requirements of the constitution, and that Montiel has failed to show he was prejudiced by

the lack of challenge to the validity of his prior conviction.  The Warden argues even if the

conviction had been ruled invalid, the conduct underlying the conviction still could have been

presented to the jury in aggravation.  The Warden concludes the state court's summary rejection

of this claim is a reasonable application of <u>Strickland</u>.

Montiel responds Lorenz could have challenged his prior conviction by presenting

evidence that Montiel was unaware he was relinquishing his right to a jury trial, and Lorenz's

failure to do so differed from the standard practice in Kern County at the time.  Montiel contends

the record does not contradict his allegation that he believed his right to a jury trial continued to

exist during the period he was at CRC, and that he is entitled to attack the judgment under

California law.  <u>People v. Bowen</u>, 22 Cal. App. 3d 267, 286 (1971).  Montiel argues that even if

the underlying facts were admissible, prejudice would still be present because the double

counting of factors based on the same evidence artificially inflated the misconduct.

Montiel must show both deficient performance and actual prejudice resulting from the

deficiency to prevail on a claim of ineffective assistance of counsel.  Montiel alleges the

ineffectiveness of Lorenz's recommendation to admit to the prior 1972 robbery conviction

prejudiced his guilt conviction, his 1979 sentence and his 1986 sentence.  The claim that Lorenz

was ineffective at penalty is moot as the 1979 death sentence was reversed by the California

Supreme Court on direct appeal.  <u>Montiel I</u>, 39 Cal.3d at 928-929.  Review of the trial transcript

does not reveal any mention by the prosecutor at the guilt phase of the prior conviction, either

during the cross-examination of Montiel or during opening or closing arguments, so no prejudice

1    occurred as the jury was not made aware of Montiel's admission of the prior conviction.  There

2    also is no prejudice from Montiel's admission of the prior conviction at the 1986 penalty retrial,

3    as evidence of prior convictions is a proper category in aggravation, the Certified Public

4    Document of the conviction was admitted into evidence instead of Montiel's admission, and the

5    prosecutor additionally presented testimony from two witnesses of the 1972 robbery.

6         Montiel has presented no showing of prejudice, i.e., that had Lorenz filed a motion to

7    strike the 1972 conviction it would have been granted and excluded from admission into

8    evidence.  Further, the record suggests a tactical reason for the admission, as Lorenz urged, and

9    the trial judge ordered, that the admitted prior conviction was not admissible for impeachment of

10   Montiel's proposed testimony, and that it would not be read to the jury.  See 79A RT Vol.

11   VIII:1-6.

12        Montiel has not shown that Lorenz's failure to move to strike the 1972 conviction

13   undermines confidence in the outcome.  Claim 15 is denied an evidentiary hearing and is denied

14   on the merits.

15        6.   Claim 16

16        In Claim 16, Montiel contends that counsel admitted misleading evidence of other

17   crimes.

18        Montiel asserts Lorenz was ineffective for failing to object to, or move to exclude,

19   evidence from Detective Floyd that Montiel was arrested for armed robbery and burglary three

20   days after the murder, on January 16, 1979.  Lorenz made no attempt to clarify if the warrant

21   related to the Ante homicide.  Montiel contends the introduction of evidence suggesting he

22   committed other crimes showed a propensity to commit the burglary for which he was on trial

23   and provided an unfair and prejudicial basis for his conviction of capital murder.

24        Montiel asserts he was prejudiced by the introduction of this evidence, as well as other

25   past criminal conduct offered by the prosecution solely to prove his disposition to violence and

26   criminal conduct.  Montiel argues this type of propensity-based inference is precisely that which

27   California Evidence Code § 1101(a) was intended to exclude.  Montiel contends the failure of

28   Lorenz to object, move to strike or exclude, move for a mistrial, or even attempt to clarify,

1  prejudicially affected the outcome of his trial.

2      Montiel proposes to present the following evidence in support of this claim at an

3  evidentiary hearing which was not presented to the state court: testimony by trial counsel Lorenz

4  that he had no tactical reason for failing to object to or move to strike the misleading testimony;

5  and testimony by a jury dynamics expert regarding the prejudicial impact of the misleading

6  testimony.

7      The Warden disputes this claim, asserting the questioning of Detective Floyd started with

8  a question about his contact with Montiel in this case, so the testimony about the arrest was made

9  against that backdrop.  The Warden argues there was no realistic or reasonable possibility the

10 jury misunderstood Detective Floyd's testimony, so Lorenz's failure to object was not

11 ineffective.  The Warden asserts that even if the jury did misunderstand Detective Floyd's

12 testimony, it is not reasonably probable they would have accepted Montiel's diminished capacity

13 defense in the absence of that testimony.  The Warden argues there was considerable evidence of

14 Montiel's intent to steal and to kill, as well as that he premeditated and meaningfully reflected on

15 the consequences of his actions.

16     Montiel replies the testimony by Detective Floyd referred to a warrant for armed robbery,

17 while the evidence from the Mankin case indicated Montiel was not armed, and did not refer to

18 the Ante murder, so the logical inference is that this warrant was for a separate crime.  Montiel

19 does not contend the outcome of the guilt trial would have differed based on this single error, but

20 contends there is a significant probability the result of the guilt trial would have been different

21 when this error is considered in conjunction with the numerous other acts and omissions by

22 Lorenz.

23     Montiel must show both deficient performance and actual prejudice resulting from the

24 deficiency to prevail on a claim of ineffective assistance of counsel.

25     The transcript from Montiel's guilt trial supports the Warden's argument.  Detective

26 Floyd's testimony stating he served a warrant for armed robbery was given in response to

27 questioning about the circumstances of this case.  79A Vol.II:374-376.  Even assuming Lorenz

28 performed deficiently in not objecting, prejudice cannot be shown.  It is not reasonably likely the

1   jury was confused by this testimony and inferred the warrant was for a separate crime from the

2   Mankin robbery or the Ante murder.

3         Montiel has not shown that Lorenz's failure to object to Detective Floyd's testimony

4   undermines confidence in the outcome.  Claim 16 is denied an evidentiary hearing and is denied

5   on the merits.

6         7.   <u>Claim 17(b)</u>

7         In Claim 17(b), Montiel contends that counsel was ineffective due to a conflict in interest.

8         Montiel asserts Lorenz's wife, Debra, intended to write a book about the case, and that

9   Lorenz facilitated communications between them and had Montiel sign a literary agreement.

10  Montiel contends evidence of the actual conflict of interest by Lorenz is shown by the extensive

11  violations of his constitutional rights during his guilt trial, all of which formed a pervasive

12  pattern of unfairness, resulting in a fundamentally unfair trial and exacerbating the prejudice of

13  each individual error.

14        Montiel proposes to present the following evidence in support of this claim at an

15  evidentiary hearing which was not presented to the state court: testimony by Lorenz that he

16  actively represented the conflicting interests of Montiel and his wife which interfered with the

17  effectiveness of his representation, and he did not consult with Montiel or obtain a waiver of the

18  conflict; and testimony by Debra Lorenz regarding the existence of the literary agreement

19  between her and Montiel.  Montiel also seeks discovery of the literary agreement.

20        The Warden admits that, although this claim was not presented to the state court, the

21  exhaustion requirement was waived, and that de novo review under pre-AEDPA law is

22  warranted since deference under 29 U.S.C. § 2254(d)(1) is not applicable.  The Warden asserts

23  that no literary agreement has been produced, there is no sworn statement from either Lorenz or

24  his wife, and there is no book or manuscript.  In short, the Warden observes the only item offered

25  to support this conflict of interest claim is the March 26, 1980 letter, which does not refer to a

26  book or literary agreement, but mentions that Mrs. Lorenz "would like to work on the writing

27  project" that "[Montiel] and she discussed."  The Warden contends a similar issue was addressed

28  by the Ninth Circuit in <u>Bonin v. Calderon</u>, 59 F.3d 815, 825 (9th Cir. 1995), which held the test

1    for determining an actual conflict of interest from <u>Cuyler v. Sullivan</u>, 446 U.S. 335 (1980), also

2    applies to conflicts of interest generated by an attorney's acquisition of publication rights relating

3    to his client's trial.  The Warden observes <u>Bonin</u> noted "[t]he fact that an attorney undertakes the

4    representation of a client because of a desire to profit does not by itself create the type of direct

5    'actual' conflict of interest required by <u>Cuyler</u>."  <u>Bonin</u>, 59 F.3d at 826.  The Warden argues

6    there is nothing in the present record which rises to the level of factual support for a claim that

7    Mr. Lorenz had an actual conflict of interest.

8          Montiel agrees in reply that success on this claim requires proof that Lorenz, personally

9    or as his wife's representative, entered into a literary rights contract with Montiel, but contends

10   that dismissal of this claim is premature as discovery in these proceedings was indicated to be

11   unavailable until after briefing of the petition was complete.  Montiel argues his proffered

12   evidence is sufficient to state a cognizable claim requiring an evidentiary hearing.

13         Where a conflict of interest results in the denial of effective assistance of counsel,

14   prejudice need not be shown to obtain relief.  <u>Cuyler v. Sullivan</u>, 446 U.S. at 349.  However,

15   until it is shown that counsel "actively represented conflicting interests," the constitutional

16   predicate for the claim is not established.  <u>Id.</u>  Further, "the possibility of a conflict is insufficient

17   . . . a defendant must establish that an actual conflict of interest adversely affected his lawyer's

18   performance."  <u>Id.</u>

19         There is no indication of any adverse effect on Lorenz's performance caused by an actual

20   conflict of interest, as no deficient performance by Lorenz has been shown.  <u>See</u> <u>Burt v. Titlow</u>,

21   571 U.S. __, 134 S. Ct. 10, 18 (2013) (counsel's possible violation of rules of professional

22   conduct by accepting publication rights as partial payment is not per se ineffective, prejudice still

23   must be shown).  The test under <u>Cuyler</u> is a compound one, requiring both that counsel have

24   conflicting interests, and that an actual conflict adversely affected counsel's performance.

25   Montiel's request for discovery on this issue is moot as even if a literary agreement could be

26   discovered, no adverse effect on Lorenz's performance has been shown.

27         Montiel has not shown that Lorenz's performance was deficient.  Claim 17(b) is denied

28   an evidentiary hearing and is denied on the merits.

8.    Claim 18

In Claim 18, Montiel contends that his counsel failed to challenge his guilt conviction prior to the penalty retrial.

Montiel asserts trial counsel at his 1986 penalty retrial, Robert Birchfield ("Birchfield"), was ineffective for failing to challenge his guilt conviction prior to the penalty retrial. Montiel contends a review of the 1979 transcripts should have apprised Birchfield that Montiel was denied effective assistance of counsel (i.e., Lorenz's failure to present percipient and expert witnesses on Montiel's mental state, failure to ensure a representative jury under Wheeler[21], and failure to litigate intent to kill as an element of the felony-murder special circumstance), and that he was denied a fair trial as alleged in Claims 8 through 14,[22] which should have prompted Birchfield to file a habeas petition presenting these claims to the state court.

Montiel argues Birchfield's failure to pursue habeas relief meets the presumed prejudice standard of United States v. Chronic, 466 U.S. 648 (1984), because Birchfield failed to subject Montiel's case to "meaningful adversarial testing," id. at 659, and completely failed to preserve Montiel's interests. Gerlaugh v. Stewart, 129 F.3d 1027, 1033 (9th Cir. 1997). Montiel contends Birchfield failed to file a habeas petition on his guilt claims despite the fact that a majority of the California Supreme Court signed a concurring opinion inviting Montiel to seek habeas relief. Montiel I, 39 Cal. 3d at 930.

Montiel proposes to present the following evidence in support of this claim at an evidentiary hearing: testimony by Birchfield that he had no tactical reason for failing to file a habeas petition challenging Montiel's conviction prior to the retrial, that he erroneously believed he was precluded from filing a habeas petition because of a mistaken interpretation of Montiel I, that he did not recognize obvious ineffectiveness claims from the guilt trial; also that he was

---

[21] People v. Wheeler, 22 Cal. 3d 258, 276-277 (1978), is the state corollary to Batson v. Kentucky, 476 U.S. 79, 89 (1986), finding the exercise of peremptory challenges to eliminate prospective jurors because of their race unconstitutional. The claim that Montiel's jury was not representative due to the removal of persons opposed to the death penalty was rejected on direct appeal. Montiel I, 39 Cal.3d at 920.

[22] Claims 8 and 13: Prosecutorial Misconduct - Inadmissible Confession and Suppression of Exculpatory Evidence; Claim 9: Denial of Competent Psychiatric Assistance; Claims 10, 11, 12 and 14: Ineffective Assistance of Counsel - Failure to Present Testimony of Diminished Capacity, Failure to Present Evidence of Dr. Siegel's Alleged Perjury, Failure to Present Evidence of Invalidity of Dr. Siegel's Test, and Presenting Prejudicial Alibi Defense.

disbarred and convicted on three counts of felony forgery; and the testimony of a <u>Strickland</u> expert that it was standard practice to review transcripts for meritorious claims to raise on habeas and that counsel should have known of the IAC claims.  Birchfield's declaration (Ex. 18) does not make any of the proffered admissions, but does state that he did not realize habeas relief was available prior to the penalty retrial, and that he researched regarding the possibility of filing a writ to stay the retrial proceedings, on the basis mentioned in the direct appeal opinion, but decided not to file one. The claim relating to disbarment and the <u>Strickland</u> expert opinion were not presented on state habeas.

The Warden argues it is inconsistent for Montiel to now claim Birchfield had a duty to seek habeas relief prior to the penalty retrial when the state habeas petition filed after the penalty retrial alleges it was timely because Birchfield did not have a duty to file a habeas petition earlier.  The Warden contends Montiel could not have suffered prejudice from Birchfield's failure to seek relief on claims that have now been abandoned.  The Warden further argues Birchfield cannot be faulted to failing to pursue these claims when there is no evidence he was aware of them prior to the penalty retrial.  The Warden asserts Montiel's new evidence relating to Birchfield's convictions is not relevant to Birchfield's competence while he represented Montiel.

The Warden contends the claim that Lorenz's failure to present testimony regarding Montiel's inability to harbor the requisite mental state for murder and robbery lacks merit.  The Warden observes Montiel offers no support of the claim that a <u>Wheeler</u> challenge would have been valid.  Lastly, the Warden asserts Birchfield's failure to seek habeas relief under <u>Carlos</u> was the result of a tactical decision based on a belief that such a petition would not succeed on the merits, and Montiel has no identified the evidence Birchfield could have, or should have, presented.

Montiel replies that Birchfield's forgery convictions and disbarment, coming so soon after the penalty retrial, undercut the presumption in favor of professional judgment from <u>Strickland</u>, and require an assessment of counsel's actions based on the evidence submitted, without according any presumption in favor of the reasonableness of counsel's exercise of

1    judgment.   Montiel argues the assessment of Birchfield's performance must consider his

2    credibility, particularly as it relates to his competence at trial.

3        Montiel contends in light of Justice Kaus' concurrence in <u>Montiel I</u>, Birchfield should

4    have filed a habeas petition before the penalty retrial.   39 Cal. 3d at 929-30 ("In this case,

5    however, there is no indication in the record that defendant failed to contest the intent-to-kill

6    issue because of his mistaken belief that the robbery-murder special circumstance would trigger

7    a penalty trial in any event.   If defendant has evidence which he withheld because he was misled

8    on the significance of the intent-to-kill issue, he may, of course, seek to present it in a habeas

9    corpus proceeding.").   Montiel asserts that Birchfield believed counsel Lorenz's trial strategy

10   was "incoherent," that there was evidence Lorenz had not presented at the guilt phase (such as,

11   testimony by Montiel's sister that he used drugs prior to the crimes and by his mother that he

12   experienced delusions and hallucinations in the weeks before the crimes), that Dr. Linder was an

13   ineffective expert witness, that Lorenz failed to litigate the Carlos issue, and that Lorenz should

14   not have raised an alibi defense.

15        Montiel argues that had Birchfield filed a habeas petition with the state, as invited to do

16   by the concurring opinion from his direct appeal, Montiel would have benefitted from the <u>Carlos</u>

17   opinion since it had not at that time been overruled.   Prior to being overruled, <u>Carlos</u> was applied

18   retroactively to cases under the 1978 death penalty statute which were not yet final.   <u>People v.</u>

19   <u>Garcia</u>, 36 Cal. 3d 539, 547-50 (1984).   Montiel asserts the California Supreme Court's denial of

20   this claim on direct review in <u>Montiel II</u> constitutes an unreasonable application of <u>Strickland</u>

21   and <u>Cronic</u>, since the facts demonstrate that competent counsel would have collaterally attacked

22   his guilt conviction.

23        <u>Carlos</u> imposed a requirement that jury instructions include the element of intent to kill in

24   felony-murder cases.   <u>People v. Carlos</u>, 35 Cal. 3d 131, 135 (Dec. 12, 1983), <u>overruled by</u> <u>People</u>

25   <u>v. Anderson</u>, 43 Cal. 3d 1104, 1115 (Oct. 13, 1987).   The jury at Montiel's guilt trial found true

26   the special circumstance that the murder of Ante was intentional and carried out for financial

27   gain, and that the robbery of Ante was committed with intent to inflict great bodily injury.   1979

28   RT Vol. III:584-85; 1797 CT Vol. II:344-45.   In light of this finding by the jury, the state court

1   resolved the underlying claim for <u>Carlos</u> error against Montiel.  <u>Montiel I</u>, 39 Cal.3d at 925-927.

2   The concurrence of Justice Kaus invited Montiel to present on habeas any withheld evidence on

3   the intent-to-kill issue.  <u>Id.</u> at 929-30.  No new evidence pertaining to Montiel's intent to kill has

4   been presented.

5       Montiel's habeas claims, which were presented to the state court following his penalty

6   retrial, were found to be timely and were denied on the merits by the California Supreme Court,

7   so there is no prejudice from Birchfield's failure to file a habeas petition prior to the penalty

8   retrial.  The claim asserting ineffective assistance of counsel based on Birchfield's resignation

9   from the bar was not presented to the state court on habeas.  Montiel's penalty retrial took place

10  from October 20 to November 10, 1986.  The dates of the forgeries were almost three years later,

11  May 31, July 3, and July 7, 1989.  Birchfield tendered his resignation from the California State

12  Bar Association with charges pending on May 23, 1990.[23]   Montiel cannot show prejudice from

13  this claim as the forgery events occurred years after Montiel's penalty retrial and they were

14  unrelated to Birchfield's representation of Montiel.

15      Montiel has not shown prejudice from the failure of Birchfield to file a state habeas

16  petition prior to his penalty retrial, nor any prejudice from the events related to Birchfield's

17  disbarment.  Claim 18 is denied an evidentiary hearing and is denied on the merits.

18      9.   <u>Claim 19</u>

19      In Claim 19, Montiel contends that he was prejudiced by the <u>de facto</u> withdrawal of co-

20  counsel.

21      Montiel asserts he was unfairly prejudiced by the de facto withdrawal of Ms. Fuller,

22  which resulted in his being effectively left without representation at his penalty retrial.  Montiel

23  asserts Ms. Fuller breached her duty as his attorney by failing to inform him about her

24  knowledge of the looming inadequacy of Birchfield.  Montiel asserts the cumulative effect of

25  these errors resulted in a breakdown of the adversarial process and violation of his constitutional

26  rights.  Montiel argues that on the second day of jury selection, co-counsel Peggy Fuller held an

27

28  [23] <u>See</u> www.calbar.ca.gov/fal/MemberSearch/QuickSerach?FreeText=Robert%20Birchfield.

ex parte meeting with the trial judge Ferguson in his chambers, where Montiel asserts she expressed her concern that Montiel was not being adequately represented, that a withdrawn Marsden motion previously filed by Montiel had merit, and that she did not want to be associated with the case because she could not ensure adequate representation.   Montiel contends Judge Ferguson advised Ms. Fuller she could resolve her concerns by not attending courtroom proceedings but remaining available for research and motion work.   Neither Birchfield nor Montiel were informed of the ex parte meeting, nor was Montiel told of the facts that would have reasonably apprised him that Birchfield was not prepared for trial.   Montiel alleges Ms. Fuller falsely informed Birchfield she had schedule conflicts that prevented her attendance in the courtroom.   Montiel contends Ms. Fuller's withdrawal and Birchfield's lack of preparation resulted in a total breakdown in his representation and the adversarial process.

Montiel contends the state court's settlement hearing, held in April of 1990, was not full and fair, did not develop the material facts, is not supported by the record, did not adequately address the issue regarding Ms. Fuller's de facto withdrawal, and did not resolve the merits of the factual dispute.   Montiel contested both the accuracy of the corrected record on appeal, and an agreed statement of facts regarding the ex parte communication.   The California Supreme Court found the factual resolution was supported by substantial evidence and that it constituted a binding appellate record.   Montiel II, 5 Cal.4th at 906 n.6.   The California Supreme Court denied this claim on the merits, holding the record disclosed no "fundamental" breakdown among Montiel, Birchfield or Ms. Fuller, and the division of attorney responsibility did not adversely affect the defense, relying in part on ate factual resolution made after the settlement hearing. Montiel II, 5 Cal. 4th at 906.   Further, the state court rejected Montiel's assertion that he had a constitutional "right" to have both counsel present during trial.   Id. at n.5.

Montiel contends the factual resolution of this issue was objectively unreasonable in light of the testimony presented at the settlement hearing.   Further, Montiel contends the lack of notice of the ex parte hearing between Judge Ferguson and Ms. Fuller so grossly violated his procedural due process rights that the subsequent findings at the settlement hearing cannot be deemed a reasonable determination of the facts.   Montiel contends the California Supreme Court's

1   conclusion in <u>Montiel II</u> is unreliable as it is based on the unreasonable determination of the facts

2   made in the settlement hearing.  Montiel asserts the deprivation of Ms. Fuller is a structural

3   defect under <u>Arizona v. Fulminante</u>, 499 U.S. 279, 310 (1991), because California provides for

4   the appointment of two counsel in capital cases and the trial court, in appointing Ms. Fuller, had

5   determined her services were necessary to ensure effective representation.

6          Montiel proposes to present the following evidence in support of this claim at an

7   evidentiary hearing: testimony by Ms. Fuller that Montiel had concerns about Birchfield's

8   preparation, that she suggested Montiel file a Marsden motion  (which he filed but later

9   withdrew), that she became increasingly concerned about Birchfield's failure to prepare because

10  on the first day of trial he did not know which witnesses he might call, had not interviewed some

11  witnesses, and did not seem to know what his defense would be, that Birchfield had not

12  furnished her the transcript from the first trial so she could prepare a writ challenging the

13  conviction, that she was aware Birchfield made false representations to Montiel about the

14  amount of preparation that had been completed, that she had good reason to believe Birchfield's

15  representation was ineffective, that despite her beliefs she did not counsel Montiel to resubmit

16  the Marsden motion but had an ex parte communication with the judge regarding Birchfield's

17  handling of the case and her ethical concerns, that Judge Ferguson suggested she remain outside

18  the courtroom and only conduct legal research which she did, that she did not inform Birchfield

19  or Montiel about the ex parte communication or her concerns, that she falsely told Birchfield

20  scheduling conflicts prevented her attendance in court, that she was not present in court after her

21  meeting with the judge, and that she had no tactical reason for not informing Montiel of her

22  observations or concerns, <u>see</u> Exhibit 9, declaration of Ms. Fuller; testimony by a <u>Strickland</u>

23  expert that Ms. Fuller had an obligation to inform Montiel and the court of Birchfield's

24  ineffectiveness and that she should have advised Montiel to refile a <u>Marsden</u> motion (not

25  presented on state habeas); and testimony by Birchfield that he obtained Montiel's consent to

26  Ms. Fuller's absence from courtroom based on her misrepresentation and requested Ms. Fuller's

27  participation in voir dire as he did not want to rely solely on his own judgment.   Exhibit 18,

28  declaration of Birchfield.  Both declarations of Ms. Fuller and of Birchfield were presented to the

1   state court in support of Montiel's state habeas petition, but no declaration from a proposed

2   Strickland expert was submitted to the state court or in this proceeding.

3          The Warden asserts the 1990 state court hearing received testimony from Ms. Fuller

4   nearly identical to her declaration submitted in support of Montiel's petition, as well as heard

5   testimony from Judge Ferguson.   The Warden argues that at the settlement hearing, Judge

6   Ferguson denied Ms. Fuller had voiced concern about Birchfield's representation, stating it was

7   "absurd" to say she was making some kind of motion to have Birchfield disqualified.   The

8   Warden concludes it was within the settlement hearing judge's province to weigh the credibility

9   of the witnesses at the settlement hearing, and to decide to omit from the settled statement a

10   finding that Ms. Fuller had indicated her belief Birchfield's representation was ineffective.   The

11   Warden asserts this Court does not have license to determine the credibility of witnesses whose

12   demeanor was observed by the state court.

13          The Warden contends the resolution by the California Supreme Court, based on the 1990

14   hearing, rejected the notion that there was a fundamental breakdown between Montiel,

15   Birchfield, and Ms. Fuller, and that there was nothing in Ms. Fuller's complaint that would

16   trigger a sua sponte obligation for the trial judge to make a further inquiry into Birchfield's

17   representation of Montiel.   Montiel II, 5 Cal. 4th at 906.   The Warden argues that to the extent

18   Montiel asserts the state court hearing failed to adequately address whether Ms. Fuller was

19   ineffective in failing to alert the trial court to Birchfield's inadequate representation or whether

20   her actions amounted to a de facto withdrawal, Montiel has not demonstrated cause for failing to

21   develop these facts and actual prejudice, or alternatively established that failure to consider these

22   claims will result in a fundamental miscarriage of justice.

23          Montiel replies any finding by the state court as to whether there was a de facto

24   withdrawal by Ms. Fuller is a mixed question of law and fact not subject to a presumption of

25   correctness and should be reviewed de novo.   Fulminate, 499 U.S. at 286.   Montiel asserts the

26   Warden has failed to properly preserve the benefit of the presumption of correctness by not

27   identifying the finding to which deference is sought and not establishing the prerequisites for the

28   presumption of correctness, specifically: to identify the issue in question; to establish the issue is

1   one of pure fact; and to provide proof of that factual determination.  28 U.S.C. § 2254(d).

2   Montiel also argues the Settled Statement of Facts is not entitled to a presumption of

3   correctness as the merits of the factual dispute were not resolved.  Montiel asserts the Settled

4   Statement fails to address the fact that an ex parte communication took place and was not

5   disclosed.  Montiel contends the Settled Statement is misleading since it states the judge recited

6   the essence of the conversation on the record, when the record reveals Birchfield stated what Ms.

7   Fuller's role would be and the court agreed without any mention of the ex parte communication

8   or Ms. Fuller's concerns about Birchfield's handling of the case or her desire to withdraw as

9   counsel of record.

10   Montiel asserts the foundation for this claim is that neither he nor Birchfield had any

11   reason to know of the facts regarding the ex parte communication.  Montiel argues Judge

12   Ferguson's failure to disclose the ex parte communication at trial, combined with his admission

13   at the state hearing that he could not specifically recall the details of the ex parte communication,

14   contributed to the inadequacy of the Settled Statement.  Montiel asserts for these reasons the

15   Settled Statement is not entitled to a presumption of correctness, and since the facts were not

16   adequately developed, he is entitled to an evidentiary hearing on this issue.

17   Montiel asserts even if the presumption of correctness is found to be preserved, it must

18   fail because he was not afforded an adequate, full and fair hearing.  In particular, Montiel asserts

19   the trial court did not allow the exclusion of witnesses as required by proper motion, restricted

20   the hearing to the in-chambers conversation and did not allow his counsel to develop background

21   information, permitted the Warden's counsel broad latitude in questioning the witness, refused to

22   make a finding that Montiel was not informed of the in camera meeting, and did not permit

23   inquiry into issues which would corroborate Ms. Fuller's alleged concerns about Birchfield's

24   preparedness or the merits of a Marsden motion.

25   Montiel contends the Settled Statement fails to adequately reflect the record regarding

26   several facts: Ms. Fuller's discussion with the trial judge about whether she should withdraw

27   from the case; her concern about the prior Marsden motion filed by Montiel; her concern about

28   the general manner in which Birchfield was handling the case; and her attempt to resolve her

45

1   ethical concerns about Montiel's representation by Judge Ferguson's suggestion that she be

2   absent from the courtroom.  Montiel argues Ms. Fuller's declaration, Exhibit 9 to the Petition,

3   and testimony to be presented at an evidentiary hearing, amount to convincing evidence in

4   rebuttal of the presumption of correctness, and that reliance on the Settled Statement to assess the

5   nature of Ms. Fuller's abandoned representation would result in a fundamental miscarriage of

6   justice.

7        Montiel also alleges he was denied due process by the failure of Judge Ferguson to

8   further inquire into the merits of a Marsden motion or into the extent of Birchfield's

9   preparedness to proceed with the penalty re-trial.  This was further complicated by the failure to

10  disclose the ex parte communication and Ms. Fuller's concerns about Birchfield's representation

11  of Montiel.   Montiel argues that had the trial judge disclosed the nature of the ex parte

12  communication, it would have, at the least, given him the opportunity to renew his Marsden

13  motion.   Ideally, Montiel contends Judge Ferguson should have initiated an inquiry into the

14  appropriateness of the Marsden motion so that Birchfield's preparedness would have been

15  disclosed.

16       Montiel further argues that once the Settled Statement is set aside and additional evidence

17  of the ex parte communication considered, there will be support for the claim that he was denied

18  the right to equal protection by not having two counsel representing him in the courtroom during

19  his capital retrial.   Montiel asserts the withdrawal by Ms. Fuller created a structural error – the

20  deprivation of state-guaranteed co-counsel in a capital proceeding – which creates a presumption

21  of prejudice under Strickland.   Lastly, Montiel alleges cause exists to develop additional facts

22  due to the extreme limitations on the scope of the state hearing, and that Ms. Fuller's withdrawal

23  caused a fundamental miscarriage of justice.

24       The judge at the 1990 settlement hearing, on which the Settled Statement was based,

25  limited evidence to the issue of the ex parte discussion between Ms. Fuller and Judge Ferguson.

26  Due to this limitation, Ms. Fuller's testimony at the hearing was similarly limited to the ex parte

27  discussion.   The portions of Ms. Fuller's 1993 declaration addressing the ex parte meeting with

28  Judge Ferguson are substantially the same as her testimony at the 1990 hearing and her 1988

1   declaration.  The California Supreme Court resolved the factual issue underlying this claim on

2   direct appeal, finding the record did not support a constitutional "conflict" nor indicate the

3   division of attorney responsibility had any adverse effect on the defense.  <u>Montiel II</u>, 5 Cal.4th at

4   906.

5          Although the scope of the 1990 settlement hearing was limited to the issue of the ex parte

6   discussion between Ms. Fuller and Judge Ferguson, it was a full and fair hearing.  Montiel was

7   provided the opportunity, and took advantage of that opportunity, to make the same arguments

8   presented in his federal petition to the settlement hearing judge.  Even assuming the trial court's

9   appointment of Ms. Fuller involved a finding that two counsel were necessary to Montiel's

10  representation, there is no requirement that both counsel be present in court.  The refusal by the

11  settlement hearing judge to make a finding that Montiel was not informed about the ex parte

12  discussion or to inquire into issues which might have corroborated any of Ms. Fuller's alleged

13  concerns about Birchfield's preparedness or the merits of a <u>Marsden</u> motion, was not

14  unreasonable as those issues were outside the scope of the ex parte discussion.  The settlement

15  hearing judge heard the testimony of both Ms. Fuller and Judge Ferguson and weighed their

16  credibility.  The resulting Settled Statement is reasonable.

17         Montiel has made no showing that he was prejudiced by Ms. Fuller's role outside the

18  courtroom, that a <u>Marsden</u> motion made after the start of trial would have been granted, or that

19  Birchfield's representation of Montiel at the penalty retrial was deficient.  Claim 19 is denied an

20  evidentiary hearing and is denied on the merits.

21         10.   <u>Claim 20</u>

22         In Claim 20, Montiel contends that Birchfield had a conflict of interest that interfered

23  with his ability to adequately represent Montiel.

24         Montiel asserts Birchfield had a conflict of interest because he represented Lorenz on a

25  drunk driving charge, which representation interfered with Birchfield's duty to explore the

26  effectiveness of Lorenz's representation of Montiel at the guilt trial.  Montiel argues Birchfield

27  had a long-standing attorney-client relationship with Lorenz in both criminal and civil matters

28  predating Birchfield's appointment to represent Montiel.  Montiel contends Birchfield did not

1    obtain a waiver nor explain the existence of a potential conflict to him.  Montiel maintains that

2    his case was assigned for trial one week after the complaint was filed against Lorenz, and at that

3    time Birchfield advised the court he was in the process of determining whether to appeal due to

4    the potential incompetence of Lorenz during the guilt phase of Montiel's trial.

5        Montiel proposes to present the following evidence in support of this claim at an

6    evidentiary hearing which was not presented to the state court: testimony by Birchfield that he

7    made decisions, including failing to provide transcripts to Fuller, to avoid challenging Lorenz's

8    competence, that he was concerned for Lorenz's reputation and failed to present a habeas

9    petition in order to avoid embarrassing Lorenz, that he did not explain the conflict from

10   concurrent representation or how it could interfere to Montiel or obtain a waiver from Montiel[24];

11   and testimony from a Strickland expert that it was standard practice to represent clients without

12   any potential conflict and that Birchfield should have informed Montiel of the nature of the

13   conflict, how it could interfere, and obtained a waiver.

14       The Warden contends this claim should be procedurally barred since Montiel did not

15   raise it at trial or on appeal.  Even if the claim is considered, the Warden asserts Montiel cannot

16   show an actual conflict of interest as there is no evidence Birchfield's judgment was undermined.

17   The Warden observes that Birchfield first appeared as counsel for Lorenz on November 21,

18   1986, after the jury's return of the death verdict on November 10.  When Lorenz's case went to

19   trial in March, 1987, Birchfield did not present an affirmative defense, instead submitting the

20   case as a court trial on the police and toxicology reports.  Further, as demonstrated in Claim 18,

21   the Warden contends that Birchfield contemplated filing a habeas petition on Montiel's behalf,

22   but reasonably decided not to do so.  The Warden disputes Montiel's claim that, due to the

23   alleged conflict, Birchfield failed to call Lorenz as a witness to say that Montiel's family

24   members were not called to testify at the guilt trial, as this testimony could have been obtained

25   from the family members and was elicited from his mother.  More importantly, the Warden

26   _____

     [24] A declaration by Birchfield, filed in support of the state habeas petition, says he told Montiel about his
27   representation of Lorenz, but did not obtain a waiver as he did not perceive that it was a conflict.  Birchfield's
     declaration states that he did view Lorenz's representation of Montiel as ineffective and does not indicate that he
28   took any actions in order to protect Lorenz from that charge.  Birchfield implies that he did not file a habeas petition
     or other writ based on research he conducted.  See Ex. 17.

1  asserts the impeachment of Montiel's family members on this minor point would have no

2  conceivable effect on the verdict.  The Warden asserts the California Supreme Court correctly

3  determined Birchfield did not have a conflict of interest, and that decision was not contrary to

4  United State Supreme Court precedent.

5      Montiel replies he could not have been expected to object to the concurrent

6  representation of Lorenz since the burden was on Birchfield to educate his client and obtain

7  informed consent.  Montiel asserts Birchfield's claim that he did not perceive a conflict is not

8  credible because he knew, or should have known, that he was not free to injure the professional

9  reputation of a client and that withholding a collateral attack on Montiel's guilt conviction based

10  on Lorenz's ineffective representation would be at Montiel's expense.  Montiel further replies

11  this claim was properly raised on state habeas since it was not part of the trial record.

12      Montiel replies he did suffer adverse effects from the conflicting representation, since

13  Birchfield did not seek extraordinary relief, and failed to provide Ms. Fuller with transcripts of

14  the guilt trial even though he had asked her to prepare a habeas petition challenging the felony-

15  murder special circumstance.  Montiel contends Birchfield's explanation that he did not prepare

16  a petition because he did not know what type of relief to seek should be rejected based on Ms.

17  Fuller's recollection that Birchfield asked her to prepare a petition and because Birchfield's

18  felony convictions involve deceit.  Montiel asserts Birchfield's true motivation was to protect

19  Lorenz's reputation, which was already under attack for ineffective representation on another

20  case.  Montiel argues that not calling Lorenz to testify about his failure to interview Montiel's

21  family members and call them to testify regarding his delusions, hallucinations, and use of PCP

22  shortly before the murder, left their testimony at the penalty retrial without sufficient credibility.

23      As stated above, Montiel need not show prejudice to obtain relief when a conflict of

24  interest results in the denial of effective assistance of counsel, but must establish active

25  representation of conflicting interests which actually resulted in an adverse effect on his lawyer's

26  performance.  Cuyler v. Sullivan, 446 U.S. at 349.

27      Montel presented this claim in his state habeas petition filed June 1, 1993, after his

28  penalty retrial, which also included claims stemming from his guilt phase trial.  The California

1   Supreme Court found any delay in presenting Montiel's claims was adequately explained and

2   summarily denied all the claims on the merits.

3       Lorenz's arrest occurred October 5, 1986, and the complaint against him was filed

4   October 9.  Exhibit 7, in support of federal petition.  The jury returned its verdict against Montiel

5   November 10, 1986.  Birchfield made his first appearance representing Lorenz on the drunk

6   driving charge November 21, 1986.  Id.  There is no indication that Birchfield's actions in

7   Montiel's cases were motivated by a desire to protect Lorenz's reputation, or that Birchfield's

8   representation of Lorenz led to any actual conflict at Montiel's trial.

9       Montiel has made no showing that he was prejudiced by the failure of Birchfield to file a

10  state habeas petition challenging the felony-murder special circumstance prior to the penalty

11  retrial, that Birchfield's representation of Lorenz impacted his representation of Montiel, or that

12  Birchfield's representation of Montiel at the penalty retrial was deficient.  Claim 20 is denied an

13  evidentiary hearing and is denied on the merits.

14          11.   Claim 22

15      In Claim 22, Montiel contends that counsel should have challenged Juror Binns during

16  voir dire.

17      During voir dire, Juror Patricia Binns, in response to whether she had heard or had any

18  feelings about drugs and/or PCP, said "I'm adamant that if you make the choice to use them,

19  then you are totally responsible for that choice you made." 86 RT Vol. IV:551.  Montiel

20  contends Birchfield unreasonably failed to clarify this statement, to question Binns about her

21  response, or to seek that she be excused for cause, and he did not exercise a peremptory

22  challenge of Binns when numerous challenges remained available.  Montiel asserts a critical

23  factor of his mitigation case was whether PCP intoxication impaired his ability to appreciate the

24  criminality of his conduct, or conform his conduct to the requirements of the law.  Montiel

25  argues Birchfield's failure to question or challenge Binns about her feelings of PCP use was

26  ineffective assistance, which was prejudicial per se.  See Davis v. Georgia, 429 U.S. 122, 123

27  (1976) (establishing a "per se rule" requiring vacating a death sentence where a single juror with

28  conscientious scruples against the death penalty was erroneously excluded, since assuming other

jurors shared the same attitude as the excluded panelist was not harmless error).

Montiel asserts Binns' answer was a strong statement of conditional bias: if the evidence proved he had used drugs during the commission of the murder, he would be held totally responsible for his actions and his drug use would not mitigate either the severity of the crime or the punishment, even though the law provided for both. Montiel argues the inclusion of Binns on the jury was the functional equivalent under Davis of impaneling a juror who would automatically impose a death sentence, regardless of what evidence was presented in mitigation. Montiel asserts Birchfield's ineffectiveness was compounded by the lack of co-counsel's participation in the voir dire.

Montiel proposes to present the following evidence in support of this claim at an evidentiary hearing which was not presented to the state court: testimony by Birchfield that he had no tactical reason for failing to use a peremptory challenge to dismiss Juror Binns, or alternatively for not questioning her regarding her attitude toward drug users in order to establish cause for her excusal[25]; testimony from a Strickland expert that it was standard practice to use a peremptory challenge or alternatively to develop reasons to excuse for cause when a potential juror is biased against a type of conduct engaged in by the defendant; and testimony by a jury dynamics expert that Juror Binns' bias against drug users, as well as the force of her answers, could have had a strong influence on other jurors.

The Warden claims the use of peremptory challenges is inherently subjective and intuitive, and rarely meets Strickland's standard of unreasonableness. The Warden asserts the record does not disclose any manifest incompetence in the retention of Juror Binns.

Montiel replies that issues relating to the competency of counsel's representation are mixed questions of law and fact and subject to de novo review. Montiel argues the issue is whether Birchfield used reasonable judgment in failing to exercise a challenge for cause or a peremptory challenge against Juror Binns, so the finding by the California Supreme Court is not dispositive. Montiel asserts that since Juror Binns was not examined about her response, it is

---

[25] Birchfield's declaration does not make these admissions.

1    impossible to speculate whether she could be fair.

2    Montiel observes the Warden failed to address his contention that a biased juror creates

3    structural error, but instead cited cases for the proposition that it is speculative whether a

4    different juror would have rendered a more favorable verdict.  Montiel argues the cases cited by

5    the Warden are distinguishable from the facts in this case.  In Clark v. Collins, 19 F.3d 959, 965

6    (5th Cir. 1994), the petitioner had not alleged prejudice from the challenged conduct.   In

7    Singleton v. Lockhart, 871 F.2d 1395 (8th Cir. 1989), counsel's conduct was determined, after an

8    evidentiary hearing, to be based on tactics.  In United States v. Taylor, 832 F.2d 1187 (10th Cir.

9    1987), the petitioner did not introduce any facts suggesting bias of any jurors.   People v.

10   Freeman, 8 Cal. 4th 450 (1992), found the record failed to establish a reasonable probability that

11   a different jury would have been more favorably disposed to the defendant, which Montiel

12   argues is in conflict with the holding of Dyer v. Calderon, 151 F.3d 970 (9th Cir. 1998), that

13   leaving a biased juror on the panel constitutes structural error.  In People v. Fauber, 2 Cal. 4th

14   792, 846 n.17 (1992), the issue was counsel's failure to conduct voir dire on a specified issue.

15   Montiel asserts the voir dire here shows a juror's extreme bias to a key type of mitigation

16   evidence he planned to present.  People v. Banner, 3 Cal. App. 4th 1315 (1992), found error from

17   counsel's failure to challenge a juror who stated she had been mugged by an addict ten years

18   earlier, when the charge against the defendant was robbery while under the influence of a

19   controlled substance.  Montiel contends the bias of Juror Binns is greater than in Banner, since

20   she was adamant that someone who uses drugs must be held fully responsible for his actions.

21   The state court addressed this issue on direct appeal, see Montiel II, 5 Cal. 4th at 911,

22   however Montiel contends there was no finding of fact, it was not fairly supported by the record,

23   and there was not a full and fair hearing.  Montiel argues the state court ruling which must be

24   analyzed is the summary denial of this claim in the state habeas petition, which he argues was

25   objectively unreasonable.  The Warden responds Montiel did not raise this claim on state habeas

26   review.  The Warden contends the state court on direct appeal did make a factual finding that

27   Juror Binns had the ability and desire to be fair on the issue of penalty, and that Montiel has not

28   shown the state court's determination of facts was unreasonable in light of the evidence.  The

1   Warden argues that in light of the state court's factual finding, Birchfield acted reasonably in not

2   further questioning Juror Binns about alleged bias, and that the state court's conclusion was a

3   reasonable application of Strickland.

4        The presence of a single biased juror violates a defendant's right to a fair trial, and is a

5   structural error.   Dyer, 151 F.3d at 973 n.2.  However, an honest yet mistaken answer given on

6   voir dire rarely amounts to a constitutional violation, and to invalidate the trial a juror's dishonest

7   answer must be found to concern a material question.  McDonough Power Equip. v. Greenwood,

8   464 U.S. 548, 555-556 (1984) (holding that to obtain a new trial, a party must demonstrate both

9   that a juror answered a material voir dire question dishonestly and that a correct answer would

10  have provided a valid basis for a challenge for cause).  Where no motion was made during jury

11  selection to dismiss the juror for cause, a petitioner assumes a greater burden of showing that the

12  evidence of partiality was so indicative of impermissible bias that the trial court was required to

13  strike the juror even though neither counsel made such a request.  United States v. Mitchell, 568

14  F.3d 1147, 1151 (9th Cir. 2009).

15       Montiel's assertion here is not that Juror Binns gave a dishonest answer, but that

16  Birchfield was ineffective for failing to further examine her to determine whether she was

17  biased.  Montiel argues Juror Binns' view about responsibility for drug use is the equivalent of a

18  juror with conscientious scruples against the death penalty, which results in structural error.

19       A structural error is a "defect affecting the framework within which the trial proceeds,

20  rather than simply an error in the trial process itself."  Fulminante, 499 U.S. at 310.  Structural

21  errors are limited.  Johnson v. United States, 520 U.S. 461, 469 (1997).  No controlling law holds

22  that a belief such as the one held by Juror Binns, that drug users are responsible for the

23  consequences of their actions, is a material issue affecting the structure of the entire trial.  This

24  court will not expand the category of structural error to include views as expressed by Juror

25  Binns.  As observed by the state court, Juror Binns indicated she could "follow the law," "go

26  either way" based on the guidelines given to her, "evaluate [the evidence] and make a choice,"

27  judge expert psychiatric evidence, and use her common sense.  Montiel II, 5 Cal. 4th at 911.

28  Based on the totality of Juror Binns' responses, there is no prejudice from her presence on the

1  jury.

2       The belief of Juror Binns is not included in the narrow category of structural errors, and

3  Montiel has not shown that Birchfield's failure to question Juror Binns regarding her beliefs

4  undermines confidence in the outcome.  Claim 22 is denied an evidentiary hearing and is denied

5  on the merits.

6       12.   Claim 23

7       In Claim 23, Montiel contends that counsel failed to preserve and introduce favorable

8  testimony from a witness.

9       After the remand for a new penalty trial, Birchfield's investigator, Roger Ruby, tape-

10 recorded an interview with Victor Cordova, where Victor said he had been instructed by law

11 enforcement not to volunteer information regarding Montiel's use of PCP before the homicide.

12 Montiel asserts Birchfield was ineffective for failing to use this evidence to challenge Montiel's

13 guilt conviction, or to introduce it at penalty as mitigating evidence.[26]   Montiel contends

14 Birchfield seriously impaired Montiel's ability to pursue this claim by either wilfully destroying,

15 or negligently misplacing, the tape and failing to furnish the tape to current counsel.  Birchfield's

16 wife, Denise D'Santangelo, declares that Birchfield destroyed a tape in her presence with a pair a

17 scissors, and asserts it was the same tape Montiel's appellate counsel had earlier requested.

18      Montiel proposes to present the following evidence in support of this claim at an

19 evidentiary hearing which was not presented to the state court: testimony by Birchfield that he

20 failed to present information from Victor in a habeas petition challenging the conviction, why he

21 misplaced or destroyed the tape of the interview with Victor, and that he had no tactical reason

22 for failing to question and/or impeach Victor regarding the statement he made in the taped

23 interview[27]; testimony from investigator Roger Ruby and Birchfield that Victor gave a taped

24

25 [26] This claim incorporates by reference Claim 8 - Inadmissible Confession/Jailhouse Informant (¶ IX of state habeas petition) and Claim 13 - Suppression of Evidence of Victor and Montiel's PCP use immediately before the homicide

26 (¶ X of state habeas petition).

27 [27] Birchfield's declaration does not make these admissions nor discuss the missing tape, it does discuss that he considered filing a habeas petition or extraordinary writ, but based on the issues presented in the direct appeal

28 opinion, not on an interview or statement by Victor.

statement detailing prosecutorial misconduct (specifically, that Victor was instructed not to volunteer information regarding Montiel's PCP use prior to the murder)[28]; testimony by Denise D'Santangelo, Birchfield's ex-wife, that she saw Birchfield destroy a tape with scissors, and that it was the same tape Montiel's subsequent counsel had requested two years earlier (Ex. 23 to federal petition); testimony from a Strickland expert that it was standard practice to present evidence of prosecutorial misconduct on habeas or retrial; and testimony by a jury dynamics expert that evidence of prosecutorial misconduct would greatly support a life sentence. Only the declaration of Denise D'Santangelo was presented in support of this claim in this proceeding.

The Warden observes Montiel offers no explanation in support of this claim as to why Birchfield would intentionally destroy potentially exculpatory evidence given to him by a defense investigator whom he had employed to gather the evidence or fail to use this alleged evidence at trial, and that Birchfield's declaration in support of the petition does not address this issue. The Warden asserts Montiel has failed to supply any evidence in support of this claim outside of the allegations in the petition. The Warden argues even if Birchfield had presented evidence mirroring Victor's declaration, it would not have made a difference to the verdict, since the transcript of Victor's interview with detectives the day after the murder directly contradicts the declaration, and since Victor testified he encountered Montiel in the jail before trial and Montiel asked him to lie about the amount of PCP he had consumed on the day of the murder.

Montiel replies Victor's declaration provides the support for this claim, and Birchfield's declaration (Ex. 22 in support of federal petition) admits a tape of the interview existed before the penalty retrial. Montiel argues an evidentiary hearing is necessary to resolve the factual dispute between Victor's declaration (that he didn't mention sharing PCP with Montiel because the prosecutor told him not to) and his testimony at the penalty re-trial (that he didn't mention sharing PCP with Montiel at the 1979 trial because he feared he would get in trouble by admitting he sold PCP and gave it to Montiel). See 86RT Vol. VI:448.

Montiel asserts an evidentiary hearing is also required to determine whether Birchfield

---

[28] Ruby testified at the penalty retrial that Montiel's sister Irene had revealed PCP use by Montiel before the crime, but did not mention the interview with Victor.

1   will deny destroying the tape, and to judge the credibility of Ms. D'Santangelo, who has sworn

2   that he did destroy the tape.  Montiel argues this claim adds to the cumulative error caused by

3   Birchfield's ineffective representation.  Montiel contends that had Victor explained at the penalty

4   retrial that at the guilt trial he failed to disclose he shared PCP with Montiel because of the

5   prosecutor's instruction, it could have caused the jury at the penalty retrial to doubt the accuracy

6   of the guilt verdicts.

7        Montiel argues the California Supreme Court's denial of this claim was an unreasonable

8   determination of the facts because proof of prosecutorial suppression of evidence has an

9   enormous impact on the jury, calling into question the prosecution's entire case.  The Warden

10  observes the California Supreme Court's denial of this claim on habeas assumed the truth of

11  Victor's 1994 declaration stating he smoked PCP with Montiel before the murder and that the

12  prosecutor told him not to mention it when he testified, as well as assumed that Birchfield failed

13  to preserve the tape of Victor's statement.

14       Birchfield's 1988 declaration, prepared in support of Montiel's state habeas petition,

15  asserts his investigator Roger Ruby did tape his interview with Victor, but that the tape was no

16  longer in Birchfield's possession by 1988.  Exhibit 22 in support of federal petition.  Ms.

17  D'Santangelo's 1990 declaration is the only evidence stating the tape Birchfield destroyed was

18  of Roger Ruby's interview with Victor.  Ms. D'Santangelo states that after the transfer of some

19  of Montiel's case materials to habeas counsel, she found notes, photographs and a cassette tape

20  relating to the Montiel case.  She showed these to Birchfield and he destroyed the tape.  She was

21  not sure what was on the tape Birchfield destroyed, only that the tape was of a witness interview

22  because she recognized the markings.  She also saw Birchfield destroy notes and photographs

23  relating to Montiel's case, but knew that he kept other files and documents, as well as three other

24  tapes labeled "Montiel."  Exhibit 23 in support of federal petition.

25       Victor's 1994 declaration states that "the District Attorney told me not to say anything

26  about Richard being on PCP.  [He] was told to just answer the questions and not say anything

27  about PCP at all."  Exhibit 21 in support of federal petition.  Victor's assertion about the content

28  of this conversation, which occurred more than 14 years earlier, is not credible as it is related,

1   since Victor's testimony at the 1979 trial would have violated the stated instructions by stating

2   that Montiel was intoxicated on PCP when he arrived at Victor's house prior to the murder.  See

3   79RT Vol. I:134-135, 138-39.  The only information Victor withheld at the 1979 trial, and

4   admitted at the 1986 retrial, was that he and Montiel shared another PCP cigarette prior to

5   leaving the house before the murder.  86RT Vol. VI:395-398, 401-402.  Further, Montiel

6   testified at the 1979 trial that he used PCP the morning of the murder, 79RT Vol. II:387, and that

7   he and Victor used more PCP before they left Victor's house before the murder.  Id., at 395-396.

8        There was no prejudice from Birchfield's failure to present Victor's statement about the

9   prosecutor's alleged instructions to Victor about his testimony regarding PCP use at the penalty

10   retrial, as Victor testified at both trials that Montiel was intoxicated when he arrived at Victor's

11   house prior to the murder.  79RT Vol. I:134-135, 138-39.  At the penalty retrial, Victor also

12   testified that he and Montiel shared another PCP cigarette prior to leaving the house before the

13   murder, 86RT Vol. VI:395-398, 401-402, and Montiel's sister Irene confirmed Montiel's PCP

14   use prior to the murder.  86RT Vol. VI:324, 329-333.  There also is no prejudice from

15   Birchfield's destruction of the tape, as even assuming the truth of Ms. D'Santangelo's

16   declaration, she "was not sure what was on the tape."

17        Montiel has not shown that Birchfield's failure to present Victor's statement about the

18   shared PCP use undermines confidence in the outcome, or that the tape Birchfield allegedly

19   destroyed was material to his trial.  Claim 23 is denied an evidentiary hearing and is denied on

20   the merits.

21        13.   <u>Claim 24</u>

22        In Claim 24, Montiel contends that counsel failed to present evidence regarding

23   Montiel's drug use to present a diminished capacity defense.

24        Montiel asserts Birchfield was ineffective in numerous ways related to the presentation,

25   or lack of presentation, of mitigation evidence based on his background, drug use, and resulting

26   diminished capacity.  Montiel asserts Birchfield failed to consult with, or present testimony from,

27   a qualified mental health expert specializing in PCP effects, failed to adequately prepare the

28   expert who did testify, and failed to investigate or present evidence of Montiel's psychosocial

1  history, including his impoverished childhood, abusive and neglectful parents, life-long alcohol

2  and drug abuse, and the impacts of these events had on his mental health.  Montiel contends that

3  had this evidence been adequately presented to the jury, there is a reasonable probability he

4  would not have been sentenced to death.

5       The crimes Montiel was convicted of occurred in January of 1979, his first trial occurred

6  in May of 1979 (the jury hung on penalty), his second penalty trial occurred in September of

7  1979 (the California Supreme Court affirmed the conviction but reversed the penalty), and his

8  penalty re-trial occurred in November of 1986.  Prior to Montiel's crimes, on September 26,

9  1978, the California Supreme Court abandoned the state's long-standing test for insanity[29], and

10 adopted the American Law Institute (ALI) test: "A person is not responsible for criminal conduct

11 if at the time of such conduct as a result of mental disease or defect he lacks the substantial

12 capacity either to appreciate the criminality of his conduct or to conform his conduct to the

13 requirements of the law."  People v. Drew, 22 Cal. 3d 333, 345 (1978), superseded by statute in

14 1982, Cal. Pen. Code § 25(b).

15      California state law at the time of Montiel's crime and guilt phase trial also provided for

16 the partial defense of diminished capacity, which negated the specific intent, malice or other

17 subjective element of a crime.  See People v. Wells, 33 Cal. 2d 330 (1949), and People v.

18 Gorshen, 51 Cal. 2d 716 (1959).  Diminished capacity can result from intoxication which

19 prevents someone from acting with express malice, the mental state necessary for first degree

20 murder.  People v. Frierson, 25 Cal. 3d 142, 154 (1979); People v. Whitfield, 7 Cal. 4th 437, 462

21 (1994), Mosk, J., concurring and dissenting.  Alternatively, an "irresistible impulse" also can

22 prove diminished capacity.  People v. Cantrell, 8 Cal. 3d 672 (1973).

23      The ALI test remained in effect until June 9, 1982, when the voters approved a new

24 statutory definition for insanity.  At the time of Montiel's penalty re-trial, California law

25 regarding insanity required proof by a preponderance of the evidence that the defendant was

26 incapable of knowing or understanding the nature and quality of the act and of distinguishing

27 ---

[29] The M'Naughten test permitted acquittal if, at the time of committing the act, an accused person was laboring
under such a defect of reason from disease of the mind as not to know the nature and quality of the act he was doing,
28 or if he did know it, that he did not know it was wrong.  10 Clark and Fin. 200, 210 (1843).

1  right from wrong at the time of the offense.  People v. Skinner, 39 Cal. 3d 765, 782 (1985).  The

2  1982 statute also codified a 1978 amendment abolishing the defense of diminished capacity.

3  California Penal Code section 28(a) provides that evidence of mental illness may not be admitted

4  to show or negate the capacity to form any mental state, but it is admissible on the issue of

5  whether the accused actually formed the required specific intent, premeditated, deliberated, or

6  harbored malice aforethought, when a specific intent crime is charged.

7       In Claim 24, Montiel asserts Birchfield was ineffective for failing to present independent

8  expert testimony regarding PCP use and instead attempting to convert the prosecution's expert

9  witness, Dr. Siegel, into a "friendly" witness by eliciting facts supporting intoxication (factor (h)

10  in mitigation), and then bolstering those facts by the testimony of San Quentin psychiatrist, Dr.

11  Louis G. Nuernberger.  Montiel contends Birchfield failed to speak to, consult, or interview

12  either expert before their testimony, and failed to consult a mental health expert with expertise in

13  the effect of PCP on mental functioning and behavior.  Montiel alleges Birchfield knew or

14  should have known that Dr. Nuernberger was not a forensic psychiatrist familiar with either

15  diminished capacity or the effects of PCP, but had only evaluated Montiel to determine his sanity

16  for the purposes of execution.  Montiel contends Birchfield's lack of proper investigation and

17  preparation resulted in the loss of a critical opportunity to present evidence of Montiel's

18  complete inability to form intent, which would have resulted in a life sentence.  Montiel contends

19  the California Supreme Court's implicit conclusion that he received effective assistance of

20  counsel was an unreasonable application of established United States Supreme Court precedent,

21  citing Strickland, (Terry) Williams v. Taylor, 529 U.S. 362, 396 (2000), and Wiggins v. Smith,

22  539 U.S. 510, 534 (2003).

23       The Warden argues the failure to seek the advice of independent experts is not

24  constitutionally inadequate assistance and that Birchfield's decision to use the prosecution's

25  expert to present the needed testimony about the effects of PCP was a classic choice of trial

26  tactics.  The Warden asserts Dr. Pitts' conclusions are not supported by the record and the

27  theories he advanced had little chance of overcoming the significant evidence showing Montiel

28  knew and understood the nature and consequences of his actions.  The Warden contends Montiel

1    has failed to show a reasonable probability that the result of the proceeding would have been

2    different, even if Birchfield had consulted a psychopharmacologist and procured testimony

3    similar to that of Dr. Pitts stating Montiel was incapable of forming the intent to steal or kill, or

4    to premeditate and deliberate.  The Warden asserts since Montiel has not shown either counsel's

5    incompetence or prejudice, the claim of ineffective assistance of counsel must fail, and the state

6    court's rejection of this claim was a reasonable application of <u>Strickland</u>.

7        Montiel replies, in light of Dr. Siegel's experience and his testimony that despite being

8    under the influence of PCP Montiel was able to deliberate and premeditate at the time of the

9    murder and could maturely and meaningfully reflect on the consequences of his actions, it was

10   unreasonable for Birchfield to rely on Dr. Siegel regarding diminished capacity and mitigation.

11   Montiel argues Birchfield had an obligation to investigate in order to determine what type of

12   experts to consult, but despite making no attempt to contact Dr. Siegel, he chose to rely on his

13   opinion, which was already established as adverse to Montiel.  Montiel contends Birchfield had

14   no basis to believe Dr. Siegel's testimony would contribute to the jury voting for life.  Montiel

15   contends that if Birchfield had consulted with another psychiatrist or psychologist with expertise

16   in the effects of PCP, he would have discovered Dr. Siegel's adverse conclusions were open to

17   serious challenge.  Montiel replies that despite the Warden's assertions, Dr. Pitts' declaration

18   does assert that the fact Montiel was able to remember what he did does not mean he was

19   exercising judgment or reasoning at the time of the action.  Montiel also argues a qualified expert

20   could have explained that the presence of cognitive abilities (obtaining a knife or going back to

21   get the beer can) does not mean those actions were governed by moral judgment because PCP

22   removes inhibitions.

23       Montiel proposes to present the following evidence in support of Claim 24 at an

24   evidentiary hearing which was presented on state habeas: testimony by Birchfield that he did not

25   think it necessary, nor did he make an attempt, to consult with mental health experts specializing

26   in PCP effects, and that he knew Dr. Nuernberger was not a forensic psychiatrist or PCP

27   specialist; and testimony by Dr. Pitts that medical experts more qualified than Dr. Siegel were

28   available, that a qualified expert could have explained that Montiel's actions were not governed

1   by moral judgment in spite of his cognitive ability to obtain a knife before the killing and

2   remember to go back for a beer can, because PCP removes all inhibitions, that the theft of

3   Mankin's purse was sheer impulse, and that PCP does not allow evaluation of behavior or moral

4   judgments.

5         Montiel also seeks to present the following evidence in support of Claim 24 at an

6   evidentiary hearing which was not presented to the state court: testimony by Dr. Siegel and

7   Birchfield that Birchfield did not interview Dr. Siegel about the evidence he intended to present

8   for the prosecution[30]; testimony by Dr. Nuernberger and Birchfield that Birchfield failed to

9   sufficiently prepare Dr. Nuernberger to testify about the effects of PCP[31]; testimony by a

10  Strickland expert that it was standard practice to interview witnesses before relying on their

11  testimony, to select the best available expert (not a witness for the prosecution) to present

12  testimony, to speak with various experts to procure the one most qualified and influential, and

13  that the strategy of relying on Dr. Siegel, a prosecution witness who testified adversely and

14  persuasively at the guilt trial, was unreasonable; and testimony from a jury dynamics expert of

15  the prejudicial impact of Dr. Nuernberger's obvious lack of expertise and experience and the

16  prosecutor's closing argument about it, and the extent to which Dr. Siegel's testimony persuaded

17  the decision for death.

18        Birchfield presented evidence at Montiel's penalty re-trial from percipient witnesses who

19  provided support for his defense of intoxication from drug use.  Mrs. Mankin's testimony related

20  that she noticed by Montiel's eyes that something was wrong, as they were "starry and glassy" at

21  the time of the robbery.  79 RT Vol. III:17-28 (the 1979 testimony was read into record at the

22  1986 trial).  Montiel's father Richard Sr. testified he knew Montiel was using some type of drug

23  in the month prior to the murder, his mother Hortencia testified he was using drugs and having

24  hallucinations in the month prior to the murder, his brother Antonio testified he was intoxicated

25  _____

[30] Dr. Siegel's testimony did not say this, and no declaration is presented from Dr. Siegel to support this allegation.

26  [31] Neither Birchfield's nor Dr. Nuernberger's declarations make this admission.  Dr. Neurnberger's declaration says
27  he traveled to Bakersfield the same day he testified and that Birchfield did not provide him with Dr. Cutting's report,
    the CDC file, or transcripts from the 1979 trial of expert or lay witnesses prior to his arrival, but that he did not
    recall what materials he may have reviewed upon arrival.  His declaration does not mention when, how often or for
28  how long he spoke to Birchfield.  See Declaration of Dr. Nuernberger, Exhibit 20, presented on state habeas.

on drugs before his arrest for the murder and could not express himself, did not make sense, was talking about legions of demons, and talked about being the devil, his sister Martha testified she thought Montiel was on drugs because he would not walk straight or talk right, and his sister Irene testified he was under the influence of PCP prior to the murder as she gave him two PCP cigarettes from some she was keeping for him the morning before the murder and that he smoked them both that morning.  86 RT Vol. VI:227-28; 264-73; 291-92, 304-05; 314-15; 324, 332-33, 338-54.  Victor testified that prior to the murder, he cut off a piece of dangling flesh from a deep wound on Montiel's left arm, but Montiel registered no pain.  86 RT Vol. VI:403.  Victor testified Montiel exhibited bizarre behavior and speech, was in a violent mood, made advances to Kathy Davis, tried to wipe a mole off Lisa Davis's face, challenged Victor by saying "deck me out," grabbed Lisa's purse, and argued with some guys across the street.  86 RT Vol.VI:406-08.  Victor also stated before they left to take Montiel to his brother's house, they shared a PCP cigarette.  86 RT Vol. VI:401-02.

Dr. Siegel testified that at the time of the crime Montiel was "grossly intoxicated" on PCP and alcohol and his motor functions and judgment were somewhat impaired, and that PCP had unpredictable effects and could reduce impulse control, cause distorted perception, produce episodic partial amnesia, exaggerate aggressive or violent tendencies, and lead to a chronic mental disorder which includes delusional episodes.  Despite these concessions, Dr. Siegel concluded Montiel was not hallucinating at the time of the murder, was capable of goal-oriented activity, and knew what he was doing, stressing Montiel's successful efforts to find and take money from Mr. Ante's house, his immediate concerns about covering up the crime, and his relatively clear memory of the events.  86 RT Vol. V:108-201.

Dr. Nuernberger testified that chronic drug abuse is both a cause, and a result, of deep lifelong alienation and depression, and opined Montiel was legally sane and had no gross mental disorder apart from drug-induced toxic dementia.  However, Dr. Nuernberger concluded Montiel's "extended intoxication with PCP and alcohol" eroded his self-control and judgment, fragmented his personality and consciousness, and exaggerated his violent tendencies, to the extent that the drug intoxication was "directly responsible for the homicide," and that behavior

like brushing or picking at a mole could be from acute or advanced stages of PCP intoxication, described as toxic delirium.  He emphasized Montiel had displayed cooperative and nonviolent behavior while in the drug-free prison setting, although he admitted on cross-examination that Montiel vacillated between times of passive conformity and extremes of aggressive violence.  86 RT Vol. VI:553-626.

Montiel must show both deficient performance and actual prejudice resulting from the deficiency in order to prevail on a claim of ineffective assistance of counsel.  An objective review of Birchfield's performance, measured for reasonableness under prevailing professional norms, including a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time of that conduct, must be conducted.  Wiggins, 539 U.S. at 523 (citing Strickland, 466 U.S. at 688, 689).  In assessing prejudice resulting from the alleged ineffective assistance of counsel at the penalty phase of a capital trial, a court must reweigh the evidence in aggravation against the totality of available mitigating evidence.  Wiggins, 539 U.S. at 534.

Dr. Siegel testified regarding the effects of PCP use, including reduced impulse control, distorted perception, episodes of partial amnesia, exaggerated aggressive or violent tendencies, and chronic mental disorder with delusions, but concluded that Montiel, despite being "grossly intoxicated" and somewhat impaired, knew what he was doing at the time of the murder.  Dr. Nuernberger opined conversely that Montiel's extended PCP use and alcohol intoxication eroded his self-control and judgment, fragmented his personality and consciousness and exaggerated his violent tendencies, and that the intoxication was directly responsible for the homicide. Percipient witnesses provided supportive evidence of Montiel's long-term drug use.

The Court is persuaded by the Warden's contention that Montiel has failed to show a reasonable probability the result of the proceeding would have been different.  Even had Birchfield consulted a psychopharmacologist and procured testimony stating Montiel was incapable of forming the intent to steal or kill, or to premeditate and deliberate, that evidence would have been largely duplicative of evidence which was already before the jury and is unlikely to have overcome the significant evidence showing Montiel knew and understood the

nature and consequences of his actions.  Claim 24 is denied an evidentiary hearing and is denied on the merits.

14.   Claim 25

In Claim 25, Montiel asserts Birchfield was ineffective for failing to prepare Dr. Nuernberger[32] to testify regarding Montiel's diminished capacity in mitigation, alleging Birchfield's first conversation with Dr. Nuernberger did not occur until the day prior to his testimony and only lasted 15 minutes.

Montiel contends Birchfield did not provide Dr. Nuernberger with police reports, Dr. Cutting's report, Montiel's CDC central file, or transcripts of the testimony of Dr. Siegel or any percipient witnesses.  See Exhibit 17, declaration of Dr. Nuernberger, ¶ 3.  Montiel argues Birchfield failed to adequately prepare Dr. Nuernberger with evidence and information necessary to form a grounded and credible medical opinion, and that Dr. Nuernberger's testimony was critical to establishing Montiel's mental state as a mitigating factor.

The Warden responds that Birchfield's investigator interviewed Dr. Nuernberger prior to the penalty retrial and provided Birchfield with a report of the interview.  The Warden opines that had Birchfield provided Dr. Nuernberger with crime reports and transcripts in anticipation of his testimony, Birchfield faced the risk the information might undermine, instead of fortify, the favorable nature of the opinions Dr. Nuernberger was willing to give.  On the issue of prejudice, the Warden argues it cannot be inferred that Dr. Nuernberger's testimony would have been of greater benefit to Montiel had additional information been made available to him during preparation of his testimony, and in fact it may have become less favorable.  The Warden contends Birchfield may have decided to rely on the positive aspects of Dr. Nuernberger's testimony, which included his conclusion that PCP was responsible for Montiel's behavior.

Montiel replies the Warden's contention is sheer speculation, as Birchfield has not stated the reason he did not provide background information to Dr. Nuernberger was fear that it would undermine his opinion.  Montiel argues that even if Birchfield did fear Dr. Nuernberger changing

---

[32] The heading of Claim 25 includes the failure to prepare and present percipient witnesses, but the text of the claim does not discuss percipient witnesses.  The analysis of this claim will only address expert witness Dr. Nuernberger.

his opinion, it would have been better to have discovered that, and if necessary obtained a

different expert, than to have allowed Dr. Nuernberger to be impeached on cross-examination by

his unfamiliarity with the facts of the case.  Montiel observes the timelines of the case belie any

argument that Birchfield made a strategic choice, since his investigator's first interview with Dr.

Nuernberger did not occur until presentation of the defense case was underway.  Montiel argues

Dr. Nuernberger was the main defense witness regarding how PCP affected Montiel's thinking

and behavior, but his ignorance of the facts of the case left him unable to challenge Dr. Siegel's

opinions or to persuade the jury.  Montiel asserts a similar lack of preparation regarding expert

testimony has been sufficient to support a finding of prejudice in other cases.  See Bean v.

Calderon, 163 F.3d 1073, 1078-81 (9th Cir. 1998); Clabourne v. Lewis, 64 F.3d 1373, 1384 (9th

Cir. 1995).   Montiel argues the California Supreme Court erroneously determined that

Birchfield's failure to adequately prepare Dr. Neurnberger to testify did not violate Strickland.

Montiel contends the state court's application of Strickland to these facts was objectively

unreasonable.

Montiel proposes to present the following evidence in support of Claim 25 at an

evidentiary hearing which was presented to the state court: testimony by Birchfield that his first

conversation with Dr. Nuernberger was the day preceding his testimony and lasted 15 minutes,

that he did not give Dr. Nuernberger the necessary documents, such as police reports and

transcripts, that he did not review the details of the case with Dr. Nuernberger until during the

retrial and then for only 45 minutes over a noon recess which was inadequate to prepare, and that

he had no tactical reason for failing to adequately prepare Dr. Nuernberger.[33]

Montiel also seeks to present the following evidence, which was not presented to the state

court, in support of Claim 25 evidentiary hearing: testimony by Dr. Nuernberger that had he been

---

[33] Birchfield's declaration, presented on state habeas, admits the time frames alleged here, but includes that the
defense investigator interviewed Dr. Nuernberger and prepared a report which Birchfield reviewed and used to
prepare questions.  The declaration does not discuss what documents were provided to Dr. Nuernberger nor make
admissions of ineffectiveness.

Dr. Nuernberger's declaration, which also was presented on state habeas, says that no records or transcripts
were given to him to review in advance of the day he testified – and that he doesn't recall what he reviewed when he
arrived.  Dr. Nuernberger does not mention anything about the timing or length of discussions he had with
Birchfield.

1   adequately prepared he would not have had to concede a lack of knowledge regarding the murder

2   and Montiel's history of incarceration, and that he did not know he could discuss Montiel's

3   intoxication when it was not covered in his report;[34] and testimony by a <u>Strickland</u> expert that it

4   was standard practice to adequately prepare expert witnesses and that Birchfield's actions were

5   inadequate to prepare Dr. Nuernberger.

6         Montiel cites to <u>Bean</u>, supra, for support for this claim.  In <u>Bean</u>, penalty counsel failed to

7   adequately investigate and present mitigating evidence of mental impairment and failed to

8   prepare experts to testify, even though consulted experts recommended additional testing and

9   there was available evidence of brain damage, mental retardation, incompetence, drug use and an

10  abusive childhood.   Counsel's failure was prejudicial when combined with the limited

11  aggravating evidence consisting of only a prior burglary and an altercation where Bean allegedly

12  fired a gun.  163 F.3d at 1078-1081.

13        Montiel also cites to <u>Clabourne</u>, supra, 64 F.3d at 1384-87, for support of this claim.  In

14  <u>Clabourne</u>, penalty counsel called only one expert witness at sentencing, who was contacted at

15  the last moment and not adequately prepared, and instead mainly relied on evidence which had

16  already been presented at the guilt phase.   Counsel failed to introduce any evidence of

17  Clabourne's history of mental illness, including psychosis and probable schizophrenia, and

18  Clabourne's susceptibility to manipulation by others.   Counsel's failure was prejudicial when

19  combined with the fact that the sentencing judge found only one aggravating factor relating to

20  the circumstances of the crime.  64 F.3d at 1384-87.

21        Montiel must show both deficient performance and actual prejudice resulting from the

22  deficiency to prevail on a claim of ineffective assistance of counsel.  Montiel's history of mental

23  illness is less compelling than <u>Bean</u>'s or <u>Clabourne</u>'s mental health histories.   Dr. Watson

24  summarized Montiel's test results as supportive of findings of "cognitive and neuropsychological

25  deficits and probably brain dysfunction" based on toluene abuse.  State Habeas Exhibit 12, 1993

26  declaration of Dr. Watson, ¶¶ 10-11.  Montiel's functioning was revealed to be "at the level of

---

27
28  [34] This admission was not in Dr. Nuernberger's declaration that was presented on state habeas.  Dr. Nuernberger made statements during cross-examination at trial regarding his lack of knowledge regarding the charges, but he did not say that he was inadequately prepared.

borderline intelligence, . . . impaired by significant learning disabilities and very severe attention/concentration deficits (in the mildly retarded range)." Id. at ¶ 10.  Dr. Watson found that Montiel's impairments "compromise his ability to hold and process information, to understand cause and effect relationships in the context of a rapidly changing sequence of events, and to engage in complex problem solving which requires logical, systematic thinking.  As a result, . . . he has rather poor planning skills, is vulnerable to misinterpreting his environment with consequent manifestations of inappropriate and ill-modulated behavior, and has difficulty in making judgments that require deliberation and consideration of abstract consequences." Id. at ¶ 13.

Evidence that was, or could have been, admitted in aggravation against Montiel also was substantially more egregious than the available evidence against Bean or Clabourne, and included the robbery of Eva Mankin; the robbery and murder of Gregorio Ante; a prior felony conviction for second degree robbery of Foster's Freeze in 1972; numerous incidents of prior violence including the stabbing of Montiel's brother Antonio in 1968, an argument/fight with Montiel's sister-in-law Yolanda in 1969; a theft at the 1971 Kern County fair, which included resisting arrest and threating officers; a misdemeanor burglary involving theft of a television from Anthony Ramirez in 1973, to which Montiel pled guilty; and commitment to the Civil Addict Program at the California Rehabilitation Center ("CRC") in July, 1972.  Between 1972 and 1978, Montiel spent the majority of his time incarcerated on drug or drug-related offenses, with his longest period of parole lasting ten months in 1977.  Montiel began using PCP at the end of 1976 during a two month parole from CRC.  By 1977, he was smoking PCP a couple of times a week, and after his release in December, 1978 from the Kern County Jail, Montiel immediately returned to daily, heavy use of alcohol and PCP, which continued through the time of the homicide in January, 1979.

Even assuming Birchfield failed to adequately prepare Dr. Nuernburger to testify, in light of the limited evidence of brain injury, Montiel's less compelling background and his history of violence, it is not likely the jury would have determined that the evidence of mitigation outweighed the evidence in aggravation and have imposed a life sentence.  Claim 25 is denied an

1    evidentiary hearing and is denied on the merits.

2           15.    Claim 26

3           In Claim 26, Montiel claims that counsel failed to object to prosecutorial misconduct,

4    inadmissible evidence, and improper argument.

5           Montiel asserts Birchfield's numerous failures to object and request admonition to

6    improper comments by the prosecutor, to inadmissible evidence, to improper argument, and to

7    faulty jury instructions denied Montiel effective assistance of counsel.   Montiel contends that

8    without the improper actions of the prosecution and Birchfield's failures, the outcome of the

9    penalty retrial would have been more favorable to him.   Listed below are Montiel's assertions of

10   ineffectiveness from Birchfield's failure to object, of which most of the underlying claims were

11   presented to the state court on direct appeal.

12          (a) Montiel asserts the prosecutor stated numerous times during voir dire that only some

13   of the evidence of guilt, not all of it, would be presented at the penalty retrial.   Montiel asserts

14   these statements deprived him of the right to confrontation and to have the jury fairly weigh

15   factors in mitigation, denied him the benefit of any lingering doubt regarding premeditation and

16   intent to rob, and implied to the penalty jury they were not responsible for determining the

17   appropriateness of death as required under Caldwell v. Mississippi, 472 U.S. 320 (1985).   The

18   underlying claim was addressed by the California Supreme Court on direct appeal.   Montiel II, 5

19   Cal. 4th at 911-913.   The state court found nothing improper in the prosecutor's comments

20   during voir dire, holding the comments regarding the jury's limited role at a separate penalty trial

21   do not eliminate the ability to litigate lingering doubt nor diminish the jury's sense of sentencing

22   responsibility and finding both the prosecution and the defense presented extensive evidence

23   regarding Montiel's mental state and intoxication.   Since the state court held there was no error

24   by the prosecutor's comments, Birchfield's failure to object was not ineffective.

25          (b) Montiel asserts the prosecutor's comments during voir dire that Montiel would be in

26   court every day, dressed up and decent, and the victim would not be there, were improper and

27   calculated to inflame the jury.   Birchfield objected and the trial court sustained the objection, but

28   no admonition was requested.   The California Supreme Court addressed the underlying claim on

direct appeal, Montiel II, 5 Cal. 4th at 914-915, holding there is no basis for reversal as the prosecutor's remarks were brief and did not call attention to anything the jurors would not readily infer, the trial court's sustaining the objection indicated the prosecutor's remarks were improper, and the jury was given the general instruction to disregard anything that had been stricken.  The state court found that Birchfield's failure to request admonition may have been tactical and the omission did not undermine confidence in the judgment.  Since the state court held there was no prejudice from the prosecutor's comments, Birchfield's failure to request admonition, even if deficient, cannot be prejudicial.

(c) Montiel asserts the testimony of Deputy Leavell introduced threats he made years earlier against Leavell's and Sgt. William's families and homes, which were inadmissible nonstatutory aggravating evidence.  The California Supreme Court addressed the underlying claim on direct appeal, Montiel II, 5 Cal. 4th at 916-917, holding the threats were admissible to demonstrate the nature of Montiel's unlawful conduct, and their admission did not infringe his constitutional right to free speech.  The state court also held Birchfield's failure to object to the admission of this testimony was not incompetent performance.  Id.

(d) Montiel asserts Dr. Siegel's testimony concerning Montiel's alleged sale of and use of drugs other than PCP was improper because it was irrelevant to Dr. Siegel's opinion and was not admissible as a factor in aggravation.  The California Supreme Court addressed the underlying claim on direct appeal, id., at 918-920, holding Dr. Siegel was entitled to place his conclusions in the context of Montiel's overall pattern of drug use, so his reference to the use of other drugs was not improper, the comment about selling drugs was brief and could hardly have been a surprise to jurors who were already aware of Montiel's drug-centered lifestyle.  The state court also held Birchfield's failure to object or request a limiting instruction was not prejudicial.  Id.

(e) Montiel asserts Dr. Siegel's introduction of Montiel's alleged confession to cellmate Palacio was improper as a basis for his opinion of Montiel's mental state and deprived Montiel of his right to confrontation.  Montiel argues that California Evidence Code § 801(b) limits the type of information an expert can rely on in forming an opinion to information which "reasonably may be relied upon," that Palacio's testimony was plainly unreasonable since he was

1   obeying the dictates of law enforcement in exchange for the abrogation of a felony complaint,

2   and that others admit Montiel was still under the influence of PCP or going through withdrawals

3   during this time period.  Montiel argues in reply that the state court failed to consider whether the

4   evidence was constitutionally acceptable under <u>Gregg v. Georgia</u>, 428 U.S. 238 (9172).  The

5   California Supreme Court addressed the underlying claim on direct appeal, <u>Montiel II</u>, 5 Cal. 4th

6   at 918-92, holding Birchfield's failure to pursue a hearsay objection was not facially

7   incompetent, as even a successful objection probably would not have prevented Palacio being

8   called as a witness, or if he was unavailable his 1979 testimony being presented, and even if

9   Birchfield should have objected, there was no prejudice as the circumstantial evidence indicating

10  Montiel possessed criminal intent prior to the murder was extremely strong.

11      (f) Montiel asserts Dr. Siegel presented improper hearsay testimony by testifying about

12  Montiel's long history of violence, which deprived Montiel of his right to confrontation.  The

13  California Supreme Court mentions the underlying claim on direct appeal.  <u>Montiel II</u>, 5 Cal. 4th

14  at 918-923.  Even though the state court did not specifically address the claim of denial of

15  confrontation, the mention of the presentation of the claim warrants a finding that the claim was

16  implicitly denied.  The state court did hold that Birchfield's failure to object was not grounds for

17  reversal as the testimony by Dr. Siegel was consistent with Montiel's own admissions.

18      (g) Montiel asserts error in the trial court's taking judicial notice of the financial gain

19  special circumstance previously ruled inapplicable to his case, the trial court's consideration of

20  the invalidated financial gain special circumstance in denying the motion to modify the verdict

21  (<u>see</u> subclaim (u) below), and the prosecutor making numerous comments in argument about the

22  invalidated financial gain special circumstance, all of which Montiel contend violate his

23  constitutional rights to due process, a reliable sentence and to be free from double jeopardy.  The

24  California Supreme Court addressed the underlying claim on direct appeal, <u>id.</u>, at 925-926,

25  holding the striking of the financial gain special circumstance because it overlapped the robbery-

26  murder special circumstance did not invalidate the jury's finding underlying the special

27  circumstance, specifically that it included a finding that the murder was intentional, so the

28  introduction of this evidence did not violate Montiel's constitutional rights.  The state court held

1  Birchfield's failure to object does not undermine confidence in the judgment as the danger was

2  minimal the jury would double-count any duplicative aspects of the special circumstances.

3       (h) Montiel asserts prosecutorial misconduct in cross-examining Montiel's mother,

4  seeking to discredit her testimony regarding Montiel's drug use and its effects by questioning her

5  failure to mention it during her testimony in 1979 when she had not previously been questioned

6  about it and was only asked about a 1968 assault on Montiel's brother, and arguing to the jury

7  her testimony was fabricated because the strategy in 1979 did not work.[35]   The California

8  Supreme Court addressed the underlying claim on direct appeal, <u>Montiel II</u>, 5 Cal. 4th at 926-

9  928, finding no prejudice as there was no dispute about the main point of the testimony--that is,

10  that Montiel was a serious, chronic drug user who was grossly intoxicated at the time of the

11  murder, and that defense questioning advised the jury the witness had not been previously asked

12  about Montiel's drug use.   The state court held Birchfield's failure to object was not prejudicial

13  as there was no dispute about Montiel's drug use and the misleading "sting" of the prosecutor's

14  questioning was diminished by defense counsel's redirect examination that Montiel's mother had

15  not previously been asked about his drug use.

16       (i) Montiel asserts prosecutorial misconduct in cross-examining Montiel's sister, seeking

17  to discredit her testimony about Montiel's drug use by questioning her failure to mention it

18  during her testimony in 1979 when she had not been asked about it, and comparing her testimony

19  to Montiel's hearsay statement to Dr. Siegel.   The California Supreme Court addressed the

20  underlying claim on direct appeal, <u>id.</u> at 926-928, finding no prejudice as there was no dispute

21  about the main point of the testimony, that is, that Montiel was a serious, chronic drug user who

22  was grossly intoxicated at the time of the murder, and that defense questioning advised the jury

23  the witness had not been previously asked about Montiel's drug use, plus holding there was no

24  prejudice from Birchfield's failure to impeach her testimony about giving Montiel a PCP

25  cigarette as inconsistent with Montiel's statements to Dr. Siegel, as the matter was highly

26  collateral and Montiel's interview statements to Dr. Siegel were admissible.   <u>Id.</u> at 928 n.22.   The

27  

28  [35] These allegations are the basis for the claim in Montiel's state habeas petition that Birchfield was ineffective for failing to object, question his mother to clarify, or call trial counsel Lorenz to explain.  See subsection (v), supra.

1   state court held Birchfield's failure to object was not prejudicial as there was no dispute about

2   Montiel's drug use and the misleading "sting" of the prosecutor's questioning was diminished by

3   defense counsel's redirect examination that Montiel's sister had not previously been asked about

4   his drug use.  Id. at 927-28.

5       (j)   Montiel asserts prosecutorial misconduct in cross-examining Montiel's father,

6   seeking to impeach his testimony about Montiel's sad mood after his arrest by questioning if

7   Montiel was "jeering and sneering" during the preliminary hearing when non-testimonial

8   conduct is irrelevant (the defense objection was sustained, but no admonition was  requested or

9   given, without which Montiel argues the comment violated his due process, fair trial and reliable

10  penalty rights), and arguing to the jury that evidence of Montiel's drug use was not brought up in

11  1979.  The California Supreme Court addressed the underlying claim on direct appeal, holding a

12  reasonable jury would understand by the trial court's ruling that the comment about Montiel's

13  demeanor was not a proper question and should be disregarded, so there is no basis for reversal.

14  Montiel II, 5 Cal. 4th at 931 and 927.   The state court held Birchfield's failure to request

15  admonition was harmless, id. at 931, and finding no prejudice from the failure to object to the

16  prosecutor's argument about the delayed evidence of drug use, as there was no dispute about the

17  main point of the testimony, that is, that Montiel was a serious, chronic drug user who was

18  grossly intoxicated at the time of the murder, that defense questioning advised the jury the

19  witness had not been previously asked about Montiel's drug use, and that the misleading "sting"

20  of the prosecutor's questioning was diminished by Birchfield's redirect examination that

21  Montiel's family had not previously been asked about his drug use.  Id. at 927-28.

22      (k)   Montiel asserts prosecutorial misconduct in cross-examining Salvatore Russo, a

23  teacher at San Quentin, seeking to imply that Montiel's participation would make him eligible

24  for early release, undermining the instruction that under life without parole he would not be

25  released, compounding the error by eliciting testimony from correctional officer Norman Davis

26  which implied Montiel would be paroled, and substituting the word "not" for "never" in the

27  instruction: "the defendant will never be released from prison."  The California Supreme Court

28  addressed the underlying claim on direct appeal, id. at 931-32, holding that although the

1  prosecutor's comments to Russo were probably improper, Birchfield's failure to object or move

2  to strike does not undermine confidence in the judgment as the comment was subtle and the jury

3  was instructed that a death sentence would be carried out and a sentence of life without parole

4  meant Montiel would not be released from prison and even if counsel should have objected, that

5  omission does not undermine confidence in the judgment; contrary to Montiel's allegations, C.O.

6  Davis did not say anything which suggested Montiel might be released from prison; and there is

7  no evidence the jury speculated about the word substitution in the instructions.  Montiel II, 5 Cal.

8  4th at 931-32.

9       (l) Montiel asserts prosecutorial misconduct by the admission of Dr. Cuttings' opinion

10  during the cross-examination of Dr. Neurenberger, and the subsequent use of the opinion as

11  substantive evidence, when the opinion was inadmissible as hearsay, irrelevant to mitigation, and

12  privileged.  The California Supreme Court addressed the underlying claim on direct appeal, id. at

13  923-925, holding the use of Dr. Cutting's opinion at penalty re-trial was not improper as a

14  violation of privilege, since it was waived by Montiel placing his mental state in issue, and it did

15  not violate hearsay or confrontation as it was proper cross-examination for testing a witness'

16  credibility.  Montiel II, 5 Cal. 4th at 923-925.  The state court held Birchfield's failure to request

17  a limiting instruction regarding evidence from Dr. Cutting's opinion was harmless as the

18  prosecutor did not strongly argue it should be given independent consideration and it was

19  unlikely the jury gave improper consideration to the substance of the evidence.  Id. at 924.

20       (m) Montiel asserts prosecutorial misconduct in questioning Montiel about his

21  expectation of a new trial, implying his good behavior would result in reversal, which Montiel

22  argues diminished the jury's sense of responsibility in violation of Caldwell, 472 U.S. at 328-29;

23  about his needs and wants, such as art supplies, books, TV, etc., being met in prison and

24  introducing his daily routine as a suggestion of unfairness to the victim, which Montiel contends

25  was improper as it was a situation over which he had no control; and about his religious beliefs,

26  attempting to impeach Montiel by his disagreement with "an eye for an eye."  The California

27  Supreme Court addressed the underlying claim on direct appeal, Montiel II, 5 Cal. 4th at 932-

28  934, finding that the prosecutor's attack on the sincerity of Montiel's rehabilitation efforts was

1   not improper, that arguing all Montiel's needs were met in prison was proper rebuttal to evidence

2   of good prison behavior, and that questioning about Montiel's religious beliefs did not violate his

3   right to freedom of religion or diminish the jury's sense of responsibility in sentencing.  The state

4   court held Montiel's claims that Birchfield was ineffective for failing to object to the

5   prosecutor's questions were without merit.  Id. at 932.

6          (n) Montiel asserts the prosecutor improperly impeached his father for failing to testify

7   about Montiel's PCP use in 1979 when he was not asked about it nor was it brought to his

8   attention (see subclaim j above), and implied that Montiel committed no violent acts between the

9   1973 theft of a TV and homicide in 1979 because he was incarcerated, when no evidence was in

10  the record to support this conclusion.  The California Supreme Court found no prejudice from

11  Birchfield's failure to object to the prosecutor's argument about the delayed evidence of drug

12  use, as there was no dispute about the main point of the testimony, that is, that Montiel was a

13  serious, chronic drug user who was grossly intoxicated at the time of the murder, that defense

14  questioning advised the jury the witness had not been previously asked about Montiel's drug use,

15  and that the misleading "sting" of the prosecutor's questioning was diminished by Birchfield's

16  redirect examination that Montiel's family had not previously been asked about his drug use.

17  Montiel II, 5 Cal. 4th at 927-28.  The California Supreme Court addressed the underlying

18  incarceration claim, id. at 935-936, finding the prosecutor's argument was not precluded as it

19  was a reasonable inference from evidence of 1973 burglary conviction that Montiel spent some

20  time in custody, and Birchfield's failure to object or request an admonition was harmless as

21  prosecutor's argument was not improper.  Id. at 935.

22         (o) Montiel asserts the prosecutor improperly argued the absence of mitigating evidence

23  counted as aggravation (Davenport error[36]) for factors (d) (extreme mental or emotion

24  disturbance), (e) (victim participation or consent), (f) (moral justification or extenuation), (g)

25  (duress or substantial domination) and (j) (accomplice or minor participant).  Montiel argues the

26  state court's failure to analyze the error, or to consider that Birchfield's failure to object

27

28  [36] People v. Davenport, 41 Cal. 3d 247, 290 (1985).

amounted to ineffective assistance of counsel, was prejudicial.  The California Supreme Court addressed the underlying claim on direct appeal, id. at 936-938, holding there was no improper argument by the prosecutor regarding factors (d) and (f); that factor (j) was not subject to Davenport error as it had not been determined to be solely mitigating; and that despite the prosecutor's improper argument regarding factors (e) and (g), it was not likely the jury was misled as they were properly instructed about their sentencing duty.  Since the state court held the error was harmless, there is no prejudice from Birchfield's failure to object.

(p) Montiel asserts the prosecutor's improperly impeached the testimony of his ex-wife, Rachel, with a prior conviction for selling heroin that was inadmissible. The California Supreme Court mentioned the underlying claim on direct appeal, Montiel II, 5 Cal. 4th at 930 n.26, but did not address it, but implicitly denied it by concluding that any arguable error was harmless due to the insignificance of the evidence.  Since the state court held the error was harmless, there is no prejudice from Birchfield's failure to object.

(q) Montiel asserts the trial court erred in presenting to the jury the issue of whether Montiel used a firearm during the 1972 robbery of Foster's Freeze (that is, whether he had a handgun or a starter pistol), and that Birchfield was ineffective by asking a victim whether he fell to the ground to "duck the bullets" which assumed adverse facts about the existence of "bullets" not in evidence.  The California Supreme Court addressed the underlying claim on direct appeal, Montiel II, 5 Cal. 4th at 917-918, holding the evidence was sufficient that Montiel brandished a handgun, and the question asked by Birchfield was brief and only suggested the witness ducked reflexively.  The state court did not address the claim that Birchfield was ineffective for failing to object to presenting the use of firearm issue to the jury, but the holding the evidence was sufficient to find that Montiel brandished a firearm, id. at 917, is enough to find no prejudice from trial counsel's failure to object.

(r) Montiel asserts the trial court erred in presenting to the jury the issue of whether Montiel assaulted a peace officer while evading arrest for a theft at the fair in 1971.  Montiel presented the underlying claim of trial error claim regarding the presentation of the assault issue to the jury in his Opening Brief on direct appeal, see Claim XXV at pages 152-155, so the

1  California Supreme Court's failure to address the claim is an implicit denial.  The state court did

2  address the related underlying claim of instructional error, id. at 916, holding the jury was

3  instructed on the elements of assault stemming from violent resistance to arrest, and that there

4  was ample evidence from which to infer criminal activity.  The state court did not address

5  whether Birchfield was ineffective for failing to object to presenting the issue to the jury, but the

6  holding that the evidence was sufficient to find that Montiel was guilty of assault, id. at 916, is

7  enough to find no prejudice from Birchfield's failure to object.

8       (s) Montiel asserts the erroneous admission of ambiguous testimony by Officer Leavell

9  which Montiel alleges fails to prove elements of an assault while resisting arrest at county fair

10 over 15 years earlier, and instead asserts suggested a struggle to escape, not an attempt to commit

11 a violent injury (see subclaim (r) above).  The California Supreme Court did not address the

12 admission error or trial counsel's effectiveness on direct appeal, but held that there was no

13 violation of due process, a fair trial or a reliable penalty as the jury was carefully instructed

14 regarding the elements of assault and the evidence supports the finding of assault.  Montiel II, 5

15 Cal. 4th at 915-916.  The state court held that the evidence was sufficient to find Montiel guilty

16 of assault, which is enough to find no prejudice from Birchfield's failure to object.  Montiel

17 further asserts the prosecutor improperly attempted to impeach the favorable 1986 testimony by

18 Montiel's father, including his denial that Montiel attacked him and not remembering any prior

19 unfavorable statements, with statements made to the responding deputy about the assault.  The

20 California Supreme Court did not address the underlying prosecutorial error claim, but the

21 impeachment claim of Montiel's father was presented in Montiel's Opening Brief on direct

22 appeal, see Claim XXVII at pages 160-162, and so was implicitly denied.  The state court held

23 that the failure of trial counsel to object to impeachment of Montiel's father did not undermine

24 confidence in the judgment.  Montiel II, 5 Cal. 4th at 930-931.

25      (t) Montiel asserts the trial court erred in failing to give an instruction specifying that Dr.

26 Siegel's sources were subject to a limiting instruction and advising the jury that Dr. Siegel may

27 only use Montiel's statements, which were made for purposes of diagnosis, as a basis for his

28 opinion and not for the truth of the statements.  The California Supreme Court addressed the

1   underlying claim on direct appeal, id. at 918-922, holding that admission of the evidence without

2   limiting instruction did not undermine confidence in the judgment and that Montiel's statements

3   from prior psychological reports, which were revealed to the jury by Dr. Siegel, were consistent

4   with other statements by Montiel and not grounds for reversal.   Montiel further asserts the

5   prosecutor erred by using as substantive evidence in argument many of Montiel's statements

6   which were made for purposes of diagnosis and relied on by Dr. Siegel.  The California Supreme

7   Court did not address the underlying subclaim, but it was presented in Montiel's Opening Brief

8   on direct appeal, see Claim IX at pages 85-89, and so was implicitly denied.   The state court, id.

9   at 918, held that Birchfield's failure to object or request a limiting instruction was not

10  incompetent so reversal is not warranted.

11      (u) Montiel asserts it was error for trial court to consider financial gain special

12  circumstance and to state specific reasons on motion to modify (see subclaim (g) above), and the

13  prosecutor made improper arguments on the motion to modify: that Montiel struck his pregnant

14  sister-in-law Yolanda in the stomach when the evidence did not support that conclusion, that 35

15  of 36 jurors found for death, that the victim's family prayed for death, and that Montiel would be

16  a danger in the future.  The California Supreme Court addressed the underlying claim on direct

17  appeal, Montiel II, 5 Cal. 4th at 945-946, finding the record suggests the trial court used

18  "financial gain" as a synonym for robbery and gives no indication the court artificially inflated

19  the seriousness of the crime by counting two special circumstance findings; that although the

20  prosecutor argued evidence of the assault on Yolanda, the trial court's comments do not suggest

21  it gave the assault any significant weight; that the statement about Montiel's dangerousness was

22  based on evidence of his potential for future violence and not prohibited; and that even if the

23  comments that 35 of 36 jurors found for death and the victim's family prayed for death were

24  improper, there was no indication the trial court weighed that evidence in reaching its decision.

25  Since the state court held these claims of error lack merit, there is no prejudice from Birchfield's

26  failure to object.

27      (v) Montiel asserts the prosecutor improperly argued recent fabrication in questioning

28  Hortensia's failure to previously testify about Montiel's hallucinations, delusions and drug use,

and in arguing that Montiel had to come up with different evidence since whatever he told Dr. Cutting in 1979 did not work.  The California Supreme Court addressed the underlying claim on direct appeal, <u>Montiel II</u>, 5 Cal. 4th at 926-928, finding no prejudice from prosecutor's argument or from Birchfield's failure to object as there was no dispute about the main point of the testimony, that is, that Montiel was a serious, chronic drug user who was grossly intoxicated at the time of the murder, and that defense questioning advised the jury the witness had not been previously asked about Montiel's drug use, and the misleading "sting" of the prosecutor's questioning was diminished by defense counsel's redirect examination that Montiel's mother had not previously been asked about his drug use.

Montiel requests an evidentiary hearing on 20 of the 22 subclaims in Claim 26 (excluding subclaims (r) and (u)), unless the Warden concedes the facts are not in dispute or a determination is made that the Warden has failed to present sufficient evidence to refute the facts presented. Should a hearing be ordered, Montiel proposes to present the following evidence in support of this claim at an evidentiary hearing: testimony by Birchfield and from a <u>Strickland</u> expert asserting the ineffectiveness of counsel for the facts set forth in subclaims (a) through (f), (h) through (q), (s), (t) and (v).[37]  In regards to subclaim (g), Montiel proposes to present testimony by Birchfield that he had no tactical reason for stipulating to judicial notice of the financial gain special circumstance but entered into it because of inadequate preparation;[38] testimony from a <u>Strickland</u> expert that it was standard practice, in light of the California Supreme Court's decision, to assert that the financial gain special circumstance be omitted at retrial; and testimony from a jury dynamics expert that the introduction of the financial gain special circumstance had a persuasive impact and that the prosecutor's "counting" references which referred to the additional special circumstance was extremely effective in persuading the jury to vote for death.

The Warden asserts these claims are largely duplicative of issues raised and rejected on direct appeal to the California Supreme Court, and are not argued in Montiel's points and

---

[37] Birchfield's declaration does not address the facts alleged in subclaims (b) and (n) through (t).  No declaration from a Strickland expert was presented on state habeas.

[38] Birchfield's declaration does not make these admissions.

1    authorities.  The Warden contends the California Supreme Court has already heard, considered,

2    and denied these claims.  The Warden argues that for the two claims the state court found where

3    Birchfield might have had tactical reasons for his failure to object or request admonition,

4    subclaims (b) and (e), the state court also found that Montiel was not prejudiced.  See Montiel II,

5    5 Cal.4th at 914-915 and 920-921.

6           Montiel replies the individual instances of prosecutorial misconduct, judicial abuse of

7    discretion, and various violations of his Sixth, Eighth, and Fourteenth Amendment rights should

8    be considered both individually and cumulatively.  Montiel asserts that allowing the jury to

9    consider vague evidence in aggravation, like the assaults on police officers at the county fair in

10   1971 and on his brother, violated his right to due process.  Montiel argues the Warden's reliance

11   on the reasoning of the California Supreme Court is insufficient because that court failed to

12   sufficiently consider the constitutional merits of the claims, frequently overlooking the

13   underlying claim of ineffective assistance of counsel and failing to provide the heightened

14   review required by the Constitution.  Montiel also disputes that Birchfield had a tactical reason

15   for failing to object or request admonition regarding subclaims (b) and (e).  Montiel argues the

16   finding by the California Supreme Court that Birchfield was not ineffective for failing to object

17   to Dr. Siegel's recitation of Palacio's testimony, subclaim (b), was based on an incorrect

18   assumption that Palacio was available to testify or that his testimony would have been admitted

19   under an exception to the hearsay rule when there was no evidence to support either situation.

20   As a result, Montiel urges that this Court is not bound by the state court's conclusions.

21          Montiel asserts the cumulative prejudicial impact of these errors by Birchfield make it

22   clear his representation fell below the constitutionally required standard, despite the failure of the

23   California Supreme Court to find the individual errors harmful.  Montiel contends he has made a

24   colorable claim that the trial court unconstitutionally failed to give limiting instructions for the

25   various instances of inappropriately admitted evidence, and the state high court failed to consider

26   whether limiting instructions were constitutionally required in order to prevent arbitrary and

27   capricious sentencing and also failed to address whether Birchfield's failure to object was

28   ineffective assistance of counsel.  Montiel argues the California Supreme Court's implicit

1    conclusion that he received effective assistance of counsel was an unreasonable application of

2    established United States Supreme Court precedent under <u>Strickland</u>.

3           The Warden replies Montiel's assertion that these claims are not entitled to deference

4    because the California Supreme Court's denial of these claims was not supported by clearly

5    enumerated grounds, fails to acknowledge that even in such a case, federal habeas review is not

6    de novo, but only an independent review to determine whether the state court's decision was

7    objectively reasonable.  Further, the Warden observes that these claims were all raised on direct

8    appeal and denied by the state court with reasoned analysis.  The Warden concludes Montiel has

9    failed to demonstrate the California Supreme Court's decisions are contrary to, or an

10   unreasonable application of, clearly established United States Supreme Court precedent, and so

11   is not entitled to relief.

12          Where a claim that has been adjudicated on the merits in state court, federal habeas relief

13   may only be granted if the petitioner shows the state court's decision was "contrary to" or

14   "involved an unreasonable application of" clearly established United States Supreme Court law,

15   or that it was based on an "unreasonable determination of the facts."  28 U.S.C. § 2254(d)(1) and

16   (d)(2); <u>Richter</u>, supra, 131 S. Ct. at 785.  Under (d)(1), a state court decision is "contrary to"

17   federal law if it fails to apply the correct controlling Supreme Court authority or comes to a

18   different conclusion when presented with materially indistinguishable facts, and is an

19   "unreasonable application" of Supreme Court law if the correct legal standard is identified but is

20   applied to the facts in an objectively unreasonable manner.  <u>Cone</u>, supra, 535 U.S. at 694.  A

21   challenge under (d)(2) requires the federal court to determine that a state court's factual finding

22   was not merely wrong, but was objectively unreasonable in light of the evidence presented in the

23   state court proceeding.  <u>Taylor</u>, supra, 366 F.3d at 999; <u>Andrade</u>, supra, 538 U.S. at 75; <u>Miller-</u>

24   <u>El</u>, supra, 537 U.S. at 340.

25          A petitioner bears the burden of showing the state court decision meets the requirements

26   of 28 U.S.C. § 2254(d)(1) and (d)(2) on the basis of the record that was before the state court.

27   <u>Miller-El</u>, 537 U.S. at 340; <u>Pinholster</u>, supra, 131 S. Ct. at 1398.  The standard of § 2254(d) is

28   difficult to meet and highly deferential, as it demands that state court decisions be given the

1    benefit of the doubt.  <u>Richter</u>, 131 S. Ct. at 786; <u>Visciotti</u>, <u>supra</u>, 537 U.S. at 24-25.  None of

2    Montiel's allegations regarding the state court's denial of these claims are sufficient to meet the

3    exceptions of § 2254(d)(1) or (d)(2), that the state court's decision was contrary to or involved an

4    unreasonable application of clearly established United States Supreme Court law, or was based

5    on an unreasonable determination of the facts.

6         The California Supreme Court on direct appeal denied on the merits the majority of the

7    subclaims of ineffective assistance of counsel alleged in this claim, either by specifically

8    addressing the effectiveness of trial counsel, or by finding no prejudice from the underlying

9    claim which would defeat any claim that counsel was ineffective even if his performance was

10   deficient.  Three subclaims – (q), (r) and (s)(1) – were not addressed by the California Supreme

11   Court on direct appeal, but the evidence of the underlying claims were sufficient to find Montiel

12   guilty of brandishing a firearm and of assault, so that any failure of trial counsel was without

13   prejudice.

14        As none of the alleged errors by trial counsel state a violation of constitutional law, there

15   is no reason to grant habeas relief based on cumulative error.  <u>Rupe</u>, supra, 93 F.3d at 1445.

16        Montiel has failed to overcome the findings of the state court that the errors complained

17   of were without prejudice, so the alleged failures by Birchfield also are without prejudice.  Claim

18   26 is denied an evidentiary hearing and is denied on the merits.

19        16.   <u>Claim 27</u>

20        In Claim 27, Montiel contends that counsel introduced evidence adverse to Montiel

21   because counsel did not adequately investigate and prepare witnesses called to testify.

22        Montiel asserts Birchfield failed to adequately investigate and prepare witnesses to

23   testify.  Birchfield admitted, in his declaration in support of Montiel's state habeas petition, that

24   the first time he talked with Montiel's family was on the day they testified.  <u>See</u> State Habeas

25   Petition Exhibit 18, ¶ 50.  When called as a defense witness at the penalty re-trial, Montiel's

26   father denied Montiel had been delusional before the homicide and denied he had ever heard

27   Montiel "talking about the devil."  Both of these statements conflicted with testimony from

28   Montiel's mother.  Montiel's mother also revealed that Montiel had been released from jail just

1   one month prior to the homicide.  Montiel further contends Birchfield's failure to interview and

2   prepare other mitigation witnesses, including his ex-wife Rachel and her mother Helen Pacheco,

3   resulted in inconsistent testimony, the impeachment of many witnesses, and prejudice to

4   Montiel.[39]

5        Montiel argues there is no reasonable or tactical justification for Birchfield's failure to

6   properly prepare witnesses, or to adequately investigate the facts of their intended testimony.

7   Montiel asserts that had Birchfield adequately investigated, he would have been able to

8   successfully exclude allegations of prior violence by Montiel.  Montiel contends if the jury had

9   heard consistent, favorable testimony which was devoid of references to prior episodes of

10   violence, it is reasonable the jury would have reached a different verdict.  Montiel states that

11   under Strickland and its progeny, Birchfield's representation was ineffective, and the California

12   Supreme Court's converse conclusion was contrary to established United States Supreme Court

13   precedent.

14        Montiel proposes to present the following evidence in support of this claim at an

15   evidentiary hearing: testimony by Birchfield that his failure to interview Montiel's parents

16   resulted in not knowing what testimony would be presented nor its scope, that he had no tactical

17   reason for this failure and it was caused by inadequate preparation[40]; testimony by Montiel's

18   mother and father, and by Birchfield[41] that Birchfield did not interview Montiel's parents until

19   the day they were scheduled to testify; and testimony from a Strickland expert that it was

20   standard practice to thoroughly interview witnesses.  The testimony by Montiel's parents and a

21   Strickland expert were not presented to the state court.

22        The Warden only responds to the allegation regarding the testimony of Montiel's father

23   denying that Montiel talked about the devil.  The Warden argues Birchfield cannot be held

24   responsible for every answer witnesses give and asserts that prejudice cannot be proved since

---

25   [39] Montiel admits in his reply he did not allege facts in his amended petition regarding Birchfield's failure to seek

26   exclusion of the allegation he assaulted his sister-in-law Yolanda Estrada 16 years prior.  Montiel now abandons this issue.

27   [40] Birchfield's declaration does not make these admissions.

28   [41] Birchfield does admit this in his declaration.

1  Montiel's mother testified she had heard Montiel make those remarks.  The Warden contends the

2  testimony of Montiel's father is not in direct conflict to the testimony from his mother, as the

3  jury could reasonably infer Montiel had talked about the devil at times when his mother, but not

4  his father, was present to hear him.  The Warden asserts Montiel's mother's testimony was in

5  fact bolstered by the testimony of his brother Antonio, who also said he heard Montiel talk about

6  the devil.

7          The Warden observes the claim regarding the testimony of Montiel's mother which

8  revealed that Montiel had been released from jail one month before the murder was considered

9  and rejected by the California Supreme Court on direct appeal, and that Montiel has not

10  mentioned this state court determination nor attempted to demonstrate it was unreasonable.  The

11  Warden contends Montiel has failed to show prejudice based on the introduction of adverse

12  evidence, and the California Supreme Court's rejection of this claim was a reasonable

13  application of <u>Strickland</u>.

14          Montiel admits in his reply that these allegations, standing alone, do not establish

15  prejudice, but contends that they do establish prejudice when considered in conjunction with the

16  numerous other incidents of ineffective assistance by Birchfield.  As the other claims that

17  Birchfield rendered ineffective assistance are without merit, see IAC analysis supra and infra,

18  there cannot be any cumulative error.  Claim 27 is denied an evidentiary hearing and is denied on

19  the merits.

20          17.   <u>Claim 29</u>

21          In Claim 29, Montiel asserts Birchfield failed to investigate and present facts in

22  mitigation regarding Montiel's reasons for drug use, and thus failed to counter Dr. Siegel's

23  characterization that Montiel was self-centered and seeking hedonistic pleasure, temporary

24  euphoria and escape.[42]

25          Montiel contends readily available witness testimony and records instead show Montiel

26  to be a chronically depressed individual, who after years of physical and psychological neglect

27  _____

28  [42] The mitigation allegations supporting this claim are mainly taken from the social history prepared in 1993 by
Gretchen White, Ph.D., in support of Montiel's first state habeas petition.  <u>See</u> Exhibit 8.

1   and deprivation, turned to alcohol and drugs as the only relief from anxiety, pain and failure.

2   Montiel asserts the available evidence in mitigation would have shown he was raised in an

3   environment of abject poverty, domestic violence and paternal abandonment.  Montiel alleges he

4   was exposed to toxic chemicals while living next to a cattle rendering yard and while working in

5   the fields and as a flagger for crop dusting, and that his parents' alcoholism contributed to the

6   continual poverty and neglect of the children.  Montiel asserts the inability of his parents to deal

7   with the loss of their Mexican and Yaqui Indian heritage contributed to the chaos and isolation in

8   the family, which was also exacerbated by his mother's belief in the supernatural and

9   unconventional healing.

10       The Warden asserts Montiel has not demonstrated that counsel at either his guilt trial or

11   penalty retrial were deficient, and even assuming Montiel shows that additional mitigating

12   evidence was available, the failure to present this evidence does not warrant reversal.  The

13   Warden argues the mitigation evidence Montiel now states Birchfield should have presented

14   would mainly have been cumulative to what was already presented, would not have countered

15   the horrendous nature of the murder, and is speculative.  The Warden contends the record shows

16   that Birchfield's failure to present more witnesses at the penalty retrial was not a result of

17   incompetence, and that he provided the jury with an overall picture of Montiel as someone who

18   was remorseful and should be allowed to live out the rest of his life in prison.  The Warden

19   further contends some of the evidence now proffered by Montiel includes negative aspects from

20   his childhood which were inconsistent with the overall defense strategy, or were solely related to

21   various members of Montiel's family and were irrelevant.  The Warden concludes the additional

22   mitigation offered by Montiel on habeas would not have altered the result in his case, and might

23   have elicited damaging rebuttal evidence.

24       The Warden asserts that the declarations by Montiel's proposed <u>Strickland</u> expert were

25   not presented to the state court, and that Montiel should not be permitted to rely on them because

26   he has failed to demonstrate he was not at fault for failing to develop that evidence in state court.

27   The Warden argues that even if the evidence is properly before this Court, it does not

28   fundamentally alter the nature of the claim presented in state court, and as such the state court's

1    adjudication is entitled to deference under the AEDPA and does not involve an unreasonable

2    application of Strickland.

3         Montiel replies that without a legitimate explanation of why he had used and abused

4    drugs, the jury was unlikely to accept the defense argument that his judgment and thinking was

5    altered by PCP.   Montiel asserts Dr. Siegel's testimony portrayed him as a self-centered,

6    hedonistic, drug-using murderer, which only led the jury to view his PCP use as aggravating the

7    crime.   Montiel disputes that Birchfield made a tactical decision to advance the positive aspects

8    of his childhood instead of the negative aspects, and argues the picture presented was materially

9    inaccurate.   Montiel contends that without a true picture of his childhood, there was no reason to

10   justify his drug use other than pleasure and hedonism.     Montiel contends Birchfield's

11   presentation of his childhood as normal and happy was not a reasoned choice, as Birchfield

12   failed to interview any of his family members until the day before they were called to testify.

13        Montiel argues the great majority of the information about his family would have been

14   admissible as explanation of his background and character.   Montiel asserts this information was

15   the basis for Dr. White's opinion that he was a person without the tools for a successful life.

16   Montiel contends neuropsychological testing like that performed by Dr. Watson (which

17   supported the finding that Montiel suffers from cognitive and neuropsychological deficits and

18   probable brain dysfunction), combined with testimony from a doctor with expertise in PCP

19   intoxication, would have provided powerful evidence that Montiel could not evaluate the moral

20   consequences of his conduct at the time of the murder.

21        Montiel and his family lived next to a rendering yard for ten years starting when he was

22   three years old, Ex. 8, ¶¶ 28–30, which in conjunction to working in the fields and as a flagger

23   for crop dusting[43], allegedly exposed him to toxic chemicals that caused his anxiety, depression,

24   and mood fluctuation (see Petition, ¶ 730), and could have been reasonably inferred as an

25   additional reason why he began inhaling toluene as early as age ten (in an alleged effort to

26   relieve these symptoms), which lead to his use of other drugs.   Montiel argues introducing

27

28   ───────────────
     [43] No dates for Montiel's work in the fields or as a flagger are given in the social history.

85

1   evidence from his childhood would not have opened the door to prejudicial information, since

2   evidence of his truancy and discipline problems would not have been surprising or disconcerting,

3   and evidence of gang membership was inadmissible. Montiel contends he was never a member

4   of a gang, observes that evidence of gang membership alone would not have been admissible so

5   it would have been irrelevant, and further, it is not a factor under California Penal Code § 190.3

6   so its admission would have been excludable as prejudicial.

7       Montiel contends that had Birchfield adequately investigated and presented evidence of

8   his background and childhood, it would have bolstered the opinion of Dr. Neurnberger, and there

9   is a reasonable probability his life would have been spared.  See Wallace v. Stewart, 184 F.3d

10  1112, 1118 (9th Cir. 1999) (remanding for evidentiary hearing upon finding a reasonable

11  possibility a death sentence would not have been imposed if background information had been

12  presented); Bean, supra, 163 F.3d at 1081 (holding counsel's failure to conduct a background

13  investigation and advise experts of the results of neuropsychological testing undermined

14  confidence in the penalty verdict).  Montiel asserts independent review of the record is proper

15  since the California Supreme Court did not provide a reasoned explanation for the denial of this

16  claim.  Montiel argues such a review will establish that relief is warranted under the standards

17  imposed by the AEDPA.

18      Montiel points to the following evidence about his character, childhood and background,

19  which was developed and presented during state habeas proceedings, as support for Claim 29.

20          Montiel's drug use began at about ten years old when he
            began sniffing glue, which continued until he was 16 or 17.  His
21          parents knew what was happening (although at trial they denied
            they knew Montiel used drugs prior to age 18), and that he was
22          missing school, but they were not able to address the problem.
            Montiel was routinely advanced to the next grade in school even
23          though he did poorly, resulting in his failing the ninth and tenth
            grades with Ds and Fs, and dropping out of school during the
24          second semester of tenth grade.  Montiel has little memory of
            school after the third or fourth grade because he was sniffing glue.
25          Neuropsychological testing indicates Montiel has significant
            learning disabilities and has severe attention and concentration
26          deficits in the mildly retarded range, conditions of which glue
            sniffing can be a contributing cause.  Montiel also began
27          developing headaches when he was 10 or 11, which may have been
            related to pesticide exposure as his mother associated them with
28          warm weather since he usually had them while working in the

fields in the summer.

After dropping out of school, Montiel began drinking more alcohol, sniffing less glue, and using seconal and Benzedrine. His younger brothers were using heroin. Montiel began dating his future wife, Rachel Estrada, when he was 16. He was drinking alcohol every day and working as a bus boy, and was actively abusing LSD, mescaline, "whites," and seconal. He tried to enlist in the military to serve in Vietnam, but was rejected. He was married when he was 18 and Rachel was 15, as she was pregnant.

Montiel's marriage was marked by arguments, and repeated separations and reconciliations (although Rachel testified they lived together for three years after their marriage, until they separated in 1970). Their first child, Julie Ann, was born July 7, 1967, after a separation of several months. Their second child, Sandra[44], was born 1 ½ years later, but she died of a heart defect at two weeks old. Their third child, Richard Jr., was born in 1970. Montiel and Rachel separated for the last time in 1971. During their last two separations, Montiel began to use heroin heavily. Rachel also became a heavy heroin user after the birth of their son.

In the year following the breakup of his marriage, Montiel became fully addicted and was hospitalized at least two times for drug overdoses. Montiel was committed to the Civil Addict Program at the California Rehabilitation Center ("CRC") in July, 1972. Between then and the murder in January, 1979, Montiel spent the majority of his time incarcerated on drug or drug-related offenses, with his longest period of parole lasting 10 months in 1977.

During the years of his marriage and subsequent incarcerations many of Montiel's close friends and relatives died, contributing to his sense of hopelessness. His best friend, Inez Salazar, died in a vehicle accident in 1969; his daughter Sandra died from a heart defect in 1969; his older brother Raymond died in 1975, allegedly from cirrhosis caused by heavy drinking following the breakup of his marriage; and his younger brother Manuel was murdered in 1977.

Montiel began using PCP at the end of 1976 during a two month parole from CRC. By 1977, he was smoking PCP a couple of times a week, and was noted to talk about magic, the supernatural, and being in "a different world." After his release in December, 1978 from the Kern County Jail, Montiel immediately returned to daily, heavy use of alcohol and PCP, which continued until the time of the homicide in January, 1979.

Declaration of Dr. Gretchen White, Exhibit 8.

Montiel asserts it was standard practice in 1986, and in fact was an obligation, for capital trial attorneys to use psychosocial histories as part of the defense when there were potential issues of drug or alcohol use. A psychosocial history provides information to bridge the cultural

---

[44] Sandra's name was provided by the testimony from Rachel and from Montiel's father. See 86 RT Vol. VI:221 and 354.

gap and enable the jury to understand why substance abuse should mitigate the offense and justify a sentence of life.   Montiel alleges counsel had a duty to conduct a reasonable investigation into these areas in order to be able to make informed decisions about how best to represent him, and that Birchfield failed to develop or use such a history in his defense.   Montiel contends that had Birchfield performed a reasonable investigation, evidence would have been uncovered to refute the prosecution's claim that Montiel had a tendency to be violent and was violent even when not intoxicated.

Montiel proposes to present the following evidence, which was presented to the state court during his habeas proceedings, in support of Claim 29 at an evidentiary hearing: testimony by Hortensia, Inez Salazar,[45] and Dr. White regarding symptoms of Montiel's depression during life-long drug abuse, childhood living conditions during childhood of severe poverty and malnutrition, parental absence due to work, father uninvolved, abusive, and repeatedly abandoned the family;[46] testimony by Dr. White regarding Montiel's psychosocial history, long standing alcohol and drug use, the contribution of many deaths to his depression and substance abuse, and the significant detrimental impact on his mental health from his mother's supernatural beliefs; testimony by Hortensia and Ismael Hernandez regarding Montiel's exposure to pesticides during his childhood;[47] testimony from Dr. Watson regarding brain dysfunction caused by prolonged abuse of toluene, Montiel's functioning at borderline intelligence, impairment by significant learning disabilities and very severe attention deficits, that the tests performed on Montiel were available in 1986, that failure in school leads to loss of self-esteem, depression and substance abuse; and school records showing poor attendance and academic performance, supporting the conclusions of Drs. White, Watson and Nuernberger by demonstrating social and

---

[45] Dr. White states in the social history that Inez Salazar died in 1969.  Ex. 8 at & 160.  A declaration from Ismael Hernandez, a childhood friend, was submitted on state habeas, which asserts Ismael and Montiel sniffed glue and drank alcohol together daily, and that he observed Montiel had rashes on his arms and irritated eyes while they were working in the fields.  State Habeas Exhibit 13.

[46] A declaration from Hortensia, which discussed Montiel's childhood, as well as Dr. White's social history, were presented to the state court on state habeas.

[47] Hortensia and Ismael Hernandez alleged in their declarations presented on state habeas that Montiel was exposed to pesticides during childhood.

1   mental problems during Montiel's childhood.[48]

2          Montiel also seeks to present the following evidence, which was not presented to the state

3   court, in support of Claim 29: testimony by Birchfield that he did not interview Montiel

4   regarding his drug use, that he did not investigate or request the preparation of a psychosocial

5   history, that he had no tactical reason for not doing so, that he would have presented information

6   from Montiel's psychosocial history if he had it, that his attempt to show Montiel as a happy,

7   normal child resulted from his failure to investigate;[49] testimony by Richard Sr. and Montiel

8   regarding symptoms of Montiel's depression during life-long drug abuse, childhood living

9   conditions during childhood of severe poverty and malnutrition, parental absence due to work,

10  father uninvolved, abusive, and repeatedly abandoned the family; testimony by Dr. Watson

11  regarding Montiel's exposure to pesticides during his childhood[50]; testimony from an agricultural

12  neurotoxic expert about the adverse health effects, including anxiety, depression and mood

13  fluctuations, from neurotoxic exposure, and the importance of exposure as a factor in causing

14  long-standing substance abuse; testimony from Rachel Estrada (Montiel's ex-wife) that Montiel

15  was engaged in self-destructive behavior during their marriage, was actively abusing drugs, and

16  got worse toward the end of the marriage;[51] testimony from a Strickland expert that it was

17  standard practice to order a psychosocial history and of his opinion on the  reasonableness of

18  Birchfield's presenting Montiel as a happy and normal child in light of the evidence of his

19  troubled history; testimony from a jury dynamics expert that Dr. Siegel's testimony about

20  Montiel's hedonistic drug use was a critical factor in sentence, that a psychosocial history would

21  have mitigated the impact of Dr. Siegel's testimony and made it more likely to view Montiel as

22  someone deserving of mercy; and his own testimony that he was not a member of the Mexican

23  Mafia.

24  _____

25  [48] Montiel's school attendance records are only provided from Kindergarten through 3rd grade, which is prior to the
    time when he states he began sniffing glue.

26  [49] Birchfield's declaration does not make these admissions.

27  [50] A declaration by Dr. Watson was presented on state habeas, but it did not comment about pesticide exposure.

28  [51] Rachel's testimony at the penalty retrial stated that Montiel was not using drugs while they were together.  No
    declaration making these contrary statements was presented on state habeas.

1    Montiel argues, like in <u>Wiggins</u>, <u>supra</u>, 539 U.S. 510, the California Supreme Court's

2    rejection of this claim involved an unreasonable application of clearly established United States

3    Supreme Court law.  Montiel asserts Birchfield's investigation of his family background was

4    extremely superficial, and did not meet the obligations embraced by Wiggins that capital counsel

5    explore all avenues leading to facts relevant to the penalty phase.  Montiel contends the real facts

6    – of his father's drinking binges, beatings of his mother, and abandonment of the family,

7    combined with their dire poverty and his mother's belief in magical remedies and her inability to

8    cope – explained the reasons for his substance abuse and the history of his ruined life.  Montiel

9    asserts that had the jury heard the full story, there is a reasonable probability his life would have

10   been spared.

11   The Warden contends, unlike counsel's investigation in <u>Wiggins</u>, Birchfield's

12   investigation into potential mitigation was reasonable in scope.  Birchfield chose to emphasize

13   the positive aspects of Montiel's early life and to argue he was not inherently violent, and his

14   substance abuse problem was the cause of his violent behavior on the date in question.  The

15   Warden observes that in pursuing this theory, Birchfield called a total of nineteen witnesses who

16   testified about Montiel's pattern of substance abuse starting as a teenager and to incidents of

17   Montiel hallucinating and speaking incoherently for weeks before the murder.  The Warden

18   argues that even if it is determined Birchfield inadequately investigated Montiel's substance

19   abuse, Montiel has failed to demonstrate he suffered resulting prejudice.  The Warden contends

20   Montiel's evidence is far less compelling than that in <u>Wiggins</u> as there is no evidence that

21   Montiel was physically or sexually abused, he was not removed from his home and placed in

22   foster care, and there is no allegation Montiel has diminished mental capacity, and Birchfield did

23   elicit testimony that drug abuse is a cause and result of, and that Montiel suffered from, life-long

24   depression.

25   An ineffective assistance claim has two components:  A petitioner must show that

26   counsel's performance was deficient, and that the deficiency prejudiced the defense.  <u>Strickland</u>,

27   466 U.S. at 687.  The question is whether counsel's deficient performance renders the result of

28   the trial unreliable or the proceedings fundamentally unfair."  <u>Lockhart v. Fretwell</u>, <u>supra</u>, 506

1    U.S. at 372.  Deficient performance falls below an objective standard of reasonableness, which is

2    defined in terms of prevailing professional norms.  Strickland, 466 U.S. at 688.  A reviewing

3    court must determine the prevailing professional norms, and where additional mitigation would

4    have been cumulative of evidence which was presented and would not have outweighed the

5    aggravating evidence of the circumstances of the crime and defendant's criminal history no

6    prejudice is shown.  Bobby v. Van Hook, 558 U.S. 4, 7-9, 12-13 (2009) (per curiam).  Even

7    assuming Birchfield was deficient in failing to investigate and present evidence of Montiel's

8    reasons for his drug use – that he was a chronically depressed individual, who after years of

9    physical and psychological neglect and deprivation, turned to alcohol and drugs as the only relief

10   from anxiety, pain and failure, and that he was raised in an environment of abject poverty,

11   domestic violence and paternal abandonment – it is not likely that the failure to present such

12   evidence would have prejudiced the defense sufficient to undermine confidence in the outcome

13   of the trial.

14        Montiel cites to Wiggins for support for this claim.  In that case, the mitigating evidence

15   counsel failed to discover and present was powerful.  Wiggins experienced severe privation and

16   abuse while in the custody of his alcoholic, absentee mother and physical torment, sexual

17   molestation, and repeated rape while in foster care.  His time spent homeless and his diminished

18   mental capacities further augment his mitigation case.  The Court held that Wiggins had the kind

19   of troubled history relevant to assessing a defendant's moral culpability.  Wiggins, 539 U.S. at

20   535; Penry v. Lynaugh, 492 U.S. 302, 319 (1989) (defendant's background and character are

21   relevant because of society's long-held belief that defendants who commit criminal acts which

22   are attributable to a disadvantaged background are less culpable).  Given the nature and extent of

23   the abuse Wiggins suffered, there is a reasonable probability that a competent attorney who was

24   aware of his history would have introduced it at sentencing and that a jury confronted with such

25   mitigating evidence would have returned with a different sentence.  Wiggins, 539 U.S. at 2542-

26   2543.  Instead, the only significant mitigating factor the jury heard was that Wiggins had no prior

27   convictions, and he had no record of violent conduct the State could have introduced to offset the

28   powerful mitigating narrative.  Id. at 2543.  The Supreme Court held that had the jury been able

to place Wiggins' excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance. Thus, the available mitigating evidence, taken as a whole, might well have influenced the jury's appraisal of his moral culpability. Id. at 2543-2544.

In contrast, Montiel's available mitigating evidence is less compelling, as he has no history of "severe privation and abuse" – there is no evidence he was sexually molested or raped, placed in foster care, or was homeless. Additionally, Montiel does have a history of prior violent incidents to counter the mitigating evidence, including a prior felony – second degree robbery in 1972 of Foster Freeze – and numerous other violent incidents – a scuffle and stabbing of his brother Antonio in 1968; an argument or fight with his sister-in-law Yolanda in1969; a theft at the Kern County fair in 1971, where he resisted arrest and made threats to the officers; and a misdemeanor burglary in 1973, to which Montiel pled guilty, involving the theft of a television from Anthony Ramirez. From the time Montiel was committed to the Civil Addict Program at the California Rehabilitation Center in July 1972, until the murder in January 1978, the majority of Montiel's time was spent incarcerated on drug or drug-related offenses, with the longest period in those more than five years that he was out of prison being ten months in 1977.

Montiel also relies on Caro v. Woodford, 280 F.3d 1247, 1255 (9th Cir. 2002), where counsel's non-strategic failure to investigate brain damage despite knowing of exposure to neurotoxicants was prejudicial. The Ninth Circuit remanded Caro's case for an evidentiary hearing, holding that counsel's nonstrategic failure to investigate Caro's brain damage, despite the known risk of neurotoxicants, constituted deficient performance under Strickland, and that a showing of brain damage would demonstrate prejudice to establish his ineffective assistance of counsel claim. Caro, 280 F.3d at 1250 (emphasis added). Three experts testified at an evidentiary hearing before the District Court that Caro suffered from brain damage caused by his exposure to neurotoxicants and/or his personal background. The experts concluded Caro suffered from "organic frontal brain damage," "structural and functional brain damage," and "persistent central nervous system and peripheral damage." The fact that Caro had a reasonably high IQ, high marks in school, satisfactorily performed in the Marines, negative blood results for

pesticides, and had normal psychiatric and neurological evaluations both before and after trial, was not found by the experts to be inconsistent with a finding of brain damage, especially frontal brain damage.  Following the presentation of the evidence, the District Court ruled that the record irrefutably established Caro suffered brain damage as a result of his exposure to toxic pesticides as well as his personal background, relying on Caro's presentation of expert opinions by three prominent, well-respected witnesses that he suffers from frontal lobe brain damage caused by head injury, exposure to toxic pesticides and the combination of both factors, and that the Warden did not present any witnesses or evidence to the contrary.

The Ninth Circuit upheld the District Court's findings that Caro's trial counsel provided ineffective assistance by failing to investigate and present evidence of Caro's brain damage, even though he was aware of Caro's extraordinary exposure to pesticides and toxic chemicals. Similarly, trial counsel did not present testimony at penalty of the effects of the severe physical, emotional, and psychological abuse Caro was subjected to as a child, including several instances of head injuries, and failed to present testimony of the detrimental impact such abuse had on Caro's brain.  The Court found the omitted evidence to be compelling, especially in light of the fact that the evidence of premeditation was not particularly strong.  The omitted evidence included expert testimony explaining the effects of Caro's psychological defects on his behavior, and that his behavior was physically compelled, not premeditated or due to a lack of moral control.

Caro's experts testified he suffered from brain damage caused by his exposure to neurotoxicants, his personal background, or some combination of the two.  First, it was determined that Caro suffered from organic brain damage, finding five indications of abnormality in the frontal lobe of Caro's brain (where three or more abnormalities are a reliable indication of damage).  These indications of abnormality included: (1) "mixed dominance" (preference for eye and foot opposite to that of hand preference), (2) a "suck" reflex (abnormal if found in adult), (3) a "snout" reflex (abnormal if found in adult), (4) paratonia (inability to relax limbs), and (5) apraxia (frontal lobe or subcortical dysfunction; inability to execute learned purposeful movements).  Also significant for the diagnosis of frontal brain damage were Caro's

1    history of pica (a symptom of a neurological or psychiatric disorder, which is usually only found

2    in children and is manifested by the ingestion of non-nutritive substances, such as large

3    quantities of dirt); head injuries; abuse by his mother and father; poisoning by Clorox; and

4    epileptic-type seizure, which he had as an adult.

5        Second, it was determined that Caro suffered from both structural and functional brain

6    damage based on: his chronic and acute exposure to cholinesterase inhibitors (used as

7    pesticides); his exhibition of many of the autonomic symptoms of such exposure, including

8    myosis of the eye, nausea, diarrhea, frequent and forced urination, constant thirst, and muscle

9    twitching; indicators of depression, including suicide threats; memory loss and other

10   disassociative events; his mother's anemia; poverty-stricken childhood; history of physical,

11   sexual, and emotional abuse; and childhood injuries.  It was also opined that Caro suffered from

12   a genetic abnormality, reflected in his family's history of alcoholism and depression, which

13   interacted with his exposure to neurointoxicants to increase the risk of brain dysfunction.

14       Finally, it was concluded that Caro suffers "persistent CNS [central nervous system] and

15   peripheral damage," due to acute and chronic exposure to neurotoxicants, citing Caro's early

16   exposure as a child of farm workers, his work as a flagger, and his work at FMC Chemical

17   Corporation.  Caro's multiple exposures to pesticides, from in utero right through infancy to

18   adulthood would "cause transient and permanent neurological, psychiatric, and behavioral

19   damage."

20       In contrast, as noted above in Claim 25, Montiel's evidence of brain damage is

21   significantly less serious than the evidence in Caro.  Dr. Watson found Montiel's test results

22   were supportive of "cognitive and neuropsychological deficits and probably brain dysfunction,"

23   and his functioning to be "at the level of borderline intelligence, . . . impaired by significant

24   learning disabilities and very severe attention/concentration deficits (in the mildly retarded

25   range)."  State Habeas Exhibit 12, 1993 declaration of Dr. Watson, ¶ 10.  Dr. Watson further

26   found Montiel's impairments "compromise his ability to hold and process information, to

27   understand cause and effect relationships in the context of a rapidly changing sequence of events,

28   and to engage in complex problem solving which requires logical, systematic thinking.  As a

94

1  result, . . . he has rather poor planning skills, is vulnerable to misinterpreting his environment

2  with consequent manifestations of inappropriate and ill-modulated behavior, and has difficulty in

3  making judgments that require deliberation and consideration of abstract consequences." Id. at ¶

4  13.  Dr. Watson's opinion of Montiel's intellectual deficits and brain dysfunction was based on

5  his abuse of toluene, not on pesticide exposure.  Id. at ¶ 11.

6      Birchfield did present evidence in mitigation, including testimony by Montiel's family

7  and friends about his drug use and the effect it had on him, and attempted to have the

8  prosecution's expert provide support for the theory that Montiel's ability to premeditate was

9  impaired by his drug use.  See Claim 24, supra, pages 85-86.  Even if  Birchfield had obtained an

10  expert who would have testified consistently with Dr. Watson's opinion, it is not likely, in light

11  of the limited evidence of brain injury, Montiel's less compelling background, and his history of

12  violence that the jury would have determined that the evidence of mitigation outweighed the

13  evidence in aggravation and have imposed a life sentence.  Claim 29 is denied an evidentiary

14  hearing and is denied on the merits.

15      19.    Claim 30

16      In Claim 30, Montiel contends that counsel failed to present evidence of consistently

17  good adjustment to confinement.

18      At the penalty retrial, Montiel presented evidence that he was a model prisoner both

19  while on death row and while in Kern County awaiting retrial.  The prosecutor suggested

20  Montiel modified his usual improper or violent behavior in order to improve the outcome of his

21  penalty retrial.  Montiel asserts Birchfield was ineffective for failing to present rebuttal evidence

22  showing Montiel's consistent adjustment to custody and non-violent history.  Montiel asserts the

23  following evidence was readily available and could have been presented: a 1972 parole agent

24  report that Montiel was "highly cooperative" while incarcerated; that Montiel was "a mainstay in

25  the group sessions" while in CRC in 1972; that during a disturbance in November of 1972,

26  Montiel influenced peace and harmony in his dorm and the institution; that Montiel had been

27  active in ethnic representation; that Montiel sought to help others and not just benefit himself;

28  that Montiel had been commended for voluntary work and was in leadership of the disciplinary

crew; that Montiel had "good institutional behavior and response" while in CRC in 1976; and that Montiel's program response was adequate and positive while at Tehachapi.   Montiel contends the presentation of this evidence would have convinced the jury Montiel did not present a significant risk if sentenced to life.

Montiel proposes to present the following evidence in support of this claim at an evidentiary hearing: testimony by Birchfield that he had no tactical reason or informed basis for failing to present history of good institutional adjustment, and that there was no persuasive evidence Montiel was a member of the Mexican mafia;[52] his own testimony that he was not a member of the Mexican mafia, that he intervened during a riot at CRC in 1972 to prevent further violence, was assigned to informational team following the riot and received a commendation for his participation, and that he did not discuss these things with Birchfield because he was not asked about them (no declaration was presented on state habeas stating this); testimony from parole agent C. Cordova that Montiel was highly cooperative while at the county jail;[53] testimony by CRC counselor F. O'Donnell that Montiel was a mainstay of group sessions, instrumental in maintaining peace and harmony during a racial disturbance in 1972, and good-natured with an altruistic character;[54] testimony from a Strickland expert that it was standard practice to demonstrate positive institutional adjustments and that Birchfield should have investigated and presented mitigation from Montiel's institutional history (not presented on state habeas); and testimony from a jury dynamics expert that had Birchfield presented evidence of good institutional adjustment, the jury would have been persuaded Montiel was not a significant disciplinary or safety risk if sentenced to life and would have been less likely to sentence him to death.  The Strickland and jury dynamics opinions were not presented on state habeas.

The Warden argues Birchfield's failure to present evidence of Montiel's earlier custodial history was based on tactics to avoid mentioning Montiel was a member of the Mexican Mafia, a

---

[52] Birchfield's declaration does not make this admission.

[53] This is stated in the November 2, 1972 report in Exhibit 2 (submitted in support of both State and Federal Petitions).

[54] These conclusions are stated in the 3/26/73 report contained in Exhibit 2.

1   violent prison gang.  The Warden observes Montiel's counsel from the guilt trial filed a motion

2   in limine to prohibit the prosecution from introducing any evidence about his gang membership,

3   and that Victor's interview with detectives and Montiel's CRC records contain allegations that

4   he was associated with the Mexican Mafia.  The Warden further argues the evidence Montiel

5   states should have been presented would have opened the door to presentation of negative

6   evidence of his adjustment, showing numerous disciplinary actions.  The Warden asserts that

7   whether or not Montiel actually belonged to the Mexican Mafia, Birchfield could have

8   reasonably concluded it would have been disastrous for the jury to hear this evidence.

9       The Warden asserts Montiel's declaration submitted in support of this claim was not

10   presented to the state court, and that Montiel should not be permitted to rely on it because he has

11   failed to demonstrate he was not at fault for failing to develop that evidence in state court.  The

12   Warden argues, that if the evidence is properly before this Court, it does not fundamentally alter

13   the nature of the claim presented in state court, and as such the state court's adjudication is

14   entitled to deference under the AEDPA and does not involve an unreasonable application of

15   Strickland.

16      Montiel replies there is no evidence Birchfield knew of the allegations of gang

17   membership, as he waited until the last moment to prepare for trial and it is extremely unlikely

18   he obtained Montiel's institutional records.  Montiel asserts again that he was never a member of

19   the Mexican Mafia, that there is no evidence of his membership, and that his institutional records

20   merely refer to possible gang membership.  Montiel contends had the prosecutor attempted to

21   rebut evidence of good institutional adjustment with evidence of gang membership, Birchfield

22   could have blocked the rebuttal at an in limine hearing.  Montiel argues even if the evidence of

23   gang membership had come before the jury, the negative value of such evidence would have

24   been outweighed by the fact that he always did well in custody and had shown strong leadership

25   in attempting to restore the peace before and after a major prison riot.

26      Montiel argues that since penalty phase jurors weigh moral, not legal, culpability, the

27   power of such evidence is enormous.  In (Terry) Williams, supra, 529 U.S. at 398, the counsel's

28   failure to present mitigation including commendations awarded to Williams for helping break up

1   a prison drug ring and for returning a guard's wallet were found prejudicial under Strickland.

2   Montiel contends he did far more than Williams, and the California Supreme Court's

3   determination there was no prejudice from trial counsel's failure to present mitigation was

4   objectively unreasonable.

5       The sentencer in a capital case cannot be precluded from considering any relevant

6   mitigating evidence.  Eddings v. Oklahoma, 455 U.S. 104 (1982); Lockett v. Ohio, 438 U.S. 586

7   (1978).  Testimony that a defendant proffers regarding his past good behavior while incarcerated

8   might serve as a basis for a sentence less than death, so such evidence may not be excluded from

9   the sentencer's consideration.  Skipper v. South Carolina, 476 U.S. 1, 4-5 (1986).

10      Montiel must show both deficient performance and actual prejudice resulting from the

11  deficiency to prevail on a claim of ineffective assistance of counsel.  Birchfield did present the

12  testimony of four witnesses (a guard, a teacher and the psychiatrist from San Quentin, and a

13  guard from the Kern County jail) who stated Montiel exhibited good behavior while in prison.

14  Birchfield's failure to additionally present the CRC documents may have been tactical, as the

15  documents contain negative information, including a reference to Montiel's gang affiliation.  Ex.

16  2 to Federal Petition, 6/19/75 Referral to Outpatient Status (Montiel's adjustment to institutional

17  life below average); 6/6/77 Report to Narcotic Addict Evaluation Authority (Montiel stabbed

18  while in county jail, anonymous information indicated Nuestra Familia ordered him killed

19  because of his association with Mexican Mafia); 6/10/77 Case Conference (same); 7/6/77

20  Closing Summary, CRC Corona (Montiel's brother Manuel was killed by what appeared to be

21  Nuestra Familia gang members); 7/21/77 Letter to Presiding Judge of Kern County Superior

22  Court (Montiel had four stays in Civil Addict Program for 1,805 days, and was previously

23  reviewed for exclusion due to burglary and sales and use of narcotics, now excluded for gang

24  association).   In addition to presenting evidence of Montiel's mental state and degree of

25  intoxication, Birchfield also presented the testimony of various family members that Montiel's

26  family life was happy, and that he was well behaved and a good student until he chose the wrong

27  friends and became involved with drugs and alcohol in high school.  Further, the prosecutor did

28  not argue that Montiel would be dangerous in the future, but argued that Montiel had behaved

well in prison in order to make a good impression on retrial.

In (Terry) Williams, supra, 529 U.S. 362, trial counsel failed to investigate and present evidence in mitigation which included Williams' commendations for helping to crack a prison drug ring and for returning a guard's wallet, as well as testimony that he was "least likely" to be dangerous and seemed to thrive in a structured environment, as well as extensive records describing Williams' nightmarish childhood, the imprisonment of his parents for criminal neglect, severe and repeated beatings by his father, his removal from home and one abusive foster home, and that Williams was "borderline mentally retarded" and didn't advance beyond sixth grade. Even though the background evidence contained some negative information (two juvenile commitments for aiding and abetting larceny when he was 11, pulling a false fire alarm when he was 12, and breaking and entering when he was 15), the decision not to introduce the voluminous amount of evidence that did speak in Williams' favor was not a tactical decision, but an omission due to the lack of preparation by trial counsel. Whether or not the omissions were sufficiently prejudicial to have affected the outcome, they demonstrated that trial counsel failed to conduct a thorough investigation into Williams' background. 529 U.S. at 1514-1515.

Unlike (Terry) Williams, Birchfield did present evidence of Montiel's good adjustment in prison through the testimony of prison employees, who were more likely to be viewed as unbiased by the jury than other witnesses. Even if Birchfield's failure to present the CRC documents was deficient performance, it could not have resulted in prejudice as similar evidence was before the jury. Further, the CRC documents do contain references which contradict Montiel's contention, and show he did not always have a good adjustment to institutional life. Claim 30 is denied an evidentiary hearing and is denied on the merits.

### 20.   Claim 32

In Claim 32, Montiel contends that counsel failed to move to recuse the district attorney.

Montiel contends Kern County has a long history of excluding members of Montiel's race (Hispanic and Native American) from civic affairs and from fair, equal treatment in the criminal justice system. Claim 32 incorporates the allegations and arguments from Claim 31. See also Exhibits 16 and 26, declarations of H. A. Sala, Esq.; Exhibit 25, declaration of David J.

Rivera, Esq.; Exhibit 27, declaration of Stanley Simrin, Esq.; and <u>Garceau v. Calderon</u>, F-95-cv-5363, Claim H.  Montiel seeks leave to file excerpts from <u>People v. Sixto</u>, Kern County Case No. 22566, addressing systematic exclusion.  Montiel asserts it was within the ability of both Lorenz and Birchfield, and was their duty, to move for recusal of the Kern County District Attorney's office.  Montiel alleges counsels' failure to do so deprived him of a fair guilt trial and a reliable determination of penalty by risking that the outcome of his trials were affected by impermissible considerations of race.

Montiel proposes to present the following evidence in support of this claim at an evidentiary hearing: testimony by attorneys David Rivera, H.A. Sala and Stanley Simrin[55] regarding the long history of excluding Hispanics from civic affairs in Kern County and that the District Attorney's office engaged in prejudicial charging, negotiations, disparate treatment of victims based on race and had a pattern and practice of striking Hispanics from jury venires; and testimony by Lorenz and Birchfield that they have numerous years of experience in Kern County and knew or should have known about Hispanic animus pervasive in Kern County;[56] and testimony from a <u>Strickland</u> expert that a competent Kern County practitioner would have moved to recuse the District Attorney's office in light of the discriminatory pattern and practice of animus against the same race as the defendant.  No evidence of these assertions, except the declaration of Mr. Sala, was presented on state habeas.

The Warden asserts the declarations submitted in support of this claim were not presented to the state court, and that Montiel should not be permitted to rely on them because he has failed to demonstrate he was not at fault for failing to develop that evidence in state court.  The Warden argues that if the evidence is properly before this Court, it does not fundamentally alter the nature of the claim presented in state court, and as such the state court's adjudication is entitled to deference under the AEDPA and does not involve an unreasonable application of <u>Strickland</u>.

---

[55] Mr. Rivera stated that Kern County prosecutors in 1987 had a practice of striking Hispanics from juries; Mr. Sala stated that from 1983-1990, Kern Co. prosecutors treated Hispanic and African-American defendants unfairly as compared to Caucasian defendants, as well as striking Hispanics from juries; and Mr. Simrin stated that in his 25 years of practice in Kern Co. (up to 1996), prosecutors had a practice of striking Hispanics from juries.

[56] Birchfield's declaration does not make this admission.

1    The Warden contends the recusal of a prosecutor, or of an entire prosecutorial agency,

2    requires showing a conflict exists which would render a fair trial unlikely.  The stringent two-

3    part test established in California for granting a recusal motion requires a showing that "the

4    circumstances of the case evidence a reasonable possibility that the District Attorney's office

5    may not exercise its discretionary function in an evenhanded manner," and that the conflict is so

6    grave as to render fair treatment throughout the defendant's criminal proceedings unlikely.

7    California Penal Code § 1424.  The Warden asserts Montiel cannot show he was prejudiced by

8    the failure of his counsel at guilt or penalty to move for recusal.  The Warden contends Montiel

9    has not claimed, and even if so claimed cannot adequately support, that his case was affected by

10   the absence of Latinos from positions of authority in the county and the District Attorneys'

11   office.  Additionally, the Warden asserts Montiel has not attempted to show that his guilt trial

12   was affected by the alleged practice of the Kern County District Attorney's office to

13   discriminatorily challenge jurors based on race, and that any allegations of discriminatory

14   challenges from the penalty retrial were supported by valid, non-discriminatory reasons as

15   discussed in Claim 4(C).

16   Montiel replies the presence of discriminatory bias in the Kern County prosecutor's

17   office tainted every stage of his trial, and justifies recusal based on a violation of his

18   constitutional rights.  Montiel argues the submitted declarations of three lawyers who regularly

19   practice in Kern County are sufficient to substantiate a colorable claim, and that at a minimum

20   the Warden's opposition presents a factual dispute which at the least requires an evidentiary

21   hearing.  Montiel contends the denial of this claim by the California Supreme Court was an

22   unreasonable application of <u>Strickland</u>, and the lack of a reasoned analysis by the state court

23   requires independent review.

24   Montiel must show both deficient performance and actual prejudice resulting from the

25   deficiency to prevail on a claim of ineffective assistance of counsel.

26        California courts have visited the issue of recusing state
          prosecutors a number of times.  For recusal to be ordered, "the
27        conflict must be of such gravity as to render it unlikely that
          defendant will receive a fair trial unless recusal is ordered."
28        <u>People v. Conner</u>, 34 Cal. 3d 141, 147, 193 Cal. Rptr. 148, 666 P.

2d 5 (1983) (citing Calif. Penal Code § 1424).

Matter of Grand Jury Investigation of Targets, 918 F. Supp. 1374, 1378-79 (S.D. Cal. 1996) (footnotes omitted). See also U.S. v. Mapelli, 971 F.2d 284, 287-88 (9th Cir. 1992) (two AUSAs disqualified for exposure to defendant's immunized testimony, but entire office not disqualified); People v. Conner, 34 Cal.3d 141, 148 (1978) (entire felony division of Santa Clara District Attorney's office disqualified because one of the prosecutors was shot at by the defendant, and talked about the incident with over half of his co-workers); People v. Lepe, 164 Cal. App. 3d 685, 689 (1985) (entire District Attorney's office disqualified where District Attorney himself had previously represented the defendant and had the power to hire, evaluate, promote and fire the deputies under him).

Montiel's allegations of county-wide animus against, and exclusion of, Hispanics are insufficient to show such a grave conflict existed so that recusal of the entire Kern County District Attorney's office was justified.   Despite Montiel's assertions to the contrary, the submitted declarations in support of this claim do not state a colorable claim, and the Warden's position to that effect does not create a factual dispute which requires an evidentiary hearing. Montiel must show both deficient performance and actual prejudice resulting from the deficiency to prevail on a claim of ineffective assistance of counsel.   As there is no showing which establishes prejudice from this claim, it cannot form a basis for ineffective assistance by counsel. Claim 32 is denied an evidentiary hearing and is denied on the merits.

## B.     Prosecutorial Misconduct Claims

Montiel contends that habeas relief is warranted due to prosecutorial misconduct.  Claims 8, 21, 28 are premised upon the issue of prosecutorial misconduct.   "A prosecutor's actions constitute misconduct if they 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"   Wood v. Ryan, 693 F.3d 1104, 1113 (9th Cir. 2012) (quoting Darden v. Wainwright, 477 U.S. 168, 181 (1986)).  "The appropriate standard of review for such a claim on a writ of habeas corpus is the narrow one of due process, and not the broad exercise of supervisory power."   Id. (quoting Darden, 477 U.S. at 181).  "On habeas review, constitutional errors of the 'trial type,' including prosecutorial misconduct, warrant relief only if

the 'had substantial and injurious effect or influence in determining the jury's verdict.'"   Id.
(quoting Brecht v. Abrahamson, 507 U.S. 619, 637-38 (1993)).

       1.     Claim 8

In Claim 8, Montiel contends that the prosecutor relied upon an inadmissible confession
during trial.

Montiel alleges that at the time of his arrest he was intoxicated on PCP to the extent that
he had no memory of what happened prior to his arrest.  In response to questions from cellmates,
Montiel contends he explained his understanding of the charges against him, that the authorities
"said" he had committed certain crimes.

Montiel alleges the following facts regarding the trial testimony from one of his
cellmates, Michael Palacio, a.k.a. Michael Castro (hereafter "Palacio"[57]):

     1.     Palacio was acting at the request of law enforcement as he talked to them before
questioning Montiel, made a deal with law enforcement in exchange for the
information, testified against Montiel in return for dismissal of pending felony
marijuana charges against him, and falsely testified that no officer asked him to
elicit a confession from Montiel.

     2.     Palacio received information about the charges against Montiel from a newspaper
article prior to questioning Montiel.

     3.     Palacio, after requested to by the prosecutor, failed to disclose Montiel appeared
"high" at the time of their conversations.

     4.     Palacio was told by his parole officer he would suffer "consequences" if he failed
to testify.

Montiel asserts the following actions by the prosecutor were misconduct: (a) the failure
to disclose Palacio was acting at the request of law enforcement while he was questioning
Montiel; (b) false and misleading testimony was presented that Palacio spoke to Montiel before

---

[57] The California Supreme Court referred to this witness as Michael Palacio in both direct appeal opinions, as does
Montiel in the federal petition.  The declaration in support of the amended petition, dated March 17, 1995, is signed
Michael Castro, but states he is also known as Michael Palacio.  Ex. 24.  This order will use "Palacio" to maintain
uniformity with the petition and state court opinions.

1   he had contact with law enforcement, that Palacio contacted law enforcement versus law

2   enforcement contacting Palacio, and that Palacio did not receive information about the case

3   before he talked to Montiel; and (c) the failure to prove that Montiel's statement was voluntary in

4   light of his intoxication.

5       Montiel contends that had the prosecution disclosed the above information, Lorenz could

6   have successfully moved for suppression of the alleged admissions as the product of an unlawful

7   government interrogation and as involuntary under then-existing California law.  The alleged

8   admissions would have then been unavailable as a basis for the clinical determination of

9   Montiel's mental state.  Montiel argues Lorenz's failure to investigate and object to Palacio's

10  testimony was deficient performance and was prejudicial.

11      Montiel asserts the conclusions reached by the state courts were unreasonable

12  determinations of the facts, and the admission of his statements were contrary to established

13  United States Supreme Court precedent which unduly prejudiced his trial since it was the only

14  evidence of criminal intent being formed prior to the murder.

15      Montiel proposes to present the following evidence in support of this claim at an

16  evidentiary hearing which was not presented to the state court: testimony by Palacio, Detective

17  Orman and Detective Clendenen that Palacio made a deal to extract information from Montiel

18  and to testify in exchange for the dismissal of pending felony charges, that they first met after

19  Palacio was summoned from his cell by the detectives, and the detectives asked Palacio to

20  investigate whether Montiel remembered facts about the crime; testimony by Palacio that prior to

21  his testimony at Montiel's trial his parole agent threatened negative consequences would result

22  should he fail to testify, that the District Attorney's office told him not to mention Montiel's PCP

23  use or that Montiel was still under the influence while in his cell, that his prior statements to

24  detectives are not a fair and accurate representations of his interaction with Montiel, that Montiel

25  did not talk until after he was prompted, that he did not ask the jailer to set up a meeting between

26  him and detectives; and Montiel's own testimony that he first spoke with Palacio after his

27  arraignment, and was still recovering from PCP use at the time.

28      The Warden asserts Palacio has renounced critical portions of the 1995 declaration upon

1   which Montiel relies.  Also, the Warden argues the transcript of Palacio's January 17, 1979

2   interview directly conflicts with his 1995 declaration, as during the interview Palacio related a

3   number of details about the Ante killing he could only have learned from Montiel.  The Warden

4   further contends Montiel's allegation that he was unable to make a reasoned and intelligent

5   waiver of his rights and confess to Palacio is contradicted by the fact that Montiel did exercise

6   his right to remain silent on January 16, 1979, when given his Miranda rights by detectives.

7   Miranda v. Arizona, 384 U.S. 436, 444 (1966).  The Warden argues that generally, statements by

8   defendants to cellmates are admissible, unless government agents deliberately elicited the

9   incriminating statements after the right to counsel attached.  Massiah v. United States, 377 U.S.

10  201, 206 (1964); United States v. Henry, 477 U.S. 264, 267 n.3 (1980); Kuhlmann v. Wilson,

11  477 U.S. 436, 459 (1986) (Massiah violation requires some action beyond mere listening which

12  is designed to deliberately elicit incriminating remarks).  The Warden argues that Montiel fails to

13  offer any evidence beyond what was presented on state habeas, that evidence refuting Palacio's

14  1995 declaration has been presented, and that the record shows the facts Palacio said Montiel

15  revealed were not part of the police reports at the time, but only confirmed later.  The Warden

16  contends even accepting Montiel's allegations that law enforcement deliberately used Palacio to

17  elicit an unknowing confession, the admission of the confession was harmless beyond a

18  reasonable doubt, since even without the confession the evidence was substantial of Montiel's

19  intent to steal and to kill, and that he premeditated and meaningfully reflected on the

20  consequences of his actions.

21      Montiel contends the prosecution violated Brady v. Maryland, 373 U.S. 83, 87 (1963), by

22  instructing Palacio not to disclose information about PCP and Montiel's symptoms.  Montiel

23  asserts Palacio's trial testimony was prejudicial since it was the only evidence that he obtained a

24  knife after seeing the money in the victim's shirt, which undoubtedly persuaded the jury Montiel

25  was in control and capable of premeditation.  Without this evidence, Montiel argues it is

26  reasonably probable the jury might have given him the benefit of the doubt on his diminished

27  capacity claim.

28      Montiel moves to strike the Warden's Supplemental Exhibit 4 to supplemental opposition

1   to first amended petition, a report of a December 19, 1999 interview of Palacio by special agent

2   Juan Morales, on the ground that it consists of hearsay and contains information which would not

3   be admissible at a hearing under Rule 56(e) of the Federal Rules of Civil Procedure.

4   Alternatively, if this evidence is considered, Montiel contends it establishes the existence of

5   disputed facts which require resolution at an evidentiary hearing.

6        This claim was presented to the state court in Montiel's state habeas petition (claim IX) ;

7   the court summarily denied it on its merits.

8        Under Brady, "the suppression by the prosecution of evidence favorable to an accused

9   [Brady evidence] violates due process where the evidence is material either to guilt or to

10   punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at

11   87. There are two general types of Brady evidence: knowing use of perjured testimony, and

12   failure to disclose exculpatory evidence. United States v. Agurs, 427 U.S. 97 (1976); United

13   States v. Bagley, 473 U.S. 667, 678 (1985).

14        Presentation of false evidence violates due process and requires a new trial. Mooney v.

15   Holohan, 294 U.S. 103, 112 (1935). This is so even where the prosecution does not solicit the

16   false information but only allows it to go uncorrected, Napue v. Illinois, 360 U.S. 264, 269

17   (1959), irrespective of the good or bad faith of the prosecution. Brady, 373 U.S. at 87. To

18   justify a new trial, the false evidence must be material, i.e., reasonably likely to affect the

19   judgment of the jury. Id. "The principal [underlying Brady] is . . . avoidance of an unfair trial to

20   the accused." Id. The knowing use of perjured testimony is material "if there is any reasonable

21   likelihood that the false testimony could have affected the judgment of the jury." Agurs, 427

22   U.S. at 103. This is equivalent to the Chapman v. California, 386 U.S. 18, 24 (1967) harmless

23   error standard. Bagley, 473 U.S. at 679-80 n.9

24        The failure to disclose exculpatory and impeachment evidence favorable to the defense is

25   material "if there is a reasonable probability that, had the evidence been disclosed to the defense,

26   the result of the proceeding would have been different. A 'reasonable probability' is a

27   probability sufficient to undermine confidence in the outcome." Bagley, 473 U.S. 682. Bagley

28   materiality is not a sufficiency of the evidence test. Kyles v. Whitley, 514 U.S. 419, 435 (1995).

1  "The question is not whether the defendant would more likely than not have received a different

2  verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial

3  resulting in a verdict worthy of confidence."  Id. at 434.

4         Montiel's proffered testimony by Palacio alleges that his parole agent threatened negative

5  consequences if he failed to testify at Montiel's trial; that the District Attorney's office told

6  Palacio not to mention Montiel's PCP use or that Montiel was still under the influence while in

7  his cell; that his prior statements to detectives are not a fair and accurate representation of his

8  interaction with Montiel; that Montiel did not talk until after he was prompted; and that he did

9  not ask the jailer to set up a meeting between him and detectives.  These statements are contrary

10 to Palacio's trial testimony, and are based on a declaration made in 1993 (but not signed until

11 March, 1995).  Ex. 24.  The Warden submitted an investigative report by DOJ Investigator Juan

12 Morales, of a December 13, 1999, interview with Palacio and counsel for the Warden where

13 Palacio refutes the statements in his 1993/1995 declaration and affirms his trial testimony.

14 Suppl. Ex. 4.  In the 1999 interview, Palacio did admit Montiel was high on something, possibly

15 PCP, when he first was brought into the cell, but asserts that despite this Montiel was still able to

16 recall details about the murder.  Id., at pg. 2-3. The Warden filed a transcript of the interview

17 between Palacio and Sheriff's Investigators Orman and Clendenen on January 17, 1979, which

18 supports the testimony Palacio gave at trial and relates Montiel's statement that he used the

19 money taken from Ante to buy heroin and clothes, but does not say that Montiel was still high

20 when he was brought to the jail cell.  Suppl. Ex. 2.

21        Palacio admitted at trial that he read a newspaper article about Montiel's crime, but

22 denied that he read the article before his first conversation with Montiel.  79A Vol.II:288.  The

23 prosecutor offered the relevant newspaper articles to show that some of the information Palacio

24 testified to was not contained in the articles.  A redacted transcript of the articles was submitted

25 to the jury.  Id., at 297-302; 79A CT Vol.II:244.  This issue was presented to, and resolved by,

26 the jury.

27        Palacio did not testify at the preliminary hearing that Montiel was under the influence of

28 PCP when he talked with him, but stated Montiel said he used the money taken from Mr. Ante to

1   buy a "spoon of heroin" and some clothes.  79A CT Vol.I:124, 126.  At trial Palacio only

2   testified Montiel used the money to buy clothes.  79A RT Vol.II:285.  Even if Palacio had

3   testified that Montiel appeared to be intoxicated on PCP at the time they talked, it is not

4   reasonably likely to have affected the judgment of the jury.

5       Palacio related in the 1999 interview with the AG and DOJ investigator, that he initially

6   thought he would only have to testify at Montiel's preliminary hearing, but was later told if he

7   did not testify at the trial the agreement to dismiss the marijuana charges would be invalidated.

8   Palacio asserts that he testified truthfully at the preliminary hearing and the trial.  Suppl. Ex. 4.

9   The proffered evidence is insufficient to undermine confidence in the outcome of Montiel's trial.

10      The only evidence indicating that Palacio's questioning of Montiel was at the request of

11  law enforcement is from the 1993/1995 declaration, which is contradicted by Palacio's initial

12  interview with law enforcement, his testimony at both the preliminary hearing and the trial, and

13  his 1999 interview.  Palacio's testimony at trial stated he initiated contact with the detectives,

14  that he did not talk to anyone from the sheriff's office prior to his first conversation with Montiel

15  and he did not question Montiel but asserts instead that Montiel volunteered the information.

16  79A Vol.II:287.  The transcript of Palacio's January 17, 1979 interview with Sheriff's

17  Investigators Orman and Clendenen affirms that Palacio initiated the contact with law

18  enforcement.  Suppl. Ex. 2.  In light of the evidence presented at trial, and of the prior consistent

19  statements from Palacio that he initiated contact with law enforcement and his later reiteration of

20  that fact, the 1993/1995 declaration, attached as Ex. 24 to the amended petition, is insufficient to

21  establish that perjured testimony was presented, to establish misconduct by the prosecutor, or to

22  undermine confidence in the outcome of Montiel's trial.

23      Montiel has failed to show the recantation by Palacio in his 1993/1995 declaration is

24  credible or undermines confidence in the outcome.  Claim 8 is denied an evidentiary hearing and

25  is denied on the merits.

26      2.   Claim 21

27      In Claim 21, Montiel contends that the prosecutor improperly used peremptory

28  challenges based upon race.

1    During jury selection, the prosecutor exercised peremptory challenges against two
2    women with Hispanic surnames, following which the defense objected.  The trial judge said he
3    could see a reason for the challenge of Elizabeth Gutierrez, but the reason to challenge Sonja
4    Gomez was less clear.  The prosecutor responded he was excusing jurors who had no strong
5    feelings on the death penalty.  The judge noted there were about 11 others who had said the same
6    thing and the prosecutor was "treading on dangerous ground."  '86RT Vol. III:473-74.  The trial
7    judge found the defense failed to make a showing of systematic exclusion because there was a
8    reason to excuse Ms. Guiterrez.  The judge denied the motion, stating that at least the prosecutor
9    had a reason other than race.  Montiel claims that contrary to the prosecutor's stated reason, Juror
10   Renz, Juror Reinelt, Juror Sanchez, Juror Semas and Mrs. Guimarra, all had views on the death
11   penalty as neutral as, or weaker than, Mrs. Gomez's view.  Montiel asserts the trial judge
12   committed clear error in the belief that more than one impermissible challenge must occur before
13   systematic exclusion is shown.

14   The California Supreme Court denied this claim on the merits, holding that although the
15   trial court mistakenly believed only multiple discriminatory exclusions were forbidden, the
16   ultimate denial of Montiel's motion was proper as the prosecutor's statement about Mrs.
17   Gomez's views on the death penalty was revealed by further discussion to be a genuine, non-
18   discriminatory reason for the challenge.  Montiel II, 5 Cal. 4th at 909-11.

19   Montiel contends the merits of the claim of systematic exclusion of Hispanics was not
20   resolved, despite the state court addressing this issue on direct appeal, as the incorrect legal
21   standard was used, the state court's conclusion is not fairly supported by record, and there was
22   no full and fair hearing.  Montiel argues the state court imposed the incorrect standard from
23   Wheeler, supra, 22 Cal. 3d 258, that required him to show a "strong likelihood" of discrimination
24   in order to establish a prima facie case of racial bias, instead of the "inference" of discrimination
25   standard from Batson, supra, 476 U.S. 79.  Montiel asserts that where the state court uses the
26   incorrect standard, the rule of deference under the AEDPA does not apply, see Fernandez v. Roe,
27   286 F.3d 1073, 1077 (9th Cir. 2002), and the claim should be reviewed de novo.

28   Montiel proposes to present the following evidence in support of this claim at an

1   evidentiary hearing which was not presented to the state court: testimony by Birchfield that he
2   did not know the proper legal standard under <u>Wheeler</u>, that he did not recognize the prosecutor
3   failed to excuse non-Hispanics with equal or stronger positions as that stated for the excusal of
4   Ms. Gomez, that he had no tactical reason not to renew the objection prior to swearing in the
5   jury;[58] testimony from a <u>Strickland</u> expert that it was standard practice to be familiar with the
6   relevant voir dire legal standards, and that the failure to renew an objection fell far below the
7   standard of representation in the community; and testimony by prosecutor Andrew Baird that his
8   stated reason for excusing Ms. Gomez was inconsistent with her answers, since he did not excuse
9   non-Latino jurors with similar answers.[59]

10      The Warden asserts the trial judge's finding of no purposeful discrimination was a factual
11  finding entitled to deference.  The Warden concludes the trial judge correctly resolved the issue,
12  as the California Supreme Court found on direct appeal.  The Warden disputes Montiel's
13  assertion that, based on a comparative analysis of other jurors, the prosecutor's reason for
14  excusing Ms. Gomez was pretext for discrimination, and argues the other jurors cited stated
15  stronger support for the death penalty than did Ms. Gomez.

16      The Warden agrees with Montiel that the state court's application of the incorrect legal
17  standard requires de novo review of this claim, but asserts such review is limited to the question
18  of whether there was a prima facie showing of bias.  See <u>Paulino v. Castro</u>, 371 F.3d 1083, 1090-
19  92 (9th Cir. 2004).  The Warden does not dispute Montiel made a prima facie showing that one
20  or more jurors were excluded on the basis of race, but argues there was no prejudice because the
21  prosecutor offered a race-neutral explanation and the trial court ultimately ruled the prosecutor
22  did not intentionally discriminate against Hispanics.  The Warden asserts this is a factual finding
23  which relies largely on an assessment of the prosecutor's credibility and is entitled to deference
24  since it is fairly supported by the record.   <u>Hernandez v. New York</u>, 500 U.S. 352, 364-365
25  (1991).

26      Montiel replies that other jurors did not state stronger support for the death penalty than

27  [58] Birchfield's declaration does not make these admissions.

28  [59] No declaration is submitted from Mr. Baird making these admissions.

1   did Ms. Gomez, and the trial court's ruling was based on a mistaken view that the discriminatory

2   excusal of a single juror was permitted.   Montiel asserts the trial court failed to make an

3   appropriate finding under <u>Wheeler</u> by failing to make a proper comparative analysis with respect

4   to non-Hispanic jurors who were not excluded, thus misapplying the legal standard.  <u>See</u> <u>Burks</u>

5   <u>v. Borg</u>, 27 F.3d 1424, 1428 (9th Cir. 1994).  Montiel argues the comparative analysis of struck

6   and remaining jurors establishes the prosecutor's race-neutral reason was a pretext for

7   discrimination, and the trial court's failure to make a determination whether there was purposeful

8   discrimination undermines the statement that the prosecutor had a reason other than race for

9   excusing Ms. Gomez.  Montiel also contends trial counsel was ineffective in failing to make a

10  proper and successful <u>Wheeler</u> objection, and in failing to renew the <u>Wheeler</u> objection prior to

11  the jury being empaneled.

12      Montiel asserts the finding by the California Supreme Court that the trial court believed

13  the prosecutor had a non-discriminatory purpose in challenging Ms. Gomez was inherently

14  flawed and is not entitled to a presumption of correctness.  Montiel contends the analysis by the

15  state court was a mixed finding of fact and law and thus subject to de novo review.  Assuming

16  arguendo that the state court did make a historical finding of fact, Montiel argues it would not

17  qualify for a presumption of correctness since there was not a full and fair hearing, the finding

18  was not fairly supported by the record, the correct legal standard was not applied, and the

19  prosecutor's stated reason was not analyzed in light of the voir dire examination.

20      Montiel further contends the California Supreme Court reviewed this claim under <u>People</u>

21  <u>v. Johnson</u>, 47 Cal. 3d 1194 (1989), which has been ruled an incorrect legal standard and not

22  deserving of deference.  <u>See</u> <u>Burks v. Borg</u>, 27 F.3d at 1428.  Lastly, Montiel alleges that had

23  Birchfield reasserted an objection at the conclusion of jury selection, a comparative analysis

24  would have uncovered the obvious pretext in the prosecutor's stated reasons for the challenge.

25      The Warden contends <u>Burks</u> held that as long as a trial judge made findings unimpeded

26  by an erroneous reading of the law, later appellate affirmance of those findings under an

27  incorrect standard does not diminish the deference due the trial court's findings.  <u>Id.</u>  The

28  Warden asserts that in this case, the trial court did engage in a comparative analysis of the

1   prospective jurors' responses, so the finding as to the prosecutor's good faith is entitled to

2   deference.

3       In Burks, 27 F.3d at 1427, a disagreement with California over Batson rulings was

4   examined.  The Ninth Circuit held that a trial court's finding could be overturned where a

5   comparison between the answers given by prospective jurors who were struck and those who

6   were not fatally undermines the prosecutor's credibility.  United State v. Chinchilla, 874 F.2d

7   695 (9th Cir. 1989).  The California Supreme Court held that, for purposes of both Wheeler and

8   Batson, though the Superior Court may compare responses, the appellate court should not

9   conduct such an inquiry on its own, and instead should "give great deference to the trial court's

10  determination that the use of peremptory challenges was not for an improper or class bias

11  purpose."  Johnson, supra, 47 Cal. 3d at 1221.  Although the United States Supreme Court has

12  not expressly ruled on the role of comparative analysis on appellate review, they recently

13  reaffirmed that the AEDPA imposes a highly deferential standard and demands that state court

14  decisions be given the benefit of the doubt.  Felkner v. Jackson, 562 U.S. ___, 131 S. Ct. 1305

15  (2011) (per curiam).  The Court found no basis to overturn the state court's denial of Jackson's

16  Batson claim where the trial court credited the prosecutor's race-neutral explanations, that

17  decision was upheld on appeal after a careful review of the record, and the appellate court's

18  decision was plainly not unreasonable.  Id. at 1307.

19      Excluding venire members from a trial jury based on the prospective juror's race violates

20  the Equal Protection Clause of the Constitution.  Batson, supra, 476 U.S. 79.  Analysis of a

21  Batson claim involves three steps: first, the defendant must establish a prima facie case of

22  purposeful discrimination "by showing that the totality of the relevant facts gives rise to an

23  inference of discriminatory purpose," id. at 93-94; second, once the defendant has made out a

24  prima facie case, the burden shifts to the prosecution to come forward with a race-neutral

25  explanation for the strike, Johnson v. California, 545 U.S. 162, 168 (2005); and third, the trial

26  court then must determine whether the defendant has established "purposeful discrimination" by

27  the prosecution.  Purkett v. Elem, 514 U.S. 765, 767 (1995) (per curiam).  The AEDPA imposes

28  a highly deferential standard when evaluating state court Batson rulings, demanding those

1   decisions be given the benefit of the doubt.  Jackson, supra, 131 S. Ct. at 1307 (review of a

2   Batson issue that turns on an "evaluation of credibility" is entitled to "great deference").

3          Montiel's objection that the California Supreme Court used the wrong, and higher,

4   standard from Wheeler regarding the establishment of a prima facie case fails.  When examining

5   this claim on appeal, the California Supreme Court viewed the trial court's inquiry of the

6   prosecutor's justification for challenging Gomez as an implicit finding that Montiel stated a

7   prima facia case.  See Montiel II, 5 Cal. 4th at 910 n.8.  Since the incorrect standard was not

8   imposed on direct review, the California Supreme Court's determination affirming the trial

9   court's "sincere and reasoned effort" to evaluate the prosecutor's good faith and subsequent

10  acceptance of the nondiscriminatory explanation for the strike, id. at 910-911, is granted

11  deference under the AEDPA.

12         Montiel's further assertion that the appropriate standard of review on habeas is de novo,

13  since the California Supreme Court's finding was a mixed question of law and fact, is incorrect

14  under the AEDPA.  The California Supreme Court denied this claim on the merits on direct

15  review, and that determination is entitled to deference unless it was unreasonable.  Landrigan,

16  supra, 550 U.S. at 473.  Here, the trial court performed comparative analysis of Gomez's voir

17  dire and the voir dire of other jurors, and found the prosecutor's explanations of his actions to be

18  race-neutral.  Montiel fails to state a claim of error under Batson.  The California Supreme

19  Court's denial of this claim on the merits is not unreasonable.

20         Montiel has not shown that the state court's denial of this claim is contrary to federal law,

21  an unreasonable application of Supreme Court law, or an unreasonable determination of the

22  facts.  Claim 21 is denied an evidentiary hearing and is denied on the merits.

23         3.     Claim 28

24         In Claim 28, Montiel contends that the prosecutor introduced inaccurate and misleading

25  opinion testimony from Dr. Siegel.

26         Montiel contends Dr. Siegel's testimony that Montiel had a "potential for violence" and

27  was violent even when not intoxicated, was inaccurate and misleading.  Montiel asserts the

28  prosecutor failed to correct this information even though he knew or should have known it was

1    inaccurate.  Further, Montiel asserts Birchfield was ineffective for failing to present evidence to

2    refute Dr. Siegel's testimony and support the defense that Montiel was not violent when not

3    under the influence of narcotics, denying him a fair and reliable penalty determination.

4         Montiel proposes to present the following evidence in support of this claim at an

5    evidentiary hearing: CRC records showing violent behavior only while Montiel was under the

6    influence of drugs/alcohol (these records were presented to the state on habeas); testimony by

7    Birchfield that he had evidence contradicting the testimony of Dr. Siegel and had no tactical

8    reason not to present it or to object to the misleading testimony by Dr. Siegel; testimony from a

9    Strickland expert that it was standard practice to refute the testimony of prosecution witnesses

10   which negatively impact the defense theory and Birchfield's failure to present evidence

11   contravening Dr. Siegel's testimony was ineffective assistance; and testimony from a jury

12   dynamics expert that had evidence contradicting Dr. Siegel's testimony about Montiel's violent

13   nature been presented, the jury would have been more inclined to grant Montiel a life sentence.

14   The CRC records and the ineffective assistance of counsel claim were presented on state habeas,

15   but the declaration from Birchfield does not make these admissions.  No declaration from a

16   Strickland or a jury dynamics expert stating the above assertions was presented in the state or

17   federal proceedings.

18        The Warden argues Dr. Siegel's testimony was not inaccurate or misleading regarding

19   Montiel's potential for violence as the testimony related information gathered from interviews

20   with Montiel and others, as well as what was included in psychological reports.  The Warden

21   contends even if Dr. Siegel's testimony was improper and either the prosecutor or Birchfield

22   should have taken steps to rectify the error, Montiel cannot show prejudice since other evidence

23   was presented at the penalty retrial of five episodes of violence from Montiel's past, three of

24   which did not include any indication of intoxication, which subsumed any inaccuracy by Dr.

25   Siegel.  The Warden asserts Montiel has failed to state a prima facie claim for relief based on Dr.

26   Siegel's testimony at the penalty retrial.

27        Montiel replies the evidence contradicts Dr. Siegel's blanket assertion that Montiel had a

28   potential for violence even when not intoxicated, observing a report states that while sober he is

1 personable and very easy going.  Montiel contends Birchfield failed to cross-examine Dr. Siegel

2 on these contradictory passages in the documents Dr. Siegel relied on.  Montiel argues the

3 admission of Dr. Siegel's testimony was misconduct because it discussed the substance of

4 another expert's opinion, instead of merely reviewing that opinion in forming his own opinion.

5 Montiel asserts the admission of this evidence violated state law and his Sixth Amendment right

6 to confrontation, and that Birchfield failed to object.  Montiel argues the California Supreme

7 Court's determination on direct appeal that Birchfield's failure to object was not prejudicial

8 under Strickland was erroneous, since the claim includes not only the failure to object but also

9 the failure to counteract the evidence by cross-examining Dr. Siegel with statements that Montiel

10 was not violent when not intoxicated.  Montiel asserts that when this claim is considered in light

11 of Birchfield's overall failure, prejudice is satisfied.

12      Deliberate deception of a court and jurors by the presentation of known false evidence,

13 including the failure to correct false evidence, is unconstitutional, and requires a finding of

14 materiality, as required under Brady, supra, 373 U.S. at 87.  Giglio v. United States, 405 U.S.

15 150, 153-154 (1972).  Prejudice from Brady or Giglio error requires a showing of a reasonable

16 probability the result of the trial would have been different if the evidence had been disclosed.

17 Strickler v. Greene, 527 U.S. 263, 282, 289 (1999).

18      Even assuming that Dr. Siegel's testimony about Montiel's potential for violence was not

19 supported by the evidence, the question is whether that testimony was prejudicial.  Evidence was

20 presented at the penalty retrial of five episodes of violence by Montiel from 1968 through 1973.

21 86RT Vol. V:3-9, 33-35, 35-43, 43-47, 48-60, and 93-98.  Law enforcement officers testified

22 regarding three of these events, stating there was no evidence observed indicating that Montiel

23 was intoxicated.  See id. at 42-43, 57-60, and 98.  In light of this evidence, it is not possible that

24 Dr. Siegel's testimony, even if erroneous, was prejudicial.

25      Prejudice from Strickland error requires a showing that counsel's deficient performance

26 prejudiced the defense such that without counsel's unprofessional errors the result of the

27 proceeding would have been different.  466 U.S. at 694.  The lack of prejudice from Dr. Siegel's

28 testimony defeats the claim of Birchfield's failure to object to Dr. Siegel's testimony or to

attempt to counteract the testimony, as even if assumed to be deficient, it cannot undermine confidence in the outcome.

Montiel has not shown that Dr. Siegel's testimony prejudiced the outcome of his trial, or that Birchfield's failure to object or attempt to counter that testimony undermines confidence in the outcomes.  Claim 28 is denied an evidentiary hearing and is denied on the merits.

**C.      Remaining Claims**

1.      <u>Claim 31: Denial of Right to Neutral Venue and Fair Cross-Section Representation</u>

In Claim 31, Montiel contends that he was denied the right to a neutral venue and a fair jury.

Montiel claims Kern County has a long, well-recognized history of excluding members of Montiel's race (Hispanic and Native American) from participation in civic affairs and from fair treatment equal to whites, particularly in the criminal justice system.  Montiel asserts these facts support the claims:

In 1978, Hispanics comprised about 25% of the population of Kern County, but only 0.3% of the bench.  There were no Hispanics on the Board of Supervisors or the City Council, nor among any of the department heads in county government.  In 1979, 20 of the 36 elementary schools were segregated, in violation of state standards.  Over 30% of the students were minorities, while only 10.8% of the teachers were minorities.  About 22% of the students were Hispanic, as compared to 5.5% Hispanic teachers.  In 1986, only 6.2% of school administrators and 5.4% of teachers in Kern County were Hispanic.  None of the top real estate sellers in 1979 or 1986 were Hispanic.

The official community reflected the general community, including the attitude of excluding non-whites from equal access to civil rights and liberties.  This exclusion reflected the community's animus toward Hispanics, particularly farm worker families who were considered to be a different and lower class of people.  They were geographically and socially separated by the majority, attended de facto separate schools, and did not participate in the social, civil and religious activities of the white community.  This animus was pervasive throughout law

1   enforcement.   In 1975, the California Supreme Court found the UFW made a prima facie

2   showing that Kern County law enforcement, including the District Attorney's office, had

3   unlawfully practiced invidious discrimination against farm workers attempting to collectively

4   organize.  Murcia v. Municipal Court, 15 Cal. 3d 286, 293 (1975).[60]

5           a.      *Change of Venue*

6           Montiel asserts the pretrial publicity in this case was substantial and made it clear

7   Montiel was a Hispanic charged with a capital offense.

8           A criminal defendant is entitled to an impartial jury.  Irvin v. Dowd, 366 U.S. 717, 722

9   (1961).  Where prejudicial publicity makes seating an impartial jury impossible, a motion for

10  change of venue must be granted.  Harris v. Pulley, 885 F.2d 1354, 1360 (9th Cir. 1988);

11  Gallegos v. McDaniel, 124 F.3d 1065, 1070 (9th Cir. 1997).  Prejudice of the venire may be

12  presumed or actual.  On habeas review, the district court must make an independent review of

13  the record to determine if prejudice existed which denied the petitioner a fair trial.  Jeffries v.

14  Blodgett, 5 F.3d 1180, 1189 (9th Cir. 1993).

15          "Prejudice is presumed when the record demonstrates that the community where the trial

16  was held was saturated with prejudicial and inflammatory media publicity about the crime."

17  United States v. Sherwood, 98 F.3d 402, 410 (9th Cir. 1996).  Prejudice is rarely presumed

18  "because 'saturation' defines conditions found only in extreme situations."  Jeffries, 5 F.3d at

19  1189.  "It is not all publicity that causes prejudice to a defendant, but only that publicity that

20  operates to deprive the defendant of a fair trial."  United States v. Bailleaux, 685 F.2d 1105, 1108

21  (9th Cir. 1982) (overruled on other grounds).

22          To establish actual prejudice, the defendant must demonstrate that the jurors exhibited

23  "actual partiality or hostility that could not be laid aside."  Harris v. Pulley, 885 F.2d at 1363.  A

24  defendant is entitled to an impartial jury, but that does not mean a jury completely ignorant of the

25  facts.  United States v. Flores-Elias, 650 F.2d 1149 (9th Cir. 1981); see also Sherwood, supra, 98

26  F.3d at 410 (actual prejudice not demonstrated despite 96% of jurors admitting they were aware

27

28  [60] The showing made in Murgia was sufficient to grant a motion for discovery.  No subsequent opinion was
    published regarding the results of the granted discovery or of the disposition of the discrimination lawsuit.

1   of the case and 60% knowing the victim was kidnapped, where empaneled jurors stated they

2   could be impartial).

3        Montiel contends the publicity before his trial, and before his penalty re-trial, was the

4   type where a court could not believe the answers of jurors and would be compelled to find bias

5   as a matter of law, since the headlines and articles were not factual or neutral, but directly

6   discussed Montiel's guilt.  Montiel claims the nature and extent of the publicity was reasonably

7   likely to prejudice the community against him.  Montiel alleges neither Lorenz nor Birchfield

8   investigated or made motions seeking a change of venue, or conducted a thorough voir dire to

9   demonstrate that an unbiased jury could not be selected, failing to meet the existing standards for

10  legal representation.

11       Montiel contends the failure of his counsel to seek a change of venue was compounded

12  by the court's failure to act to protect Montiel's right to a fair trial and reliable penalty

13  determination, and that the prosecutor's discriminatory use of a peremptory challenge against

14  Mrs. Gomez and Ms. Guiterrez (see Claim 21) is evidence of the unconstitutional systematic

15  exclusion of Hispanics from Kern County juries.

16       Montiel proposes to present the following evidence in support of this claim at an

17  evidentiary hearing which was not presented to the state court: testimony by attorneys David

18  Rivera, H.A. Sala[61] and Stanley Simrin regarding the long history of excluding Hispanics from

19  civic affairs in Kern County and that the District Attorney's office engaged in prejudicial

20  charging, negotiations, disparate treatment of victims based on race and had a pattern and

21  practice of striking Hispanics from jury venires; and testimony from a Strickland expert that it

22  was standard practice to object to pervasive racial animus and that Lorenz and Birchfield should

23  have more thoroughly questioned potential jurors regarding animus towards Hispanics.

24       The Warden asserts the evidence Montiel submits in support of this claim was not

25  presented to the state court, and that Montiel should not be permitted to rely on it because he has

26  failed to demonstrate he was not at fault for failing to develop that evidence in state court.  The

27

28  _____
    [61] A declaration from Attorney Sala was presented on state habeas, but it alleges misconduct by the Kern County
    District Attorney, not prejudicial publicity.  See Claim 32.

1    Warden argues that if the evidence is properly before this Court, it does not fundamentally alter

2    the nature of the claim presented in state court, and as such the state court's adjudication is

3    entitled to deference under the AEDPA and does not involve an unreasonable application of

4    Strickland.

5          The Warden observes Montiel has not included as exhibits any of the publicity prior to

6    his trial which he describes as "lurid" and "prejudicial" and supportive of a change of venue.

7    The Warden asserts that prejudice from pretrial publicity is rarely presumed.   Sheppard v.

8    Maxwell, 384 U.S. 333, 356-57 (1966) (prejudice presumed where media accounts contained

9    inflammatory, prejudicial information that was inadmissible at trial); Ridau v. Louisiana, 373

10   U.S. 723 (1963) (prejudice presumed where case involved televising of a twenty minute in-jail

11   interrogation of defendant by police where defendant confessed to the murder for which he was

12   ultimately convicted).   The Warden argues Montiel's citation to six articles is insufficient to

13   demonstrate that the presumed prejudice principle applies to his case or that a change of venue

14   was warranted.

15         Turning to the question of actual prejudice, the Warden observes in 1979 the trial court

16   inquired whether prospective jurors had been exposed to publicity about the case, and points to

17   the excusal of the only juror who answered affirmatively, and that two jurors, who were

18   ultimately excused, indicated later during jury selection that they had read about the case.   The

19   Warden points to the questionnaire given to the 1986 penalty phase jury, which inquired about

20   whether they had heard of the case, and to the subsequent questioning during voir dire about any

21   affirmative answers.   The Warden notes that only two of the empaneled jurors remembered

22   hearing any publicity about the case, and both stated they had not formed an opinion about the

23   case and could be fair.   The Warden contends Montiel's claim against trial counsel is unfounded

24   as counsel did question the prospective jurors.   The Warden argues the questioning of potential

25   jurors regarding any racial bias against Latinos was not warranted by Lorenz, Birchfield, or the

26   court, since the victim was also a member of a minority group.   The Warden concludes a change

27   of venue was not warranted on the basis of racial prejudice.

28         Montiel argues the publicity prior to both trials was sufficient to place counsel on notice

1    that a change of venue should have been sought and that steps should have been taken to assure

2    the jury had not been, and would not be, exposed to media during the trial.  Montiel asserts the

3    news articles during his trial were sufficiently prejudicial to justify presumed prejudice because

4    they were published immediately prior to his trial and when his sentence was reversed, they

5    contained lurid headlines and details of the alleged crimes, and they made it known that Montiel

6    was Latino.  The brief in support of Montiel's federal petition gives the following sampling of

7    prejudicial news article headlines: "Throat slash murder suspect arrested after anonymous tip";

8    "Legal maneuvering delays murder trial"; "Death suspect recalled seeing gory body 'a trip'";

9    "Four will testify defendant bragged of murder"; "Death sentence called 'God's will'"; and

10   "Kern killer returns to death row."

11       This claim was presented to the California Supreme Court in Montiel's state habeas

12   corpus petition. On February 21, 1996, that court summarily denied the claim on its merits.

13       None of the evidence Montiel has presented in support of his state or federal habeas

14   petitions, nor proposes to present in support of this claim, meets the extreme situation necessary

15   to find presumed prejudice.  The headlines referenced in the supporting points and authorities are

16   primarily factual in nature, and are not identified as published prior to the trials.  Both juries at

17   guilt and at penalty retrial were repeatedly admonished not to read or listen to news reports about

18   the trial.  Montiel has not demonstrated presumed prejudice.

19       A review of the voir dire from both the 1979 guilt phase and the 1986 penalty retrial fails

20   to show actual prejudice.  The transcript from the 1979 guilt phase shows that 74 potential jurors

21   were questioned in order to empanel 12 jurors and three alternates.  During general voir dire, the

22   trial judge stated a preference for jurors who know nothing about the case, but if not, that they

23   could put what they read or heard out of their mind and decide the case on what was presented in

24   court.  79A RT Voir Dire 4/23, 4/24, 4/25/79, at page 18.  The potential jurors were questioned

25   about their ability to judge the case based on the evidence presented in court repeatedly

26   throughout voir dire.  See id. pages 37, 150, and 282.  Five potential jurors were excused for

27   cause because they knew people involved with the crime: Larry Mendez and Gerald Horton

28   because they knew Henry Ante, id. at pages 35 and 248; Alex Alveraz because he went to school

1    with Montiel, id. at page 30; and Danny Owens and Elva Renfree because they knew David

2    Ante, id. at pages 122 and 241.  Two potential jurors were excused for bias, Jim Borden, at page

3    235 (knows city firemen as he worked with them, would tend to believe their testimony over

4    other testimony because he knows them), and John Geisler, at page 182.  Mr. Geisler said, "I

5    wouldn't want him judging me, because I don't think it is strict enough.  Q. You don't think you

6    should.  You could decide a case fairly on the evidence that's presented in court?  A. Not in this

7    one, no, because I would definitely be too strong."

8          A review of the transcript from 1986 penalty retrial reveals that 21 of the 100 potential

9    jurors who completed the juror questionnaire marked "Yes" to question No. 6, "Have you heard

10   of this case before?"  Of the 21, six potential jurors[62] also answered "Yes," or "?," to question

11   No. 7, "Do you know anything about this case except that it is now pending in this court?"  Of

12   those six potential jurors, Mr. Barton's name was not drawn during jury selection, and only

13   Linda Sesmas served on the jury.  The other four potential jurors were excused, Mr. Scetena for

14   hardship, Mr. Williams for cause (bias), Mr. Porter during death qualification (would never

15   impose a death sentence), and Ms. Rall peremptorily by the defense.  During voir dire, Ms.

16   Sesmas said that her niece lived in an area related to the crime and she had been concerned for

17   her, and that she had heard about the case through the news, but that she could decide the case

18   based on the evidence presented in court.  Vol. III, page 345.

19         Pamela Guimarra served on the jury and answered "Yes" to question No. 6, but "No" to

20   question No. 7.  During voir dire she indicated she had a vague recollection of the case and that

21   Montiel looked vaguely familiar, but stated she could decide the case on the evidence presented

22   in court.  Vol. III, page 379.

23         There is no evidence that the jury, in either 1979 or in 1986, was prejudiced against

24   Montiel due to exposure to publicity or could not be impartial and none of the evidence Montiel

25   proposes to present in support of this claim shows bias or prejudice on the part of the jury.

26   Montiel must show both deficient performance and actual prejudice resulting from the deficiency

27

28   _____
[62] Those potential jurors were James Barton, James Porter, Francine Rall, Domenieo Scatena, Linda Sesmas, and R.O. Williams.

121

1    to prevail on a claim of ineffective assistance of counsel.  There is no showing of prejudice from

2    this claim, so it cannot form a basis for ineffective assistance by counsel.

3          Montiel has not shown the extreme situation necessary for a finding of presumed

4    prejudice existed at either of his trials, and there is no evidence that either the guilt or penalty

5    retrial juries were actually prejudiced against Montiel or that they could not be impartial.  As

6    there is no prejudice shown which would justify a change of venue motion, counsel's failure to

7    file such a motion cannot be ineffective assistance.  Claim 31(a) is denied an evidentiary hearing

8    and is denied on the merits.

9          b.    *Fair Cross-Section*

10         Montiel contends that the impaneled jury did not represent a fair cross-section of the

11   community because Hispanics were underrepresented.   Montiel contends the Kern County

12   population of adult Hispanics was 16.3% based on INS and census figures, but only 8.3 % of

13   those who appeared for jury duty.

14         The Sixth Amendment guarantees a criminal defendant an impartial jury drawn from a

15   fair cross-section of the community.  Taylor v. Louisiana, 419 U.S. 522, 530 (1975).  "In order to

16   establish a prima facie violation of the fair-cross-section requirement, the defendant must show:

17   (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the

18   representation of this group in venires from which juries are selected is not fair and reasonable in

19   relation to the number of such persons in the community; and (3) that this under-representation is

20   due to the systematic exclusion of the group in the jury-selection process."  Duran v. Missouri,

21   439 U.S. 357, 364-66 (1979) (Duren met the test by showing that women, a distinct group, were

22   over half the population but only 15% of jury venires over the course of nearly a year).

23         Statistics which show a 10% or less absolute disparity between the group representation

24   on the jury venire and in the community have been insufficient to establish proof of

25   unconstitutional discrimination.  "We cannot say that purposeful discrimination based on race

26   alone is satisfactorily proved by showing that an identifiable group in a community is under-

27   represented by as much as 10%."  Swain v. Alabama, 380 U.S. 202, 208-09 (1965), overruled on

28   other grounds by Batson, supra, 476 U.S. at 90-96.

1   Montiel argues Kern County did not have appropriate procedures in place to assure

2   Hispanics would be properly and proportionally represented in the jury venire. Montiel asserts

3   that in combination with Claim 21 regarding improper peremptory challenges, he has plead

4   sufficient facts to state a claim of the denial of his right to be tried by a fair cross-section of the

5   community.  Montiel asserts the number of Hispanics who appeared is not a fair and reasonable

6   representation of the community and neither Lorenz nor Birchfield investigated or moved to

7   quash the venire.

8   The Warden asserts Montiel has failed to satisfy the second and third prongs of the test

9   from Duran, 439 U.S. at 364, that the representation of a "distinctive" group in the venire is not

10  fair and reasonable related to the community's population and that this under-representation is

11  due to systematic exclusion of the group in the jury-selection process.  The Warden contends

12  Montiel's claim of under-representation of minorities on Kern County jury panels is meritless as

13  he has failed to establish an absolute disparity that rises to an unconstitutional level between the

14  percentage of minorities on the panel and in the community.  Further, the Warden argues

15  Montiel's assertion that "jury selection procedures" did not ensure sufficient Hispanics, is

16  insufficient to constitute a showing of systematic exclusion.

17  Montiel replies his petition sets forth a prima facie case of systemic racial prejudice

18  against Hispanics in Kern County during the time of his trial and penalty retrial which mandates

19  voir dire questioning regarding racial prejudice.  Montiel argues the failure of the trial court or

20  his counsel to recognize the likelihood that such prejudice might infect his trial deprived him of

21  his right to a fair and impartial jury and his right to be tried in a neutral venue.

22  This claim was presented was presented to the California Supreme Court in Montiel's

23  state habeas corpus petition. On February 21, 1996, that court summarily denied the claim on its

24  merits.

25  The statistics relied on by Montiel are figures compiled by Dr. Terry Newell from a study

26  of Kern County venires from 1980 to 1981, which were previously presented in the federal

27  habeas petition of Ronald Sanders.  The Ninth Circuit rejected Sanders' claim, asserting Dr.

28  Newell's study was highly likely to have substantially overstated the disparity between the

1   percentage of Hispanics in the county and in the jury venire, as no attempt was made to control

2   for illegal immigration.   See Sanders v. Woodford, 373 F.3d 1054, 1069-70 (9th Cir. 2004)

3   (overruled on other grounds by Brown v. Sanders, 546 U.S. 212 (2006)).   Another under-

4   representation challenge which was based the comparison on the number of Hispanics in the jury

5   venire versus the total population, was also rejected by the Ninth Circuit because the relevant

6   comparison population to the venire should have been the number of Hispanics who were jury-

7   eligible citizens, not the total population.   United States v. Artero, 121 F.3d 1256, 1262 (9th Cir.

8   1997).

9        The opinions of Mr. Simrin, Mr. Rivera and Mr. Sala are untimely, partisan, subjective

10   views, not easily corroborated years later, which should have been presented in the trial court.

11   Neither Lorenz nor Birchfield objected to the jury venire generally, nor did they file a pretrial

12   motion to challenge the District Attorney's alleged biased jury selection practices or to seek the

13   judge's intervention in limine during jury selection.   No published court decisions, empirical

14   studies, or statistics of the racial composition of Kern County jury panels, trial juries or jury

15   selection practices are offered.   Even if such alleged discriminatory jury selection practices

16   existed in the Kern County District Attorney's office, no objective evidence shows it impacted

17   Montiel's trial.

18        Montiel's proffered statistics of 8.0% absolute disparity between adult Hispanics in the

19   total population and the Hispanics on the jury venire is not significantly greater than the 7.7%

20   disparity found by the Ninth Circuit to be within allowable limits.   United States v. Suttiswad,

21   696 F.2d 645, 650 (9th Cir. 1982).   In addition, Montiel offers only these statistics to prove

22   systematic exclusion.   This evidence is substantially less persuasive than evidence which has

23   been found to show unconstitutional discrimination.   A disparity of 14% combined with the

24   government's stipulation that no black had served on any jury in the county in the past 25 years

25   was sufficient to show purposeful discrimination.   Hernandez v. State of Texas, 347 U.S. 475,

26   480-81 (1954).   A trio of cases from Georgia found that disparities ranging from 14.7% to 19.7%

27   were sufficient when combined with jury selection procedures using tax rolls which required

28   blacks to file on yellow paper and whites on white paper.   Whitus v. Georgia, 385 U.S. 545

1   (1967); Jones v. Georgia, 389 U.S. 24 (1967); Sims v. Georgia, 389 U.S. 404 (1967).  Similarly,

2   a 16% disparity combined with selection process which identified race on the jury form

3   constituted prima facie evidence of discrimination.  Alexander v. Louisiana, 405 U.S. 625, 630-

4   31 (1972).

5       None of the evidence Montiel presented to the state court, nor proposes to present in

6   support of this claim, presents a prima facie case that the fair cross-section requirement was

7   violated. Montiel must show both deficient performance and actual prejudice resulting from the

8   deficiency to prevail on a claim of ineffective assistance of counsel.  As there is no showing of

9   prejudice from this claim, it cannot form a basis for ineffective assistance by counsel.  Claim

10  31(b) is denied an evidentiary hearing and is denied on the merits.

11          2.    Claim 33: Unwarranted Shackling

12      In Claim 33, Montiel contends that he was inappropriately shackled during his trials.

13      Unjustified shackling impacts a defendant's constitutional rights when viewed by the

14  jury, by "creating an inherent danger that the jury may form the impression that the defendant is

15  dangerous or untrustworthy."  Rhoden v. Rowland, 172 F.3d 633, 636 (9th Cir. 1999) (citing

16  Holbrook v. Flynn, 475 U.S. 560, 568-69 (1986)).  Where the jury did not see the shackles, any

17  error may be harmless.  Rhoden, at 636.  Shackling, like prison clothes, indicates a need to

18  separate a defendant from the community at large, creating a risk the jury may believe the

19  defendant is dangerous or untrustworthy.  Flynn, 475 U.S. at 568-69.  A jury's brief or

20  inadvertent glimpse of shackles outside the courtroom does not warrant habeas relief.  Rhoden,

21  172 F.3d at 636.  Any error in the imposition of a defendant's shackles is harmless where they

22  are not actually seen by the jurors.  Id. at 636.  To evaluate if shackling had a substantial and

23  injurious effect on the verdict, id. at 637-38, the court must look to the scene presented to the

24  jurors and determine whether what the jurors saw was so prejudicial it posed an unacceptable

25  threat to Montiel's right to a fair trial.  Flynn, 475 U.S. at 572.

26      Montiel asserts he was inappropriately shackled at both guilt and penalty trials.  Montiel

27  claims the leg iron attached to the courtroom floor was obvious to the jurors, and the shackles

28  were probably observed by the jurors when on numerous occasions bailiffs walked him past the

1 open door of the jury room.  Montiel contends there was no credible or admissible evidence that

2 such restraints were warranted or necessary, and that the trial court made no such determination.

3 Counsel unreasonably failed to object to the use of such restraints, which diminished his

4 presumption of innocence, deprived him of a fair determination of guilt and a reliable

5 determination of penalty.  Montiel argues the shackling prejudiced him at the penalty phase since

6 unsubstantiated testimony was offered that he had great potential to commit further violent acts.

7 　　　　Montiel proposes to present the following evidence in support of this claim at an

8 evidentiary hearing which was not presented to the state court: his own testimony that the

9 handcuffs and leg irons were visible to jurors as he was transported to and from courtroom, and

10 the attachment of leg irons to the metal ring on the floor was visible to jurors; testimony by

11 Lorenz and Birchfield that they had no tactical reason for failing to challenge the use of

12 shackles[63]; testimony from a Strickland expert that it was standard practice to challenge the use

13 of shackles; testimony from a jury dynamics expert about the prejudicial impact from the use of

14 shackles, that the jury would have considered Montiel as presenting the risk of present and future

15 violence, that the presumption of innocence would have been substantially impaired, and that the

16 use of shackles would have significantly contributed to the decision to render a sentence of

17 death; and photos and other evidence showing what Montiel looked like to the jury while in

18 shackles and when his leg irons were attached to the floor.

19 　　　　The Warden asserts Montiel's declaration submitted in support of this claim was not

20 presented to the state court, and that Montiel should not be permitted to rely on it because he has

21 failed to demonstrate he was not at fault for failing to develop that evidence in state court.  The

22 Warden argues that if the evidence is properly before this Court, it does not fundamentally alter

23 the nature of the claim presented in state court, and as such the state court's adjudication is

24 entitled to deference under the AEDPA and does not involve an unreasonable application of

25 Strickland.

26 　　　　The Warden further contends there is no mention of shackling in the record from either

27

28 [63] Birchfield's declaration does not make this admission.

1   the guilt or the penalty retrial.  Even assuming Montiel was shackled as he alleges, the Warden

2   asserts there was no prejudice from a brief or accidental viewing during transport and there was

3   no indication the jury saw the leg chain in the courtroom.  The Warden contends that any failure

4   on the part of counsel to object was not prejudicial, since it is not reasonably probable the result

5   of the proceedings would have been different even had counsel objected.  If the leg chain was

6   briefly visible to the jury, the Warden asserts that the viewing would not have had a substantial

7   and injurious effect on the verdicts as the key issue at both trials was Montiel's mental state, not

8   his identity as the killer, and also would not have impacted the issue of future dangerousness if

9   sentenced to life as the jury heard undisputed evidence of Montiel's good behavior in prison.

10      Montiel replies the trial court's failure to determine that compelling circumstances

11  required he be shackled during trial mandates an evidentiary hearing be conducted to determine

12  whether the shackling was justified.  Montiel declares he believes some jurors saw deputies

13  unhooking his leg shackle from a floor hook during his guilt trial or the penalty retrial.  Montiel

14  argues the jury's viewing a shackled defendant, especially in combination with evidence

15  presented at the penalty retrial of several violent acts he committed, was sufficient to create the

16  impression that he was dangerous.  Montiel asserts the California Supreme Court did not address

17  this claim, and states the anticipated evidentiary hearing will establish he was prejudiced by

18  counsel's failure at both trials to object to the shackling, and that it is reasonably probable the

19  outcome of both trials would have been different had he not been shackled.

20      This claim was presented was presented to the California Supreme Court in Montiel's

21  state habeas corpus petition. On February 21, 1996, that court summarily denied the claim on its

22  merits.

23      No statement was provided, in support of either Montiel's federal or state habeas

24  petitions, that any juror observed his shackles.  Montiel proposes to present as evidence in

25  support of this claim his own testimony that the handcuffs and leg irons were visible to jurors as

26  he was transported to and from courtroom and that the attachment of leg irons to the metal ring

27  on the courtroom floor was visible to jurors, as well as photos and other evidence showing what

28  Montiel looked like to the jury while in shackles and when his leg irons were attached to the

1     floor.  Even considering the proposed evidence Montiel seeks to present, he has not presented a

2     sufficient basis to support this claim.  Habeas relief is not available where the jury did not see, or

3     only briefly or inadvertently saw, a defendant's shackles.  The facts underlying this claim, which

4     is denied on the merits, cannot form a basis for ineffective assistance by counsel.  Claim 33 is

5     denied an evidentiary hearing and is denied on the merits.

6         3.     California Death Penalty Law Unconstitutional in Form and Application

7         In Claim 35, Montiel contends that California's death penalty law is unconstitutional in

8     form and application.

9         There are two aspects to the capital sentencing process, the eligibility phase and the

10     sentencing phase.  Tuilaepa v. California, 512 U.S. 967, 971 (1994).  In the eligibility phase, the

11     jury's discretion must be channeled and limited to ensure that death is a proportionate

12     punishment and that its imposition is not arbitrary and capricious.  Buchanan v. Angelone, 522

13     U.S. 269, 275-76 (1998).  By contrast, the selection phase requires a broad inquiry into all

14     relevant mitigating evidence to allow an individualized determination.  Tuilaepa, at 971-73; Zant

15     v. Stephens, 462 U.S. 862, 878-79 (1983).   That requirement is met when the sentencer can

16     consider relevant mitigating evidence of the character and record of the defendant, the

17     circumstances of the crime, and an assessment of the defendant's culpability.  Tuilaepa, 512 U.S.

18     at 972-73; Buchanan, 522 U.S. at 276; Eddings v. Oklahoma, 455 U.S. 104, 114-15 (1982).

19         a.     *Claim 35a: Failure to Adequately Narrow*

20         Montiel claims the statutory scheme under which he was sentenced contains so many

21     special circumstances upon which a finding of felony murder could be based that it fails to

22     perform a narrowing function, resulting in an arbitrary and unpredictable penalty.  Furman v.

23     Georgia, 408 U.S. 238 (1972); Stephens, 462 U.S. at 877 (a death penalty statute must genuinely

24     narrow the class of eligible persons).  Montiel asserts California's statute is so overbroad it is

25     almost impossible for the perpetrator of a first degree murder not to be death eligible and that the

26     special circumstances potentially designate nearly every homicide as felony murder and death

27     eligible.  Montiel contends that blanket or across-the-board eligibility for the death penalty fails

28     to account for differing degrees of culpability, enhances the possibility of arbitrary sentences

1  without regard for blame, and possibly violates due process.  See Adamson v. Ricketts, 865 F.2d

2  1011, 1025-26 (9th Cir. 1988) (en banc) (overruled on other grounds by Walton v. Arizona, 497

3  U.S. 639 (1990)).

4       The Warden admits that, although this claim was not presented to the state court, the

5  exhaustion requirement was waived, and that de novo review under pre-AEDPA law is

6  warranted since deference under 29 U.S.C. § 2254(d)(1) is not applicable.  The Warden asserts

7  the United States Supreme Court found California's 1977 death penalty statute had sufficient

8  checks on arbitrariness to be constitutional without proportionality review, since it required the

9  jury to find at least one special circumstance, thus limiting the death sentence to a subclass of

10  capital-eligible cases.  Pulley v. Harris, 465 U.S. 37, 53 (1984); Tuilaepa, 512 U.S. at 975-80;

11  (Keith) Williams v. Calderon, 52 F.3d 1465, 1484 (9th Cir. 1995).  The Warden contends that

12  although the statute at issue here is the 1978 death penalty law, the result is the same.  Mayfield

13  v. Woodford, 270 F.3d 915, 924 (9th Cir. 2001) (en banc), declined hear an appeal on this claim,

14  holding that California's 1978 death penalty statute narrows the class of persons eligible for

15  death.  The Ninth Circuit again addressed the issue in Karis v. Calderon, 283 F.3d 1117, 1141

16  n.11 (9th Cir. 2002), finding the 1978 statute satisfies the narrowing requirement set forth in

17  Stephens, supra, as the special circumstances apply to a subclass of defendants convicted of

18  murder and are not unconstitutionally vague, and the sentence selection is made on

19  individualized determination based on the character of the individual and the circumstances of

20  the crime.

21       Montiel replies the Warden's citation to Tuilaepa deals with the sentencing factors, not

22  the eligibility factors, of the California statute, and that Justice Blackmun's dissent indicates the

23  issue of whether California's statute adequately narrows the class of persons eligible for the

24  death penalty has not been decided.  See 512 U.S. at 994-95.  Montiel asserts the California

25  Supreme Court failed to address this claim on his appeal, and thus review is warranted.  Montiel

26  argues that to the extent the state court has ruled on any constitutional issue pertaining to the

27  death penalty, the decision failed to account for the holdings of the United States Supreme Court

28  in Furman, supra, 408 U.S. 238, and Gregg, supra, 428 U.S. 153, and their progeny, thus failing

1   to apply clearly established law.

2   The California Supreme Court has considered and rejected the challenge that the

3   numerous special circumstances of § 190.2 embrace all murders, thus failing to narrow the class

4   of persons for whom the death penalty is reasonably justified.  "[T]he special circumstances set

5   forth in the statute are not over inclusive by their number or terms, nor have the statutory

6   categories been construed in an unduly expansive manner."  People v. Arias, 13 Cal. 4th 92, 187

7   (1996) (citing People v. Crittenden, 9 Cal. 4th 83, 155 (1995) and People v. Bacigalupo, 6 Cal.

8   4th 457, 467 (1993)).  Constitutional principles require statutes to rationally narrow the death-

9   eligible class in a qualitative manner, which California's statues do.  People v. Burgener, 29 Cal.

10  4th 833, 884 n.7 (2003).

11  United States Supreme Court jurisprudence requires that death penalty schemes

12  distinguish between "the few cases in which it [the death penalty] is imposed from the many

13  cases in which it is not."  Furman, supra, 408 U.S. at 313 (White, J., concurring).  This is

14  accomplished by channeling the jury's discretion using objective standards capable of appellate

15  review, Godfrey v. Georgia, 466 U.S. 420, 428 (1980), by findings of specifically defined

16  "aggravating circumstances."   In California, the narrowing "aggravating circumstances" are

17  referred to as "special circumstances."  See Penal Code § 190.2 (a).

18  The narrowing function of a death penalty statute can be satisfied by one of two methods.

19  The statute may narrow the definition of a capital offense so that the narrowing function of death

20  eligibility occurs at the guilt phase.  Lowenfield v. Phelps, 484 U.S. 231, 246 (1988) (discussing

21  Louisiana and Texas death penalty statutes which operate in this manner).  Like the Louisiana

22  and Texas statutes at issue in Lowenfield, California law places the narrowing function in the

23  guilt phase proceedings by the jurors' unanimous finding beyond a reasonable doubt of at least

24  one statutory special circumstance.  Bacigalupo, supra, 6 Cal.4th at 468.  Other states define

25  capital offenses more broadly and "provide for narrowing by jury findings of aggravating

26  circumstances at the penalty phase."  Lowenfield, 484 U.S. 246 (referring to the Georgia death

27  penalty statute at issue in Stephens, supra, 462 U.S. 862); see also Bacigalupo, id., (discussing

28  the same statutory process in Arizona, Florida, and Georgia).

1    In <u>Williams</u>, <u>supra</u>, the Ninth Circuit held the 1977 California death penalty statute,

2    which is the predecessor to the 1978 statute under which Montiel was convicted, offered

3    "constitutionally-sufficient guidance to jurors to prevent arbitrary and capricious application of

4    the death penalty."  52 F.3d at 1484 (citing <u>Harris</u>, 465 U.S. at 51-54 (holding California's 1977

5    statute complies with the requirements of <u>Furman</u>)).  The sentencing factors of the 1977 statute

6    are substantially the same as the factors from the 1978 statute.  <u>See</u> Cal. Penal Code ' 190.3,

7    former section added by Stats. 1977, c. 316, eff. Aug. 11, 1977, repealed and new section 190.3

8    added by Initiative Measure eff. Nov. 8, 1978.

9    Montiel fails to suggest any meaningful distinction between the 1977 statute approved in

10   the <u>Williams</u> and <u>Harris</u> cases and the 1978 statute under which he was sentenced.  Under the

11   1977 statute, like the 1978 statute, "a person convicted of first-degree murder is sentenced to life

12   imprisonment unless one or more 'special circumstances' are found, in which case the

13   punishment is either death or life imprisonment without parole.  [Citation omitted.]  Special

14   circumstances are alleged in the charging papers and tried with the issue of guilt at the initial

15   phase of the trial.  At the close of evidence, the jury decides guilt or innocence and determines

16   whether the special circumstances alleged are present.  Each special circumstance must be

17   proved beyond a reasonable doubt.  [Citation omitted.]  If the jury finds the defendant guilty of

18   first-degree murder and finds at least one special circumstance, the trial proceeds to a second

19   phase to determine the appropriate penalty."  <u>Harris</u>, 465 U.S. at 51.  Apart from these holdings,

20   two Ninth Circuit cases have held that the 1978 statute adequately narrows the class of persons

21   eligible for the death penalty.  <u>Mayfield</u>, <u>supra</u>, 270 F.3d at 924; <u>Karis</u>, <u>supra</u>, 283 F.3d at 1141

22   n.11.

23   Montiel has not established that California's 1978 statute violates the Eighth Amendment

24   under <u>Furman</u> and its progeny.  California's statute requires juries in capital cases to find at least

25   one special circumstance based on the facts of the crime or on the defendant's history, thus

26   distinguishing those defendants convicted of first degree murder who are selected for death from

27   those who are not.  <u>Tuilaepa</u>, 512 U.S. at 972; <u>Furman</u>, 408 U.S. at 189.  The consideration of

28   aggravating and mitigating factors at the penalty phase, including the defendant's character and

1   background and the circumstances of the crime, allows for an individualized determination of

2   sentence, thereby directing and limiting the sentencer's discretion to avoid arbitrary and

3   capricious action.  California v. Brown, 479 U.S. 538, 540 (1987); Lockett v. Ohio, 438 U.S.

4   586, 604-05 (1978); Woodson v. North Carolina, 428 U.S. 280, 303-04 (1976).   Finally,

5   California's statute requires that the defendant either killed, intended to kill, or acted with

6   reckless indifference to human life, so the death penalty is proportionate to the crime committed.

7   Enmund v. Florida, 458 U.S. 782, 787 (1982); Tison v. Arizona, 481 U.S. 137 (1987).

8          The California Supreme Court and the Ninth Circuit Court of Appeals have both rejected

9   claims asserting that California's death penalty statute fails to adequately narrow the class of

10  defendants eligible for death.  Montiel has not shown that conclusion is contrary to federal law,

11  an unreasonable application of Supreme Court law, or an unreasonable determination of the

12  facts.  Claim 35a is denied on the merits.

13          b.    *Claim 35b: General Defects*

14          Montiel also alleges California's capital sentencing process suffers from a wide variety of

15  procedural and substantive defects.  Montiel argues these defects failed to give proper guidance

16  to the jury, resulting in a vague, arbitrary and capricious selection of the death sentence.  The

17  alleged defects include the failure to designate which factors are mitigating and which are

18  aggravating, exacerbated by instructional error regarding the definitions of mitigation and

19  aggravation; the failure to require a finding beyond a reasonable doubt that aggravation

20  outweighs mitigation; the failure to require a finding that death is the appropriate sentence

21  beyond a reasonable doubt; the failure to require a finding unanimously and beyond a reasonable

22  doubt on the existence of aggravating factors; the failure to require written findings: of which

23  aggravating factors were applied, of proof beyond a reasonable doubt of each aggravating factor,

24  of unanimity of each aggravating factor (including factor (b)), that aggravation outweighs

25  mitigation beyond a reasonable doubt, and that death is appropriate beyond a reasonable doubt;

26  and the lack of a requirement for a procedure enabling meaningful review.

27          The Warden responds that there is no federal constitutional requirement that section

28  190.3 factors be defined as aggravating and mitigating; that the sentencer determine death is the

1 appropriate sentence beyond a reasonable doubt; that any aggravating factor be found

2 unanimously or true beyond a reasonable doubt; for written findings of the factors relied on to

3 impose death; or precluding the use of unadjudicated acts in aggravation.  The Warden asserts

4 the contentions are groundless that California's death penalty law is unconstitutional for failing

5 to require written findings of which aggravating factors were applied; proof beyond a reasonable

6 doubt of each factor; unanimity of each aggravating factor (including factor (b)); that

7 aggravation outweighs mitigation beyond a reasonable doubt; that death is appropriate beyond a

8 reasonable doubt; and for failing to provide a procedure enabling meaningful review.  The

9 Warden concludes that the United States Supreme Court has found the method and scope of

10 appellate review in California to be sufficient, and has not found any constitutional deficiency

11 regarding the inclusion of age as a sentencing factor.

12      Montiel replies that the sentencing factors of section 190.3 are unconstitutional because

13 they induce duplicative consideration by the jury.  Montiel contends the failure to label the

14 sentencing factors, which allows evidence in mitigation to be deemed aggravating, the

15 questionable validity of the circumstances of the crime factor (§ 190.3(a)), and the relationship

16 with the special circumstances, which include an overbroad portion of murder defendants into

17 the death penalty sentencing phase and allows duplicative consideration of prior and present

18 crimes, results in an arbitrary and capricious death penalty scheme.

19      Montiel argues the fatal constitutional flaw in California's death penalty scheme is that

20 both the trial court and the reviewing appellate court rely on overly inclusive eligibility criteria

21 and amorphous sentencing factors without requiring the trier of fact to disclose the reasons for

22 their determination.  Omitting proportionality review further strips away protection against

23 arbitrary and capricious decisions.  Montiel concludes that although each individual segment of

24 California's death penalty scheme seems within the confines of the Constitution, review of the

25 entire scheme reveals the constitutional inadequacies.

26      The California Supreme Court rejected on direct appeal these challenges to the

27 constitutionality of California's death penalty law. Montiel II, 5 Cal.4th at 943.

28      Montiel's allegation that the failure to designate which factors are mitigating and which

1   are aggravating was exacerbated by instructional error regarding the definitions of mitigation and

2   aggravation is undermined by United States Supreme Court precedent.   A trial court is not

3   required to define the section 190.3 factors as either aggravating or mitigating, or to instruct the

4   jury how to weigh any particular fact in the capital sentencing decision.   Tuilaepa, 512 U.S. at

5   978-79.   Instead, sentencing factors must have a common-sense core of meaning understandable

6   by the jury, allowing an individualized determination of the appropriate penalty.   Id. at 972–73,

7   975.   Further, capital sentence selection permits the jury broad discretion.   Id. at 979.

8   California's factors are constitutionally sound.   Ibid.; see also, Harris, supra, 465 U.S. at 51-53;

9   accord, Boyde v. California, 494 U.S. 370, 386 (1990).

10      Montiel's allegations regarding the failure to require beyond a reasonable doubt findings

11  or written findings do not entitle him to relief.   The California Supreme Court, in People v. Cox,

12  53 Cal. 3d 618, 692 (1991), held that unanimity, written findings, and proof beyond a reasonable

13  doubt were not required under the constitution to confirm aggravating factors exist, that

14  aggravating factors outweigh mitigating factors, or that death is appropriate.   Accord, Bonin v.

15  Vasquez, 807 F. Supp. 589, 622-23 (C.D .Cal. 1992).   The failure of California's statute to

16  require written findings or specify a burden of proof, i.e., that aggravating factors must outweigh

17  mitigating factors beyond a reasonable doubt, does not violate the constitution.   Harris v. Pulley,

18  692 F.2d 1189, 1194-95 (9th Cir. 1987) (overruled on other grounds by Pulley v. Harris, 465 US.

19  37 (1984); Bonin, 807 F. Supp. at 622-24.   Constitutional requirements do not compel unanimity

20  of aggravating factors, but are satisfied when each juror agrees that total aggravation outweighs

21  total mitigation.   Accord, Bonin, 807 F. Supp. at 623.

22      In Williams, supra, the Ninth Circuit held that the 1977 California death penalty statute,

23  the predecessor to the 1978 statute under which Montiel was convicted, offered

24  "constitutionally-sufficient guidance to jurors to prevent arbitrary and capricious application of

25  the death penalty."   52 F.3d at 1484 (citing Harris, supra, 464 U.S. at 51–54).   Relevant to

26  Montiel's claims, the court further held that the statute did not suffer from the failure to require

27  written findings. Id. at 1484–85.

28      The grounds alleged do not violate the Constitution.  Montiel's 1986 penalty retrial jury

was properly instructed to consider only those factors it deemed "applicable;" that sentencing involved subjective weighing, not mechanical counting, of factors; that the jury was free to assign the appropriate value to the factors; that its task was to determine which penalty was justified and appropriate by considering all aggravation and mitigation evidence; and that the death penalty could be imposed only if each juror was persuaded the aggravating evidence is so substantial in comparison with the mitigating evidence that death was warranted.  See Montiel II, 5 Cal. 4th at 937.

Montiel's allegation that California's statute has no requirement for a procedure enabling meaningful review is not well taken.  In California, appellate review of capital cases is provided by Penal Code section 1239(b).  After a judgment of death is rendered, an appeal is automatic without any action by the defendant or his counsel.  The mandate of this provision, which safeguards the rights of those on whom a death sentence is imposed, is so compelling that even where defendant's counsel does not make an appearance and no brief or argument is presented, a duty is imposed upon the high court to examine the complete record of the trial and ascertain whether the defendant was given a fair trial.  People v. Perry, 14 Cal. 2d 387, 392 (1939), quoted in People v. Stanworth, 71 Cal. 2d 820, 833 (1969).

A claim challenging the adequacy of state appellate review is not cognizable on federal habeas.  The "right of appellate review is statutory, did not exist at common law, and is not required by the United States Constitution."  Agana Bay Development Company Ltd. v. Supreme Court of Guam, 529 F.2d 952, 956 (9th Cir. 1976), overruled on other grounds by Guam v. Olsen, 540 F.2d 1011 (9th Cir. 1976).  However, once a state has established the right to appeal, that state's procedures must comport with the demands of Due Process and Equal Protection.  Evitts v. Lucey, 469 U.S. 387, 393-94 (1985).  Montiel does not show he was denied Due Process or Equal Protection.  Further, the Constitution does not require proportionality review.  Harris, supra, 465 U.S. at 43-44.

The California Supreme Court has rejected similar claims asserting that various errors of California's death penalty statute render it unconstitutional.  The United States Supreme Court also has rejected various claims attacking the constitutionality of California's death penalty

1   statute.   Montiel has not shown that those conclusions are contrary to federal law, an

2   unreasonable application of Supreme Court law, or an unreasonable determination of the facts.

3   Claim 35b is denied on the merits.

4          c.      *Unconstitutional As Applied*

5          Montiel contends various aspects of California's death penalty statute and related jury

6   instructions, as applied to his case, violated his constitutional rights.   Montiel objects to the

7   application of his age as a factor in aggravation, the introduction of unadjudicated crimes,

8   instructions regarding "criminal activity" which allowed double counting of the crimes

9   underlying the murder, the failure of instructions to correct the commonplace misunderstanding

10  regarding the release of life-sentenced prisoners, the failure to instruct that the jury could

11  affirmatively exercise mercy, triple counting of the same facts at guilt, eligibility, and sentence,

12  the deprivation of the benefits of the California Determinate Sentencing Act, and the failure to

13  instruct that the lack of mitigation does not constitute aggravation.

14         The California Supreme Court considered these arguments on Montiel's direct appeal and

15  denied them on the merits.  Montiel II, 5 Cal.4th at 932, n.29, 938-40, 943.

16         Montiel also objects to the prosecutor's unfettered discretion and lack of mandated

17  selection procedures regarding prosecution, his death sentence not being proportionate to his

18  culpability or as compared to similarly situated defendants, and the prosecutor's use of

19  peremptory challenges against all "pro-life" jurors.

20         These arguments were not addressed by the California Supreme Court in Montiel's direct

21  appeal, however the state court has rejected the same claims in other cases.  See People v.

22  Keenan, 46 Cal.3d 478, 505 (1988); Caro, supra, 46 Cal. 3d at 1068; People v. Champion, 9 Cal.

23  4th 879, 907 (1995), overruled on other grounds by People v. Combs, 34 Cal. 4th 821, 860

24  (2004).  The same claims also have been rejected by the United States Supreme Court.  See Jurek

25  v. Texas, 428 U.S. 262, 274 (1976), Proffitt v. Florida, 428 U.S. 242, 254 (1976), and Gregg,

26  supra, 428 U.S. at 199-200; Harris, supra, 465 U.S. at 43-44; Gray v. Mississippi, 481 U.S. 648,

27  672 (1987) (concurrence of Powell, J.).

28         Standing alone or taken together, Montiel contends these errors require reversal of his

1    sentence.  Montiel argues the California death penalty statute is unconstitutional as applied in his

2    case, and created an unjustifiable risk that the sentencer acted in an arbitrary and capricious

3    manner.  The California Supreme Court invalidated the financial gain special circumstance in

4    Montiel's first direct appeal, but the prosecutor recharged the financial gain special circumstance

5    at the penalty retrial and at closing argument urged the jury to "count" the various special

6    circumstances and sentence selection factors which point to the death penalty.[64]  Montiel asserts

7    the California Supreme Court did not re-weigh or conduct harmless error analysis of the invalid

8    special circumstance on the second direct appeal, but erroneously presumed the jury understood

9    the financial gain special circumstance to refer only to the money which was taken.  Montiel

10    asserts this was insufficient review which imposed an arbitrary assumption and violated his

11    rights under the Eighth and Fourteenth Amendments.

12        Montiel contends the sentence selection factors were unconstitutional as applied due to

13    the consideration of the financial gain special circumstance which tainted other evidence under

14    section 190.3.  Montiel asserts the extent to which the invalid financial gain special circumstance

15    infected the sentencer cannot be known since there is no written explanation of the reasons for

16    the sentence.  Montiel argues his case sufficiently presents the arbitrariness of California's death

17    penalty scheme, as the jury was presented with evidence of the capital crime, previous

18    convictions, and previous criminal activity, despite the danger of giving duplicative weight to

19    this evidence under various sentencing factors: (a) the circumstances of the crime; (b) violent

20    criminal activity; and (c) prior felony conviction.  Montiel asserts the confusion created by these

21    over-lapping factors fail to provide sufficient reliability as required by the Constitution, which is

22    shown by the California Supreme Court's tolerance of possible juror error.  See Montiel II, 5

23    Cal. 4th at 939.

24        The California Supreme Court found that section 190.3 factors (a), (b), and (c) allow for

25    consideration of all convicted offenses and other acts of criminal violence, but held that nothing

26    in the statute or the instructions implies these matters may be considered more than once.  Also,

27

---

28    [64] Neither claim of misconduct, in charging the financial gain special circumstance on penalty retrial or in urging the jury to count the special circumstances, are presented as separate claims in Montiel's petition.

1   the state court found the prosecutor's argument did not urge the jury to consider the same

2   aggravating aspects of Montiel's criminal behavior or history more than once.  Montiel II, at 939.

3          The federal constitution requires that sentencing factors have a common-sense core of

4   meaning understandable by the jury, which permits the jury broad discretion and allows an

5   individualized determination of the appropriate penalty.  Tuilaepa, 512 U.S. at 972–73, 975, 979.

6   Nothing in Montiel's claims against the California death penalty statute as applied to his case

7   show a violation of this requirement.

8          The California Supreme Court and the United States Supreme Court both have rejected

9   similar claims asserting that various errors of California's death penalty statute render it

10  unconstitutional.  Montiel has not shown that those conclusions are contrary to federal law, an

11  unreasonable application of Supreme Court law, or an unreasonable determination of the facts.

12  Claim 35c is denied on the merits.

13         4.   Cumulative Error

14         Montiel contends that habeas relief is warranted to due cumulative errors which formed a

15  pervasive pattern of unfairness and thereby resulted in a fundamentally unfair trial.  Claims 17(a)

16  and 34 are premised upon the issue of cumulative error.

17         The California considered these claims on direct appeal and rejected them.  Montiel II, 5

18  Cal. 4th at 943-44.

19         a.   *Claim 17(a)*

20         In Claim 17(a), Montiel contends the extensive violations of his constitutional rights

21  during his guilt trial form a pervasive pattern of unfairness, resulting in a fundamentally unfair

22  trial.

23         Montiel asserts the errors combine to exacerbate the prejudice of each individual error,

24  and are evidence of the actual conflict of interest by trial counsel.  See Mak v. Blodgett, 970 F.2d

25  614, 622 (9th Cir. 1992) and Cain v. Cupp, 442 F.2d 356, 357 (9th Cir. 1971).  Montiel argues

26  the implicit finding by the California Supreme Court that Lorenz provided effective assistance at

27  trial was an unreasonable application of Strickland.

28         Montiel argues the analysis by the California Supreme Court failed to comport with

138

substantially identical facts and errors in cases where the Ninth Circuit granted relief.  See Killian v. Poole, 282 F.3d 1204, 1211 (9th Cir. 2002) (habeas relief granted based on perjury by the prosecution's main witness, the prosecution's failure to disclose impeachment evidence, and the prosecution's comment on privileged activities) and Alcala v. Woodford, 334 F.3d 862, 894 (9th Cir. 2003) (habeas relief granted based on failure of defense counsel to challenge prosecution expert and witness testimony, improper admission of evidence, and failure of defense counsel to conduct on-site investigation).  Montiel asserts the errors he now presents go to the heart of the prosecution's theory of the case against him, and undermine every important element of proof offered by the prosecution.  Montiel contends his counsel was wholly ineffective in presenting evidence regarding his ability to form intent and in challenging the perjury by Dr. Siegel, that the prosecution actively suppressed evidence and used an otherwise inadmissible confession against him to establish his guilt.  Montiel argues these errors are not minor and undermine the verdict against him.

The Warden contends none of the individual claims alleged by Montiel demonstrate error and/or resultant prejudice, so there is nothing to accumulate, and no reason to reverse his conviction.  The Warden argues that even if any errors are found to have occurred during the guilt trial, they did not render Montiel's trial fundamentally unfair, either individually or cumulatively.

Where no claim states a violation of constitutional law, there is no reason to grant habeas relief based on cumulative error.  Rupe v. Wood, 93 F.3d 1434, 1445 (9th Cir. 1996); Hoxsie v. Kerby, 108 F.3d 1239, 1245 (10th Cir. 1997) ("Cumulative-error analysis applies where there are two or more actual errors").  None of the claims Montiel has advanced challenging the guilt phase of his trial present a basis for habeas relief.  Claim 17(a) is denied evidentiary hearing and is denied on the merits.

b.   *Claim 34*

Claim 34 also contends that there were so many cumulative errors of constitutional dimension at his trials that they formed a pervasive pattern of unfairness, exacerbating the individual prejudice of each act or omission.

1    Montiel proposes to present the following evidence in support of this claim at an

2    evidentiary hearing which was not presented to the state court: testimony from a Strickland

3    expert that the entire record shows the representation by Lorenz, Birchfield and Fuller fell far

4    below the standard of practice and had a cumulative effect resulting in ineffectiveness and the

5    overall collapse of Montiel's defense; and testimony from a jury dynamics expert that the entire

6    record shows the cumulative impact of counsels' ineffectiveness would have grossly influenced

7    the jury's decision to render a death sentence.

8        The Warden contends that none of the individual claims alleged by Montiel demonstrate

9    error or resultant prejudice, so there is nothing to accumulate and no reason to reverse his

10   sentence.   The Warden asserts Montiel has not demonstrated that he received ineffective

11   assistance of counsel, or that the prosecution engaged in misconduct.  The Warden argues that,

12   even if errors are found to have occurred, they did not individually or cumulatively render

13   Montiel's trial fundamentally unfair, and as such the California Supreme Court's rejection of this

14   claim was not contrary to or an unreasonable application of federal law.

15       Montiel replies that the state court found instances of prejudice in his case, see Montiel

16   II, 5 Cal. 4th at 914, and asserts that each of his claims makes a sufficient showing that his

17   constitutional rights were violated.   Montiel contends that should some of his claims fail to

18   warrant the issuance of habeas corpus, the cumulative effect of these claims should be

19   considered.  The ineffective assistance of counsel claims may be aggregated for consideration

20   under the "cumulative prejudice" doctrine, Harris v. Wood, 64 F.3d 1432 (9th Cir. 1995), and

21   claims regarding the constitutionality of the death penalty, introduction of inadmissible evidence,

22   prosecutorial misconduct, and other structural errors may be evaluated under a Fourteenth

23   Amendment Due Process "cumulative error" analysis.   Kelly v. Stone, 514 F.2d 18 (9th Cir.

24   1975).

25       Montiel asserts each phase of his case was marked by judicial error, including the in-

26   chambers conference between Ms. Fuller and the trial judge, the use of the improper standard to

27   evaluate the Wheeler challenge, and providing the financial gain special circumstance to the jury.

28   Montiel contends that in addition to prejudice from the judicial errors, he was prejudiced by

1    repeated instances of prosecutorial misconduct and the collapse of a meaningful defense by

2    ineffective assistance of counsel, including the failure to properly prepare evidence to support

3    available mitigation and the failure to object to inadmissible evidence.

4          Where no claim states a violation of constitutional law, there is no reason to grant habeas

5    relief based on cumulative error.  Rupe, supra, 93 F.3d at 1445; Hoxsie, supra, 108 F.3d at 1245.

6    None of the claims Montiel has advanced challenging either the guilt phase trial or the penalty

7    re-trial present a basis for habeas relief.  Claim 34 is denied evidentiary hearing and is denied on

8    the merits.

9                                                **V.**

10                        **CERTIFICATE OF APPEALABILITY**

11         Rule 11(a) of the Rules Governing § 2254 Cases charge district courts with issuing or

12   denying a certificate of appealability ("COA") when entering a final order adverse to a petitioner

13   for a writ of habeas corpus.  The standard for granting a COA under 28 U.S.C. § 2253(c)(2) is a

14   "substantial showing of the denial of a constitutional right."  This, in turn, requires a "showing

15   that reasonable jurists could debate whether . . . the petition should have been resolved in a

16   different manner or that the issues presented were 'adequate to deserve encouragement to

17   proceed further.'"  Slack v. McDaniel, 529 U.S. 473, 484 (2000); Sassounian v. Roe, 230 F.3d

18   1097, 1101 (9th Cir. 2000).  Meeting this standard is not onerous.  Rather, the standard "is

19   relatively low."  Jennings v. Woodford, 290 F.3d 1006, 1010 (9th Cir. 2002); Beardslee v.

20   Brown, 393 F.3d 899, 901-02 (9th Cir. 2004).  For the Court to issue a COA, Montiel "need not

21   show that he should prevail on the merits," Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983), but

22   must meet the threshold requirement of showing that reasonable jurists could debate whether the

23   claims should have been resolved differently or that the issues presented deserve encouragement

24   to proceed further.  See Miller-El, 537 U.S. at 336.

25         Accordingly, the Court has sua sponte evaluated the Claims within the amended petition

26   for suitability for the issuance of a COA.  See 28 U.S.C. § 2253(c); Turner v. Calderon, 281 F.3d

27   851, 864–65 (9th Cir. 2002).

28         Montiel must only "sho[w] that reasonable jurists could debate" the district court's

resolution or that the issues are "adequate to deserve encouragement to proceed further."  <u>Miller–El</u>, 537 U.S. at 327.  While the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part."  <u>Miller–El</u>, 537 U.S. at 338.

Having reviewed its determinations and rulings in adjudicating Montiel's amended petition, the Court finds that the <u>Miller-El</u> standard is met with respect the Court's resolutions of Claims 24 and 25.  The Court therefore will grant a Certificate of Appealability as to those issues.  The Court declines to issue a Certificate of Appealability for its resolution of any procedural issues or any of Sanchez's other habeas claims.

## VI.

### CONCLUSION AND ORDER

Based upon the foregoing, it is HEREBY ORDERED that Claim 26, subclaims (r) and (u) and Claim 35 as stated above are DENIED on the merits.  Montiel's request for an evidentiary hearing is DENIED.  Claims 8, 9, 10, 11, 12, 13, 14, 15, 16, 17a, 17b, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, and 34 as stated above are DENIED an evidentiary hearing and are DENIED on the merits.  A Certificate of Appealability is ISSUED as to the Court's resolution of Claims 24 and 25 and DECLINED as to Montiel's other Claims. The Clerk of the Court is directed to TERMINATE the Warden's  motion for summary judgment, VACATE scheduled dates and ENTER JUDGMENT forthwith.

IT IS SO ORDERED.

Dated:  __November 25, 2014__        ___/s/ Lawrence J. O'Neill___
                                        UNITED STATES DISTRICT JUDGE